Joseph E. Buck, Jr. v. Mercury Marine

16CV1013

Transcript of the Testimony of:

# Joseph E. Buck

July 18, 2017



800.899.7222 • www.GramannReporting.com

MILWAUKEE   **414.272.7878** • FAX: **414.272.1806** • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203
MADISON   **608.268.0435** • FAX: **608.268.0437** • 14 West Mifflin Street, Suite 311, Madison, WI 53703

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WISCONSIN
2                     MILWAUKEE DIVISION

3    _____

     JOSEPH E. BUCK, JR.,

                     Plaintiff,
5
             -vs-                    Case No. 16-CV-1013
6
     MERCURY MARINE, a division of
7    BRUNSWICK CORPORATION,

8                     Defendant.

9    _____

                DEPOSITION OF JOSEPH E. BUCK
10                    July 18, 2017
                   8:58 a.m. to 2:42 p.m.
11                 1001 West Glen Oaks Lane
                      Mequon, Wisconsin
12

13

                        APPEARANCES:
14
        HEINS EMPLOYMENT LAW PRACTICE, LLC, by ALAN FREED,
15   JR., Attorney at Law, 1001 West Glen Oaks Lane,
     Suite 103, Mequon, Wisconsin 53092, appearing on
16   behalf of the plaintiff.

17      CONSTANGY, BROOKS, SMITH & PROPHETE, LLP, by DAVID
     C. VOGEL, Attorney at Law, 2600 Grand Boulevard,
18   Suite 750, Kansas City, Missouri 64108, appearing
     on behalf of the defendant.

19

20

21

22

23

24

25
```

```
 1                    INDEX TO EXAMINATIONS

 2
       Witness:                                        Page:
 3
         Joseph E. Buck
 4            Examination by Mr. Vogel..................... 4
              Examination by Mr. Freed..................... 173
 5            Examination by Mr. Vogel..................... 175

 6

 7
                      INDEX TO EXHIBITS
 8
       Exhibit                                         Page
 9       No.               Description                 ID'd

10     Exh. 1   Complaint                                17

11     Exh. 2   Résumé                                   24

12     Exh. 3   Agreement by and between Mercury and     36
                Lodge #1947, August 30, 2009 to August
13              27, 2016

14     Exh. 4   Policy Statement, D000080 and D000081    40

15     Exh. 5   Signature sheet, D000119                 43

16     Exh. 6   6/19/13 letter to Buck from Schwartz,    44
                D000049
17
       Exh. 7   12/4/13 letter to Buck from Schwartz,    45
18              D000013

19     Exh. 8   Attendance record, D000131               51

20     Exh. 9   Attendance record, D000012               53

21     Exh. 10  5/30/14 letter to Buck from Schwartz,    53
                D000069
22
       Exh. 11  5/29/14 letter to To Whom It May Concern 96
23              from Baseley, D000002

24     Exh. 12  7/15/14 letter regarding Joseph Buck from 124
                Jessica Sabel, D000001
25
```

```
 1    Ex. #              Description                  Page

 2    Exh. 13   E-mail chain, D000067 and D000068      129

 3    Exh. 14   8/25/14 letter to Buck from Dvorjac,    141
                D000070
 4
      Exh. 15   Plaintiff's Rule 26(a)(1)(A) Initial   154
 5              Disclosures

 6    Exh. 16   Plaintiff's Expert Disclosures         159

 7    Exh. 17   Plaintiff's Answers to Defendant's First  163
                Set of Interrogatories
 8

 9              (Original exhibits attached to the
                original transcript, copies to copies of
10              transcripts.)

11

12

13                    REQUESTED INFORMATION

14    Description:                                Page:

15
                      (None requested)
16

17

18

19

20

21

22

23

24

25
```

*Gramann Reporting, Ltd.*          *(800) 899-7222*

Page 4

1  (July 18, 2017, 8:58 a.m.)
2        JOSEPH E. BUCK,
3  being first duly sworn on oath to tell the truth, the
4  whole truth, and nothing but the truth, testifies as
5  follows:
6  EXAMINATION BY MR. VOGEL:
7  Q   Could you state your full name, please.
8  A   Joseph Edward Buck, Jr.
9  Q   And you go by Joe generally--
10 A   Joe, right.
11 Q   --is that correct?
12      Do you understand that oath you were just
13 administered?
14 A   Yes.
15 Q   You understand that's an oath to tell the truth just as
16 if we were sitting in a courtroom rather than a
17 conference room, right?
18 A   Yes.
19 Q   We shook hands before the deposition.  My name is David
20 Vogel.  I'm a lawyer with the law firm called
21 Constangy, Brooks, Smith & Prophete.  I'm actually
22 based out of the company's Kansas, Missouri, office,
23 and our office represents Brunswick corporation in the
24 lawsuit that you filed against the company.  Do you
25 understand that?

Page 5

1  A   Yes.
2  Q   And do you understand that you're giving sworn
3  testimony in connection with that lawsuit?
4  A   Yes.
5  Q   And do you understand that John, our court reporter, is
6  taking down every word that is said when we're on the
7  record, and he will most likely make a transcript, a
8  written copy, of our testimony today for future use in
9  the case?
10 A   Yes.
11 Q   So I want you to understand--I'm not saying this would
12 happen--that if you were to say something different
13 down the road as the case proceeds than you said today,
14 then we could bring out the transcript to point out a
15 discrepancy or contradiction if there was one.  Make
16 sense?
17 A   Yes.
18 Q   And along those lines, I want to make sure you
19 understand my questions.  I ask bad ones; I ask
20 confusing ones, especially as we get further into the
21 day.  So if you don't understand my question, will you
22 please tell me?
23 A   Okay.
24 Q   And if you do answer my question, is it a fair
25 presumption that you understood it?

Page 6

1  A   Yes.
2  Q   It is important that you and I speak one at a time.  I
3  see a couple times already you're sort of beginning
4  your answer before I finish my question, which is the
5  normal way people talk, but we have to talk a little
6  abnormally today just because it will make John crazy
7  and it will make the record crazy if we're talking over
8  each other, even if we're not arguing or anything like
9  that.  So I'm going to ask that you let me complete my
10 question before you begin your answer even if you see
11 what's coming.  Does that make sense?
12 A   Yes.
13 Q   And if you don't, I might say please let me finish my
14 question.  And if I say that, sometimes that can come
15 out kind of tough guy abrasive, but that's not what
16 it's meant to be.  Do you understand?
17 A   Yeah.
18 Q   I also want you to continue as you're doing, Mr. Buck,
19 to answer with words, an affirmative answer with a yes,
20 a negative answer with a no, as opposed to saying
21 uh-huh or unh-unh, which people do, or nod their heads.
22 If you do that, which people do on occasion, including
23 me, I might say, is that a yes or is that a no?  Again,
24 that can sometimes come out sort of abrasive, those
25 words, but I'm not doing it to be a tough guy.  I'm

Page 7

1  doing it so we have a clean record.  Make sense?
2  A   Yeah.
3  Q   I tend to take a break at least every 90 minutes or so
4  just because I think people need a break after that
5  long.  But if you get to a spot where it's less than
6  that and you'd like to take a break, just let me know
7  that, and I promise you we'll get to a break real
8  quickly.  Is that fair?
9  A   Okay.  That's fine.
10 Q   Sir, is there any reason that you're aware of that you
11 could not give full, complete, and truthful answers to
12 my questions today?
13 A   Not offhand.
14 Q   If that changes, if you hit a point during the day
15 where you don't think you can give full, complete, and
16 truthful answers, will you let me or your attorney
17 know?
18 A   Okay.
19 Q   I promise you I'll get to questions as opposed to
20 statements.
21      You're represented here today by counsel.  We're
22 at Janet Heins's office.  She's present today in the
23 office, but you're joined at the table here in the
24 conference area by Alan Freed.  I just want to tell you
25 that I'm not entitled to know

**Page 8**

1  about any communications that you might have had with
2  Mr. Freed or Ms. Heins in the course of their
3  representation of you. Do you understand that?
4  A  Yes.
5  Q  So I if ask you did you tell anybody or did you talk to
6  anybody about something, if you talked to your lawyers,
7  you don't even need to tell me you talked to your
8  lawyers about it. Does that make sense?
9  A  Yes.
10  Q  Sir, I have your month and year of birth as
11  September 1958; is that correct?
12  A  No.
13  Q  Okay. What is your month and year of birth?
14  A  September 20th, 1958.
15  Q  Okay. Yeah, I usually don't put the exact date of
16  birth in there.
17  A  Okay.
18  Q  I usually just put the month and year. That's okay.
19  If I did the calculation right, are you 58 years old?
20  A  Yes.
21  Q  Most of my questions are going to be about the time you
22  worked at Brunswick, although I'm going to ask some
23  pre- and post-Brunswick questions. But during the time
24  you worked at Brunswick, which was from 2012 to 2014,
25  correct?

**Page 9**

1  A  Yes.
2  Q  Did you reside in Fond du Lac?
3  A  Yes.
4  Q  And did you reside at the Winnebago Drive address?
5  A  Yes.
6  Q  Is that where you still live today?
7  A  No.
8  Q  During the time you worked at Brunswick, did anyone
9  live with you in your home?
10  A  No.
11  Q  Were you married during any of that time?
12  A  No.
13  Q  Have you ever been married?
14  A  Yes.
15  Q  How many times?
16  A  Once.
17  Q  From approximately when to approximately when?
18  A  1983 to 1979.
19  Q  Did that marriage end--
20  A  Or 1997. I'm sorry.
21  Q  That's okay. Did that marriage end in divorce?
22  A  Yes.
23  Q  Did you give any sort of testimony in the divorce
24  proceedings, a deposition like this?
25  A  No.

**Page 10**

1  Q  Have you ever given a deposition before?
2  A  No.
3  Q  Ever testified in court?
4  A  No.
5  Q  You won't be able to say that after today, right?
6  A  Right.
7  Q  I understand from looking at some discovery responses
8  that you currently have--I'll use the term a
9  significant other. Is that accurate?
10  A  I have a fiancée.
11  Q  Very good. But you were not engaged during the time
12  you worked at Brunswick?
13  A  No.
14  Q  Has she ever worked for Brunswick?
15  A  No.
16  Q  I don't want to know their names at this point, but do
17  you have any children?
18  A  Yes.
19  Q  How many?
20  A  Three.
21  Q  Are they grown-ups?
22  A  Yeah.
23  Q  Okay. What are their ages?
24  A  Thirty-three, 32, and 29.
25  Q  Have any of them ever worked for Brunswick?

**Page 11**

1  A  No. Well, rephrase that.
2  Q  Sure.
3  A  My son Preston did.
4  Q  And is he the oldest, middle, or youngest?
5  A  Middle.
6  Q  Did he work for Brunswick in Fond du Lac?
7  A  Yes.
8  Q  Do you know from when to when or if he's still there?
9  A  It wasn't very long.
10  Q  Okay. Did he work in the same facility where you were?
11  A  No, he was in plant four.
12  Q  But he worked for the boat manufacturing facility in
13  Fond du Lac?
14  A  Right.
15  Q  And do you know if he voluntarily quit or if he was
16  terminated?
17  A  He was terminated.
18  Q  Do you know why?
19  A  That I couldn't--
20  Q  Your three children live in Wisconsin?
21  A  Yeah.
22  Q  All three? And do they all three have the last name
23  Buck?
24  A  Yes.
25  Q  What's your fiancée's name?

Case 2:16-cv-01013-PP    Filed 08/21/17    Page 6 of 48    Document 18-1

## Page 12

1  A  It's 137 Chapleau, C-H-A-P-L-E-A-U, Street.  That's
2      north Fond du Lac.
3  Q  How long have you lived there?
4  A  Since October 15th.
5  Q  Of 2016?
6  A  Yeah.
7  Q  Prior to that you lived at the Winnebago Drive address?
8  A  Yes.
9  Q  And does your fiancée live with you?
10 A  Yes.
11 Q  What's her name?
12 A  Angela Tew, T-E-W.
13 Q  Anybody else live there with you?
14 A  No.  Just her dog.
15 Q  We'll touch on that later in the day.  It's a sensitive
16     issue.  Dogs can be part of our family as well, right?
17 A  Oh, yeah.
18 Q  I've had a couple of those as well.
19      Are you a high school graduate, sir?
20 A  Yes.
21 Q  And where did you graduate from high school?
22 A  Superior Senior High in Superior, Wisconsin.
23 Q  What year was that?
24 A  1977.
25 Q  Are you a Wisconsin native?

## Page 13

1  A  Yeah.
2  Q  Any additional education after high school?
3  A  I have one year of vocational for welding and blueprint
4      reading, 1980 to '81.
5  Q  Where did you get that?
6  A  Superior, WITC.  And I have a year diploma in small
7      engine and chassis mechanic from 1988 to '89.  That was
8      in New Richmond, Wisconsin.
9  Q  Some sort of technical school there?
10 A  Yeah.  Yes.
11 Q  Anything else?
12 A  I have-- I'm certified with Johnson Evinrude factory
13     in 1990.
14 Q  Certified for what?
15 A  Marine mechanic.  And I was--went to Mercury school in
16     Fond du Lac in 1989, 1990, and '91.
17 Q  What was the course of study there?
18 A  Marine mechanic.  That was for Mercury Mariner
19     outboards.  And then in 2004 I was went to MerCruiser
20     school in Detroit Lakes, Minnesota.
21      And I have numerous certificates for small engine,
22     Honda, Yamaha, Tecumseh, Toro, Briggs & Stratton,
23     Kohler.  So I have a lot of knowledge of mechanical,
24     small engines, outboards.
25 Q  If an engine broke down, you'd be able to fix it?

## Page 14

1  A  Yes.
2  Q  Okay.  Ever had any legal training or education?
3  A  No.
4  Q  Ever had medical training or education?
5  A  Just in the service.
6  Q  That's was my next question.  You did serve?
7  A  Yes.
8  Q  Thanks for that.
9  A  1977 to 1980.
10 Q  What branch?
11 A  Army.
12 Q  Highest rank?
13 A  E-5.
14 Q  Honorable discharge?
15 A  Other than honorable.
16 Q  Okay.  What happened?
17 A  It was a lot of mix-ups in my-- What do you call it?
18     My discharge papers from one station to the next.  I
19     never got my hours to where I was supposed to go, so I
20     was considered AWOL.
21 Q  And your position is you just never got the word on
22     where to go?
23 A  No.  It was like two months.  I waited for it, I waited
24     for it, and by the time it showed up, it was--I was
25     already AWOL so--

## Page 15

1  Q  That's about 37 years ago too, right?
2  A  Yeah.
3  Q  Have you ever sued anyone before?
4  A  No.
5  Q  Have you ever been sued?
6  A  No.
7  Q  Ever file for bankruptcy?
8  A  Yes.
9  Q  When did you file for bankruptcy?
10 A  2001.
11 Q  Well before you went to work for Brunswick?
12 A  Right.
13 Q  And had that--  I guess it had, but sometimes these
14     things go on for a long time.  That bankruptcy had been
15     discharged and--
16 A  Yes.
17 Q  --wrapped up before you went to work for Brunswick?
18 A  Oh, yeah.
19 Q  Okay.  Without talking about any communications with
20     your lawyer, did you look at any documents to prepare
21     for your deposition today?
22 A  I kind of went through some that they sent through me
23     in Gmail, but basically it was just something to be
24     prepared.

Case 2:16-cv-01023-PP Filed 08/21/17 Page 7 of 48 Document 18-1

## Page 16

1  A   Just what to expect for the hearing.

2  Q   Got you. Okay. Did you talk to any current or former

3      employees of Brunswick in preparation for this?

4  A   No.

5  Q   Do you still keep in touch with anyone from Brunswick?

6  A   I used to talk to a guy in third shift, and as far as I

7      know, he still works there.

8  Q   What's his name?

9  A   Dale. I don't know his last name. I haven't talked to

10     him since September of last year.

11 Q   You talk to him about your case at all?

12 A   No.

13 Q   Have you provided your lawyers all the documents in

14     your possession that you think are relevant to your

15     case?

16 A   Yes.

17 Q   Did you ever tape record anyone at Brunswick?

18 A   No.

19 Q   Ever videotape anyone at Brunswick?

20 A   No.

21 Q   When I say have you turned over all documents regarding

22     your claims you think are relevant, that includes any

23     e-mails or any documents that would be on a computer,

24     right?

25 A   Right.

## Page 17

1  Q   Mr. Buck, throughout the day I'm going to be handing

2      you documents and asking you some questions about them.

3  A   Okay.

4  Q   I have a copy for your attorney of each document I use

5      as well. Make sure the ones with the sticker, you

6      don't take any of them out of here with you.

7  A   Oh, okay.

8  Q   They go with the court reporter. We might remind you

9      of that.

10     What I'm handing you here as Exhibit 1 I'll

11     represent to you, and I don't think your attorney would

12     disagree with me, this is a copy of the complaint,

13     which is the first document in the lawsuit that you

14     filed against Brunswick. Do you agree that's what that

15     appears to be?

16 A   Yes.

17 Q   Okay. And if you look through this--and the whole

18     document will be in the record, and it's in part of the

19     court file already and it will be the best evidence of

20     its contents. But as I understand it from sort of a

21     big picture view, you're suing Brunswick because you

22     believe they discriminated against you because of a

23     disability that you have; is that correct?

24 A   Yes.

25 Q   And according to the complaint, and I'll probably think

## Page 18

1      it's paragraph eight on page 2, it says your disability

2      is back problems and related insomnia. Do you agree

3      with that?

4  A   Yes.

5  Q   How long have you had issues regarding your back?

6  A   July of 2014.

7  Q   And can you tell me what it is about your back that

8      constitutes a disability?

9  A   It was in July of 2014, '15, '16, and '17. I worked

10     third shift. I started having some back pains like

11     five o'clock in the morning. My shift goes from 11:00

12     to 7:00.

13 Q   Let me pause you there just so we can make a

14     clarification.

15 A   Okay.

16 Q   You worked a shift that started at eleven o'clock at

17     night and ended at seven o'clock the next morning,

18     right?

19 A   Yes.

20 Q   And we might as well say that up-front because we'll

21     probably have to highlight this for people reading it

22     later. So that would mean, just taking today for an

23     example, we agreed today is July the 18th, 2017, right?

24 A   Yes.

25 Q   So if you were scheduled to work that shift today, you

## Page 19

1      would begin at 11:00 p.m. on July 18th but finish at

2      7:00 a.m. on July 19th, right?

3  A   Yes.

4  Q   So it's stating the obvious, but that can get a little

5      confusing, right? The--

6  A   Right.

7  Q   --shift always covered two calendar days, correct?

8  A   Right.

9  Q   Okay. Thank you. So keep going on your back issue.

10 A   So anyway, I text Troy Schwartz.

11 Q   And he was your supervisor at the time?

12 A   Right. I told him, "Troy," I says, "my back is really

13     sore. I'm just going to let you know that I have to

14     slow down."

15     And he text me back. Actually, he didn't text me

16     back. He showed up at my work station, and he's like,

17     "Do you want to go to occupational health?" He said,

18     Well, you have to go across the street into plant 17."

19     Because they didn't have a nurse there on duty.

20     I says, "No I'm just going to let you know I'll

21     finish out my shift because there's only an hour and a

22     half left. Seven o'clock I'm done, I'll go home, take

23     some Tylenol, and just lay down."

24     And he says, "Okay. Are you sure?"

25 Q   And he--

Page 20

1    So when I went home, I woke up at ten o'clock with
2    real bad back spasms, and I couldn't get off the couch.
3    So I called my girlfriend, which is my fiancée now, at
4    that time. "Hey, can you come and get me? I need to
5    go to the doctor because something's wrong." I
6    couldn't drive by myself.
7        And that's when I went and seen the doctor. And
8    it was like 1:30 in the afternoon, and she said, "I'm
9    going to put you on three-day bed rest."
10  Q  Was this the first time you had back problems?
11  A  Right--
12  Q  Okay.
13  A  --very first time.
14  Q  We'll get more into that situation. That back issue
15     that arose in July of 2014, at least some aspects of
16     that are the subject of a separate workers'
17     compensation claim you've made against the company,
18     correct?
19  A  Right.
20  Q  And you have separate counsel for that, correct?
21  A  Right.
22  Q  And, in fact, I don't know--do you know--I don't
23     represent Brunswick in that case. They have another
24     lawyer, right?
25  A  Right.

Page 21

1   Q  Okay. And we might touch on some of that, but I think
2      we both are clear and agree those are two separate
3      things, right?
4   A  Right.
5   Q  Understood. Okay. And tell me about what's the
6      related insomnia?
7   A  That's from working overtime. From February 15th of
8      2014 up to the day I started having the problems, I had
9      218 hours in overtime. I covered part of second shift,
10     part of my shift, and first shift. So I had actually
11     worked like four hours for second shift and then do my
12     shift at 11:00, work until 7:00, take over four hours
13     for first shift.
14  Q  So sometimes you'd come in early before your regular
15     shift was supposed to start?
16  A  Right.
17  Q  And that would be some overtime?
18  A  Right.
19  Q  And sometimes you'd stay after your regular shift ended
20     and carried over into what became the first shift, and
21     that would be overtime?
22  A  Right.
23  Q  And doing that over a period of time threw off your
24     sleeping patterns?
25  A  Well, if the... [Case 2:16-cv-01013-PP Filed 08/21/17 Page 9 of 48 Document 18-1]

Page 22

1   Q  Go ahead.
2   A  When I started, I started on second shift. I applied
3      for first shift.
4   Q  We might as well get it in here. What were the hours
5      of first shift?
6   A  First shift was 7:00 to 3:00.
7   Q  7:00 a.m. to 3:00 p.m.?
8   A  Right.
9   Q  Okay.
10  A  Second shift was 3:00 to--
11  Q  To 11:00.
12  A  Right.
13  Q  I can figure this stiff out sometimes. I'm with you.
14     Okay, understood.
15  A  Well, I applied for first shift. Instead I got second
16     shift. Then like a month and a half later they wanted
17     me to go to first shift, which is what I wanted. So it
18     was in November 11th of 2012 that I started on first
19     shift. Then in January I got bumped off of first
20     shift, and I was forced to take third shift and I
21     never--
22  Q  January of 2013?
23  A  Right. Sorry.
24  Q  That's okay. I just want to sure we get the years in
25     there because three years are involved, so I want to

Page 23

1      make sure we're on the same page when we're talking
2      about years.
3          Go ahead.
4   A  So I didn't want third. I never worked third shift my
5      whole entire life. It was always first shift. So they
6      put me on a shift that I was--I couldn't sleep during
7      the daytime. I'm not a daytime sleeper. So it took me
8      at lot of months to try to get used to that.
9   Q  Okay. But you stayed on third shift until the end of
10     your employment?
11  A  Right. I bid it off it, but every time I bid it for a
12     first shift job, I got beat out by somebody else.
13  Q  And when you say "beat out," you got beat out by
14     someone with more seniority?
15  A  Right.
16  Q  And the other thing you're claiming is Brunswick
17     interfered with your right to take leave under a law
18     called the Family and Medical Leave Act, right?
19  A  Right.
20  Q  All right. We might use the complaint as kind of a
21     guidepost. It's generally not evidence, but I might
22     use it just to help us through some of the allegations
23     today.
24  A  Okay.

Page 24

1   Sir, I'm handing you what's been marked as
2   Exhibit 2--
3 A   Okay.
4 Q   --and you'll also see as we hand you documents that
5   some of them have sort of document control numbers on
6   there. This one is actually out of order because I
7   think we inadvertently produced it out of order. But
8   this is D113 and D115. And can you tell me, sir, if
9   this is some sort of a document that you prepared or
10   were involved in preparing?
11 A   This is something that I've had since I started with
12   Brunswick.
13 Q   Right. This would be sort of equivalent to a résumé or
14   something--
15 A   Right.
16 Q   --setting out your education and experience, right?
17 A   Right. Right.
18 Q   Okay. And as you kind of look at this, to the best of
19   your knowledge, is all of this information regarding
20   education and work history accurate?
21 A   Yes.
22 Q   Okay. I don't want to go through each of these because
23   I know the list of jobs is in here, but you list four
24   prior jobs that you held between 2003 and 2012,
25   correct?

Page 25

1 A   Right.
2 Q   Of those four jobs, were any of those jobs from which
3   you were involuntarily terminated?
4 A   No.
5 Q   Okay. You resigned from all of those jobs?
6 A   Right.
7 Q   And you resigned of your own choice?
8 A   Yes.
9 Q   When you were working at any of those places, did you
10   take leave under the Family and Medical Leave Act?
11 A   No.
12 Q   Did you know what the Family and Medical Leave Act
13   was--
14 A   No.
15 Q   --when you worked there?
16   Did you ever know what it was when you were at
17   Brunswick?
18 A   No.
19 Q   Do you know what it is today?
20 A   Yes.
21 Q   How do you know what it is today?
22 A   One of the guys that I worked with on third shift was
23   on the FMLA, had eye surgery.
24 Q   And who was that person?
25 A   Dale.

Page 26

1 Q   Dale whose last name you don't know?
2 A   No.
3 Q   That's fine.
4 A   I never did.
5 Q   Absolutely. And did you know he took FMLA when he was
6   working there?
7 A   Yes.
8 Q   And when you were working there?
9 A   Yes, I was still there.
10 Q   And tell me what Mr.--I'm sorry, what Dale told you
11   about his FMLA leave. How did you become aware that he
12   was taking leave under the FMLA?
13 A   He had said for the three days that he was going to be
14   off he was getting paid through the FMLA act.
15 Q   Did you have any other discussion about that?
16 A   Well, this was kind of what he said. He came back and
17   worked the third day, so then Mercury denied it.
18 Q   Because he was out for less than three days?
19 A   Right.
20 Q   Do you recall approximately when that was in terms of
21   your employment?
22 A   May of 2014.
23 Q   So in approximately May of 2014 your co-worker Dale
24   explained to you that at least initially he had been
25   approved to take some time off under something called

Page 27

1   the FMLA?
2 A   Right.
3 Q   And he was taking that time off for medical reasons,
4   correct?
5 A   Right.
6 Q   And you understood that that was a way that he was
7   going to take that time off for medical reasons and it
8   would be excused?
9 A   Right.
10 Q   And he also--your understanding was he would get paid
11   for it?
12 A   Right.
13 Q   So in May of 2014 you had some knowledge that there was
14   possibly something called the FMLA under which
15   employees could get excused paid medical leave?
16 A   Right.
17 Q   Did you talk to anybody else at the facility about
18   that?
19 A   No.
20 Q   Now, the other thing I was going to ask you about
21   Exhibit 2 in terms of these prior jobs is whether you
22   ever requested any sort of accommodation for any
23   disability or any health impairment that you had.
24 A   Not that I recall.
25 Q   Okay. And of those prior jobs, you said that I

## Page 28

1 recall based on your prior testimony is because you
2 didn't have a back issue until July of 2014. Did I
3 understand that correctly?
4 A Yes.
5 Q Okay. So you wouldn't have asked for some sort of
6 accommodation or special treatment for a back issue
7 from a prior employer because you didn't have a back
8 issue then--
9 A No.
10 Q --right? Okay.
11 Did you ever bring any sort of charge of
12 discrimination against any prior employer?
13 A No.
14 Q Did you ever complain that you were being discriminated
15 against or retaliated against with any prior employer?
16 A No.
17 Q We haven't taken any other depositions in this case
18 today, so I'm going to give you just sort of the--with
19 your understanding to state for the record, what is
20 Brunswick or at least the facility you worked for?
21 A Oh, Mercury?
22 Q Sure.
23 A Okay. Brunswick makes bowling balls, bowling shoes,
24 and other sports equipment.
25 Q They make boats as well, correct?

## Page 29

1 A Right.
2 Q And boat engines?
3 A Right.
4 Q And you worked for a division of Brunswick called
5 Mercury Marine, correct?
6 A Yes.
7 Q And they have a large assembly facility in Fond du Lac,
8 correct?
9 A Yes.
10 Q And you started working there, I think you indicated,
11 in September of 2012, right?
12 A Yes.
13 Q And you were hired as a machinist?
14 A Yes.
15 Q And that's the positions you held the whole time you
16 worked there, correct?
17 A Yes.
18 Q What does a machinist do?
19 A They do mike measuring, gauging parts, changing tools
20 on the machines, on the Mazak machines.
21 Q And did your work focus on the manufacture of boats or
22 boat engines or both?
23 A Boat engines.
24 Q Do you have any recollection regarding the hiring
25 process that you went through at--at the time you

## Page 30

1 so-- And let me be more specific. Do you remember if
2 you were interviewed for the job?
3 A Yes.
4 Q Do you remember how many people interviewed you?
5 A One.
6 Q Do you remember who that was?
7 A Jason Rodriguez.
8 Q Do you know what Mr. Rodriguez's job title was?
9 A Supervisor.
10 Q Do you remember how you learned that you were hired?
11 A Basically that very same day in the interview.
12 Q Mr. Rodriguez informed you you were being hired?
13 A Yes.
14 Q And, again, based on your prior testimony, is it
15 accurate to state that there was no discussion about
16 any health impairments or any potential disabilities
17 you might have had?
18 A At that time, yeah, there was.
19 Q There was. Tell me what was discussed.
20 A With HR-- Excuse me. I had-- In 2009 I had a stent
21 in my heart. But because I was living in Superior at
22 that time, it was done in Duluth. So I would have
23 actually started September 4th. But because they
24 wanted me to go to Duluth to a doctor that actually did
25 the stent and have a release form saying that I'm

## Page 31

1 capable of working. So instead of starting on
2 September 4th, I started on September 24th.
3 Q Got you. Because they--when you disclosed that you had
4 had a stent put in your heart, the company asked you to
5 have your healthcare provider indicate that you could
6 still perform the job duties?
7 A Yes.
8 Q And in your belief, do you believe you could perform
9 the job duties regardless of the heart procedure?
10 A Yes.
11 Q Which had been three years before you started the job?
12 A Yes.
13 Q Did the heart condition or the procedure that you
14 underwent with the stent, did that limit you in any
15 way?
16 A No.
17 Q Did it mean that you needed any accommodations to
18 perform the machinist job?
19 A No.
20 Q So as you see it, that condition was a nonissue with
21 regard to your employer?
22 A No, it wasn't. It was not.
23 Q It was not an issue?
24 A No.
25 Q And that if--again, you didn't have any sort of a

Page 32

1   back issue?
2 A   No.
3 Q   And you didn't have any sort of an insomnia issue?
4 A   No.
5 Q   As part of your hiring process, was there an
6    orientation?
7 A   Yes.
8 Q   Was there an orientations that involved any folks from
9    the human resources department?
10 A   Yes.
11 Q   Do you remember who from the human resources department
12    participated in that?
13 A   I think it was Jennifer Witt. I'm not totally sure.
14 Q   That's fair. We're going back quite a few years, so I
15    understand.
16      You have every right, for lack of a better term,
17    to qualify your answers, meaning if you're not sure,
18    you can tell me that.
19 A   Okay.
20 Q   If you don't know, you can tell me that. If you don't
21    remember, you can tell me that. But it's also fair to
22    say you think it might have been Jennifer Witt, and I
23    understand that. Make sense?
24 A   Yeah.
25 Q   Do you know what Ms. Witt's job title was?

Page 33

1 A   She was part of the HR.
2 Q   Team?
3 A   Yeah.
4 Q   Okay. Did Ms. Witt speak about or provide you with any
5    documents regarding a Brunswick policy that stated that
6    they did not discriminate against people with
7    disabilities?
8 A   Not to my knowledge. If I might say, that's going
9    back. I never had a handbook.
10 Q   Okay. And you just don't remember-- Is it fair to
11    say--and if it's not fair, tell me. Is it fair to say
12    that you just don't remember one way or the other
13    whether any policy prohibiting discrimination against
14    people with disabilities--
15 A   I don't remember.
16 Q   --was discussed? That's fair.
17      Was there any discussion or documentation
18    regarding a procedure by which employees could ask for
19    an accommodation if they believed they had a
20    disability?
21 A   I don't recall that neither.
22 Q   Okay. Were you ever aware just through any job you had
23    or things you heard that if people believe--in the
24    workplace believe they have a disability, they can go
25    and ask for an accommodation if they have something you

Page 34

1   heard in your 58 years other than in this law office?
2 A   I don't recall that neither.
3 Q   Okay. Did you have any discussion during that
4    orientation about Brunswick's policy regarding family
5    and medical leave?
6 A   No.
7 Q   Did you ever see any postings at the facility regarding
8    ways employees could make requests for medical leaves
9    of absence?
10 A   No.
11 Q   Did you ever stop and look at bulletin board postings?
12 A   No.
13 Q   There were bulletin boards around the plant with
14    postings on them--
15 A   Yes.
16 Q   --right?
17      And you're just telling me you never read those?
18 A   Never paid attention.
19 Q   Okay. And just to make sure-- And I may--sometimes my
20    questions can be redundant, and I apologize.
21      During your entire employment, other than what
22    you've told me about your discussion with Dale, did you
23    ever discuss with anyone at Brunswick a process where
24    you could request an accommodation for a health
25    condition or disability?

Page 35

1 A   No.
2 Q   Now, again, I appreciate what you told me earlier about
3    you did start and spent a couple of months on first
4    shift, but then you indicated you got bumped over to
5    the third shift and you stayed there the rest of your
6    employment, right?
7 A   Yes.
8 Q   So most of-- In fact, I think all of the dates that
9    we're going to be talking about in this deposition
10    involved a period of time that you were on third shift,
11    right?
12 A   Yes.
13 Q   And you say you got bumped because as an employee at
14    that facility as a machinist, you were a member of a
15    union, correct?
16 A   Yes.
17 Q   And that union was the International Association of
18    Machinists, or IAM?
19 A   IAMs.
20 Q   They call it IAM?
21 A   IAMs.
22 Q   Okay. And as part of that relationship there is what's
23    referred to as the contract between the company and the
24    union, right?

Page 36

1   Q   Did you ever get a copy of that?
2   A   Yes.
3   Q   During your employment?
4   A   I got it later on, basically in December of 2013.
5   Q   And you actually had a hard copy of it at some point?
6   A   Yes.
7   Q   And that's something where the union and management--
8       And I say it in very general terms, and if you have a
9       different understanding, tell me. But they have some
10      negotiation, and they agree on some terms that go into
11      the contract, and that governs at least some of the
12      terms and conditions--
13  A   Right.
14  Q   --of your employment, right? Okay.
15      Had you been a member of a union before?
16  A   Nope.
17  Q   Okay. Now, the contract's a pretty good sized book,
18      right?
19  A   Right.
20  Q   So I'm handing you what's marked as Exhibit 3, just
21      some excerpts from that. And, you know, there were
22      control numbers on here, but the way it copied on
23      there, you can't see them. I'm not sure it really
24      matters. But they have been produced. I think they've
25      been produced by both sides.

Page 37

1       But if you look at the cover page here-- First of
2       all, does that look like the cover page for the
3       contract between the company and the union?
4   A   Yes, the handbook.
5   Q   That's the handbook, okay. It actually says
6       "Agreement" there on the top, right?
7   A   Yes.
8   Q   And it says, "By and between Mercury," which you
9       understand means Mercury Marine, which is the division
10      of Brunswick that you worked for, correct?
11  A   Yes.
12  Q   "And Lodge Number 1947." And under that there's a
13      logo, and then it says "International Association of
14      Machinists," correct?
15  A   Yes.
16  Q   So IAM is the big international union, and then Lodge
17      1947 is the local, correct?
18  A   Yes.
19  Q   And this says the dates on here are August 30, 2009, to
20      August 27, 2016, so this would have been the agreement
21      that was in place during the entirety of your
22      employment, right?
23  A   Yes.
24  Q   One of the things that was in that agreement were
25      provisions --you have to sit down once, right?--

Page 38

1   A   Yes.
2   Q   If you look there, I've taken pages 11 and 12 setting
3       out that attendance procedure. Is that what that
4       appears to be?
5   A   Yes.
6   Q   And the whole thing will be in the record. I won't
7       read it word for word, but one thing it says at the top
8       is, "Employees are expected to be at work every day
9       that they're scheduled," correct?
10  A   Yes.
11  Q   And that's a reasonable request, right?
12  A   Yes.
13  Q   This indicates that the attendance policy--it's the
14      bottom of page 11 and carries over to page 12--tracks
15      absences on the calendar year basis from January to
16      December in any given calendar year. Was that your
17      understanding?
18  A   Yep.
19  Q   And then in subsection (2) there on page 12, there's a
20      whole series of absences that they list out that they
21      say if you have proper documentation, it will not count
22      against an employee, correct?
23  A   Yes.
24  Q   One of those things on there is workers' compensation,
25      right?

Page 39

1   A   Yes.
2   Q   One of the things on there is approved FMLA, right?
3   A   Yes.
4   Q   And one of the things on there says "approved medical
5       leave of absence," correct?
6   A   Yes.
7   Q   It goes on there to sort of lay out what the
8       progressive discipline is under the policy, which
9       basically says if someone gets the equivalent of six
10      absences, they get a final written warning. If they
11      get eight absences, they're subject to termination,
12      right?
13  A   Yes.
14  Q   And then there's also in section four there a way that
15      they measure these absences and what counts as a full
16      day, what counts as a half day, and what counts as a
17      quarter day, correct?
18  A   Yes.
19  Q   And then there's a provision there that says if an
20      employee brings in a valid physician's slip, they can
21      be permitted to be absent without penalty on three full
22      days or six half days occasions, right?
23  A   Right.
24  Q   And were these all provisions that you were familiar

**Page 40**

1  A  Yep.

2  Q  Okay. At least from December 2013 going forward,

3     right?

4  A  Right.

5  Q  I'm going to hand you what's been marked as Exhibit 4,

6     which is a two-page document numbered D80 to 81. It

7     says at the top "Policy Statement," and subject it

8     says, "Equal employment opportunity and affirmative

9     action." I just want to ask, have you ever seen that

10    document before?

11  A  I don't recall this.

12  Q  Might have, might not have?

13  A  I might have.

14  Q  Okay.

15  A  But I'm not sure.

16  Q  That's fair. But this appears to be a written

17    Brunswick policy, correct?

18  A  Yes.

19  Q  And it states under purpose, "This policy statement

20    sets forth Brunswick's policy of providing equal

21    employment opportunities for all employees without

22    regard to," and then there's a whole long list of

23    categories for which they're stating that they provide

24    equal employment opportunities. That's what it says,

25    right?

**Page 41**

1  A  Yes.

2  Q  And some of those employment I'm sure you're familiar

3     with, but it also--one of the things listed there is

4     disability, correct?

5  A  Yes.

6  Q  And if you go down a little bit in terms of--in the

7     section that says policy, there's three subsections

8     there. Number one says, "The company recruits, hires,

9     upgrades, trains, and promotes in all job titles

10    without regard to race, color, religion, national

11    origin, sex, pregnancy, marital status, sexual

12    orientation, age, disability, veteran status, genetic

13    information, citizenship status, or membership in any

14    other legally protected class."

15      Did I read that right?

16  A  Yes.

17  Q  And then there's subsection three, and I'm going to

18    paraphrase it. But says it is also the policy of

19    Brunswick to provide reasonable accommodations to--I'm

20    skipping some language there--reasonable accommodations

21    to otherwise qualified disability applicants and

22    employees in accordance with applicable law to enable

23    them to apply and/or to perform the essential functions

24    of their position unless it would impose an undue

25    hardship

**Page 42**

1     And I skipped over language about religious

2     beliefs, but otherwise did I read that correctly?

3  A  Yeah.

4  Q  So this document would state that Brunswick has a

5     policy essentially stating it doesn't discriminate

6     against people with disabilities. That's what it says,

7     correct?

8  A  Yes.

9  Q  And it also says that it will provide reasonable

10    accommodations to people with disabilities, correct?

11  A  Yes.

12  Q  And then in that same subsection three it says:

13    "Requests for accommodation should be directed to the

14    human resources department. Requests for accommodation

15    are handled on a case-by-case basis." Correct?

16  A  Yes.

17  Q  So that would indicate that the HR department-- And

18    you knew what the HR department was, right?

19  A  Yes.

20  Q  It's indicated that they would at least entertain

21    requests for accommodation from employees who believe

22    they were disabled, right?

23  A  Yes.

24  Q  Did you ever go to the human resources department and

25    ask for an accommodation?

**Page 43**

1  A  No.

2  Q  Still on Exhibit 3 real quick, there's a section there

3     that says "Affirmative Action." Do you see that?

4      MR. FREED: Do you mean Exhibit 4?

5      MR. VOGEL: I'm sorry. Yes, I do. I beg

6     your pardon. Exhibit 4. Thanks, Counsel.

7  Q  In Exhibit 4, you see subsection B that says

8     "Affirmative Action" there?

9  A  Yes.

10  Q  Okay. And then you see subsection three under that.

11    It says: "Employees are encouraged to identify

12    themselves as either persons with a disability or as

13    disabled veterans. This self-identification is

14    strictly voluntary, confidential, and will not result

15    in retaliation by Brunswick."

16      Did you ever self-identify as a person with a

17    disability to Brunswick?

18  A  No.

19  Q  I'm going to hand you what's been marked as Exhibit 5.

20    It's a one-page document marked for production D119.

21    Let me ask you, under the signature line there, is that

22    your signature?

23  A  Yes.

24  Q  This is a document that's headed Signature Sheet. It

25    says I acknowledge that I received and understand

Case 2:16-cv-01013-PP    Filed 08/21/17    Page 14 of 48    Document 130-1

**Page 44**

1  the information in Making the Right Choice: The
2  Brunswick Guide to Conduct in the Workplace and agree
3  to the best of my ability to apply the guide in my
4  daily work activities."
5      Did I read that correctly?
6  A   Yes.
7  Q   And you wrote your name on this and signed it on
8  September 24, 2012, correct?
9  A   Yes.
10 Q   It was your first day of employment?
11 A   Yes.
12 Q   Okay.  Do you remember if you actually read that book?
13 A   I read some of it, not--kind of skipped over probably a
14 lot of things.
15 Q   Sure.  Were you actually given a hard copy of that
16 book, or was it something you read online?
17 A   Something I read online.
18 Q   Online, okay.  I'm not going to spend a lot of time on
19 this, but this is Exhibit 6.  It's another document
20 numbered for production D49, and this is a letter to
21 you dated June 19, 2013, from Troy Schwartz, who you
22 previously identified as someone who was your
23 supervisor for a period of time at Brunswick, correct?
24 A   Yes.
25 Q   Do you recall receiving this letter?

**Page 45**

1  A   Yes.
2  Q   And this is a final written warning for attendance,
3  correct?
4  A   Yes.
5  Q   And this indicates that you had accrued as of June 19th
6  six absence points pursuant to the attendance provision
7  of the contract, correct?
8  A   Yes.
9  Q   So as a result, you got a final written warning, which
10 we saw in the contract is the appropriate step for
11 that, right?
12 A   Yes.
13 Q   To your recollection, did you ever challenge any of
14 these points in 2013?
15 A   I didn't challenge any of this up until December
16 of 2013.
17 Q   Until December of 2013?
18 A   Right.
19 Q   Okay.  I'm going to hand you what's been marked as
20 Exhibit 7, which is a one-page document numbered for
21 production D13, which is a letter to you from
22 Mr. Schwartz dated December 4th, 2013, headed
23 Termination, correct?
24 A   Yes.
25 Q   And do you recall receiving this letter?

**Page 46**

1  A   Yes.
2  Q   And just to get it up-front so that we're--don't
3  confuse anyone, you were not ultimately terminated in
4  December of 2013, correct?
5  A   Yes, I was.
6  Q   You were terminated?
7  A   I was walked out the door.
8  Q   You were walked out the door, but you came back.
9  A   Only because the burden of proof was on me.  Two
10 doctors' excuses in September of 2013 were given to
11 them, so they went from September, October, November,
12 December, waited until approximately December 11th of
13 2013.  Try tried walking me out for something that HR
14 did.  They made the mistake, but the burden of proof
15 was on me.
16 Q   Okay.
17 A   So they walked me out the door.  I said, "I have the
18 proof.  Do I have to go back to the doctor?  I've given
19 them a copy of doctor's excuses from September of 2013
20 to Troy Schwartz, one to HR to Jennifer Witt, and one
21 to the plant manager, which was Carrie at that time."
22 And it was a family medical procedure that was going on
23 in September with one of my sons for committing
24 suicide.
25 Q   That's-- I appreciate you sharing that, but I'm not

**Page 47**

1  going to ask you any questions about that or the
2  reasons for it.
3  A   All right.
4  Q   But I do want to talk about the medical documentation.
5  A   That's what I was trying to get at.
6  Q   I got you.  I appreciate it.
7  A   That's not listed on here.
8  Q   Let's get a little background so people reading this
9  later, including me, might be able to figure this out.
10     If we look at Exhibit 6, which was the final
11 written warning--
12 A   Right.
13 Q   --the absences for which you accrued points were two in
14 January, one in May, and three in June, correct?
15 A   Right.
16 Q   Okay.  Now, if we look at Exhibit 7, which is the
17 termination letter, it's stating that you had two
18 additional absences that brought you from six to eight
19 points.  That's what it says in the letter, right?
20 A   Right.
21 Q   And what you're telling me is when you were informed
22 that you were being terminated for that and walked out
23 the door, you informed Brunswick that you had medical
24 excuses for those two subsequent absences.

Page 48

1  Q  And ultimately they looked at those and said, "We're
2  going to accept those documents, excuse those absences,
3  and bring you back to work."
4  A  That's not what happened.
5  Q  Okay. Well, tell me what it was.
6  A  What happened is they supposedly said that they
7  couldn't find it. It was in September what I had told
8  them--or, actually, what they told me is that you're
9  going to have to get ahold of your doctors because we
10  don't have them on file, and Troy Schwartz doesn't have
11  it on file.
12  Now, this is in September. Now we're talking four
13  months later. They're trying to say the burden of
14  proof was on me. So basically I had to get ahold of my
15  doctor that I seen in September, have him fax over the
16  two days for the absences. I had to give one to Troy
17  Schwartz, one to Jennifer Witt, and HR.
18  And she said well--and this is a quote; this is
19  exactly what they said--"Well, we don't want you to
20  come in to work tonight," because it was my last day of
21  the work.
22  I says, "Well, you're going to make me take off a
23  day off, and I'm not going to get paid for it." And
24  the union's telling me that they're not going to
25  represent me. I wanted to file an arbitration against

Page 49

1  them. Union didn't do anything.
2  James Gardener from HR said, "We don't--we
3  basically work--the union works for us." This is
4  exactly what he said: "The union works for Mercury."
5  I said, "Well, then who works for the employees
6  that we pay $58.60 a month? You're going to walk me
7  out the door two weeks before Christmas, and you're
8  going to give me a day off without pay, and the union's
9  not going to represent me to file arbitration against
10  you?" I said, "Who's in the wrong? Your mistake. I
11  paid for it. I lose a day's work."
12  Q  So you ultimately lost a day's work?
13  A  Yeah.
14  Q  But you did ultimately get brought back to active
15  employment?
16  A  Yes.
17  Q  The termination didn't stand?
18  A  No. But the burden of proof was on me.
19  Q  And I understand you're frustrated about that. Again,
20  without going through the details of that--
21  A  Okay.
22  Q  --that was a medical situation involving one of your
23  children?
24  A  Yes.
25  Q  Okay.

Page 50

1  appreciate your frustration with it. You believe
2  you've done everything you're supposed to do because
3  you provided the medical documents regarding those--
4  A  Right.
5  Q  --two absences.
6  When it came time to them saying that you were
7  being terminated for absences, the statement by
8  Brunswick from HR and otherwise was that they didn't
9  have those documents, right?
10  A  Yes.
11  Q  And you were frustrated because you knew you provided
12  them?
13  A  I had given it to all three places: Carrie from plant
14  manager in plant 15, Troy Schwartz, and Jennifer Witt.
15  So they had all copies. What frustrated me the most is
16  why did you wait four months to tell me this?
17  Q  Okay.
18  A  You know.
19  Q  To be fair, just in terms of--because I don't really
20  know. I wasn't there.
21  A  Okay.
22  Q  I'm not suggesting I was. But it doesn't say that the
23  two additional occasions were in September, right?
24  A  No, it doesn't say that.
25  Q  Okay. Your understanding was that those were the two

Page 51

1  additional absences?
2  A  That's what they were.
3  Q  Okay. Let's close this out, and we can take a little
4  break, and we'll move into something else.
5  I'm going to hand you a one-page document that's
6  been marked as Deposition Exhibit 8, which is numbered
7  for production D131. I'll represent to you that this
8  was provided as records regarding your attendance from
9  2012 to 2014. And I realize your name isn't on there,
10  but if you presume with me for purposes of this
11  question that these are records that Brunswick
12  maintains regarding your attendance, if you look at the
13  top half of the page under 2013, there are not any
14  September 2013 absences recorded on there, right?
15  A  I don't know why.
16  Q  Okay. But there is a July 2013 absence, right?
17  A  That's one I don't recall.
18  Q  Which is fair. July 9, 2013, would be after the final
19  written warning was issued on June 19th, correct?
20  MR. FREED: Let the record reflect there's
21  no name attached to this document, so we don't know to
22  whom this refers.
23  A  And if I may say, 11/26/2012 I never called in, and it
24  says Minnesota, called in sick Minnesota.

Page 52

1 A    So there's a lot of these absences are not mine.

2 Q    Okay. And your attorney's notation is in the record.

3       If this were--if this is your attendance record, it

4       doesn't contain any entries for September 2013,

5       correct?

6 A    No.

7 Q    And it contains entries on July 9th, 2013, and

8       November 1st, 2013, correct?

9 A    Right.

10 Q   And then there's an October 4th, 2013. It says DMA,

11      and DMA is a shorthand abbreviation for excused

12      absence, right?

13 A   Right. I may also say I've never been a no call

14      no-show.

15 Q   Okay. And we'll talk about that in a minute. In fact,

16      it's ten o'clock. Let's take about a five-minute break

17      if we could because I'm shifting into 2014, so it's a

18      natural breaking time.

19 A   Okay.

20 Q   And then we'll get back on the record.

21 A   Okay.

22      (Recess from 10:01 a.m. to 10:06 a.m.)

23 Q   Are you ready?

24 A   Yes.

25 Q   Mr. Buck, I want to shift our attention to the calendar

Page 53

1       year 2014.

2 A    Okay.

3 Q    And is it your understanding that you were ultimately

4       terminated due to attendance points accrued in that

5       calendar year?

6 A    Yes.

7 Q    I'm going to hand you two documents that maybe you can

8       keep in front of you for a bit and we can use as

9       guideposts and it will hopefully help us. The first

10      one is Exhibit 9, which we numbered for production D12,

11      and this is a printout of some attendance information.

12      And your name does appear on this, correct?

13 A   (No response.)

14 Q   You see in the third column from the left it says name?

15 A   Yes.

16 Q   And it says Joseph Buck. That's you, right?

17 A   Yep.

18 Q   Okay. And these are entries regarding absences--and

19      we'll go into them in some more detail--in the calendar

20      year 2014, correct?

21 A   Yes.

22 Q   Okay. I'll hand you another one. This is easier to

23      read, and we can also use this to help with us dates at

24      least. This has been marked Exhibit 10, a one-page

25      document Bates-number D8-6, which I believe has listed

Page 54

1       to you from Mr. Schwartz dated May 30, 2014, which is a

2       final written warning for attendance, right?

3 A    Yes.

4 Q    And that lists the absences that you had for which you

5       had accrued points in the calendar year 2014 with the

6       earliest being February 17th and the latest being

7       May 26th, correct?

8 A    Yes.

9 Q    I'm sorry, May 28th. I beg your pardon. I think

10      May 28th would match up with Exhibit 9 as well. Okay.

11      All right.

12      Now, I'm just going to tell you up-front as we

13      jump around here--and I'll take as much time as we need

14      and hopefully we can all be patient with one

15      another--for some of these I have other records; for

16      some of these I don't. For some of these we have the

17      call in; for some of these we don't.

18 A   Okay.

19 Q   Okay? And we'll just kind of work through these to the

20      best of our respective abilities.

21      So the first one on both documents, the first

22      attendance incident marked on Exhibit 9 and Exhibit 10,

23      is February 17th of 2014, correct?

24 A   Yes.

25 Q   And it indicates that you missed eight hours, which is

Page 55

1       a full shift, right?

2 A    Yes.

3 Q    And so therefore you were assessed one point, correct?

4 A    Right.

5 Q    And on Exhibit 9 there's a code listed. If you look at

6       the sort of right side of Exhibit 9, there's a column

7       for codes, and the code listed is all caps ILL. Do you

8       know what ILL stands for?

9 A    No, I don't.

10 Q   Okay. So do you recall the specific circumstances that

11      caused you to be absent from work in February 17th--on

12      February 17th, 2014?

13 A   No, I don't.

14 Q   Would you have any way to determine the specific

15      reasons that you were absent on February 17th, 2014?

16 A   I don't recall.

17 Q   Okay. And I will tell you--and, again, the record in

18      terms of documents that were produced by the two sides

19      will ultimately carry the day on this issue, but in

20      terms of the documents that both sides have produced

21      in this case, I have not seen a note indicating that you

22      were treated by a doctor or presented a doctor's excuse

23      for that day. Are you aware of any facts to suggest

24      that you were treated by a healthcare provider that day

25      or that you obtained a doctor's excuse for that day?

Page 56

1  A  No.
2  Q  Okay. And I will be-- I try my best to be fair with
3     you because on the cases where we do have doctor's
4     notes, I will put those in front of you.
5  A  Okay.
6  Q  We'll work through that. Okay.
7        So are you able to testify today under oath as to
8     any information you might have provided to Brunswick
9     regarding the specific reasons for that absence?
10 A  I don't recall. I don't think I can right at this
11    time.
12 Q  Okay. Fair enough.
13 A  As far as a medical, I would have to go back and look
14    at the date because if it's on a Sunday, I have reasons
15    why I called in.
16 Q  According to my phone, February 17, 2014, was a Monday,
17    so that would be--
18 A  Sunday.
19 Q  Right. So as I understand it, that would mean you
20    would have called in sometime before 11:00 p.m. on the
21    16th--
22 A  Right.
23 Q  --and the absence would have been recorded as occurring
24    on the 17th.
25 A  Right.

Page 57

1  Q  So we agree that that's how this worked, right?
2  A  Yes.
3  Q  So this would suggest--we can have an inference--that
4     when you called in it was on a Sunday.
5  A  Right.
6  Q  And you were going to explain there's a reason that you
7     would end up calling in on a Sunday.
8  A  Yeah, it was the girl that I was working with on sixth
9     shift.
10       (Reporter clarification.)
11 Q  Like the number six?
12 A  Yeah. And this was the girl that was harassing me, the
13    sexual harassment thing.
14 Q  Okay.
15 A  And eventually that came down to where I finally did
16    talk to Troy because he had asked me, "Why are you
17    always taking off on Sunday?"
18 Q  Okay.
19 A  Because I didn't want to have to-- So I was taking--
20    Between vacations-- If they wouldn't grant me my
21    vacation day on Sunday, then I would take a ding. So
22    which I was aware of that.
23 Q  Okay. I'm going to touch on that in a second.
24       MR. VOGEL: Off the record for a second.
25       (Discussion held off record.)

Page 58

1  Q  So let me see if can understand this. In the 2014 time
2     frame there was a woman who also worked at the
3     facility?
4  A  Right.
5  Q  And you ended up interacting with her on Mondays?
6  A  No. Well, Sunday night.
7  Q  Sunday night?
8  A  Right.
9  Q  Into Monday, right?
10 A  Yeah.
11 Q  She didn't always work in your area?
12 A  No. She always worked on Friday, Saturday, and
13    Sundays.
14 Q  Got you. She was a weekend worker?
15 A  Yes.
16 Q  All right. So that when you had to come in Sunday
17    night into Monday for your first regular shift of the
18    week, that would be when you'd have an encounter with
19    her?
20 A  Right.
21 Q  And she was engaging in what you termed as sexually
22    inappropriate behavior towards you?
23 A  Yes.
24 Q  And do I understand correctly that you ultimately
25    reported this, but for some time you didn't report it?

Page 59

1  A  Right.
2  Q  And so what you did for a period of time rather than
3     report it is called in sometimes on Sunday afternoon
4     and said I'm not going to come in?
5  A  I would call in and either ask for a vacation day or it
6     would be--if they did accept a vacation day on a
7     Sunday, then they accepted it. If they didn't, then
8     I'd have to take a ding. So personally I have tooken a
9     few dings on Sundays.
10 Q  Okay. So by take a ding, just so we understand reading
11    this later, take a ding is your way of saying I
12    understand I'm going to be assessed a point--
13 A  Yes.
14 Q  --for this absence?
15 A  Yes.
16 Q  Can you tell me under oath that for that particular
17    absence on February 17, 2014, you specifically informed
18    Brunswick that the reason you were calling in was
19    because you believed you were being subjected to
20    inappropriate sexual activity or comments by another
21    employee?
22 A  No.
23 Q  And that didn't have anything to do with any sort of a
24    back condition or insomnia, correct?

Page 60

1 Q Okay.

2 A May I go back to that?

3 Q Sure.

4 A From the 15th-- Earlier on in my statement I had said

5    that from February 15th up until the day I got

6    terminated I was working a lot of overtime.

7 Q Okay.

8 A So I was covering second shift, my shift, and part of

9    first shift.

10 Q Do a lot of people end up doing that though?

11 A No.

12 Q Let me ask this: Can you explain to me why you-- Were

13    you the only employee at the facility working overtime?

14 A All them-- Yeah, for the weeks on time for-- There

15    were other people that worked but wouldn't cover the

16    shifts like I did.

17 Q Was that something that you were asked if you were

18    willing to do and you would agree to it?

19 A Yeah.

20 Q Okay. So what you're telling me, if I understand your

21    testimony correctly, is that you believe you were one

22    of the only employees who would step up when overtime

23    needed to be worked?

24 A Right.

25 Q So-- Go ahead.

Page 61

1 A Like the guy that I would cover on first shift, he was

2    going on vacation and was having a wedding anniversary,

3    so he wanted to take off the week. And Donnie that

4    worked on first shift had asked me, "If I can't get the

5    vacation, will you be willing to work?"

6     I said, "Well, yeah if they let me work." So

7    that's--I was covering my shift and his shift for like

8    two weeks in a row.

9 Q Okay. But you were effectively doing that voluntarily?

10 A Right.

11 Q And you got paid for it?

12 A Right, I did.

13 Q And you got paid a premium for it?

14 A Right. But there were times I'd have to come in--I got

15    called from the second shift, Audrey, which is

16    supervisor on second shift, would want to know if I

17    could come in seven o'clock to cover Brendon's shift

18    because he called in sick.

19 Q Okay.

20 A So I was doing that a lot too.

21 Q All right. But as we're talking about this specific

22    absence on the February 17, 2014--

23 A Yes.

24 Q --shift, I think--and tell me if I'm misstating

25    this--you testified a couple of pages ago that you

Page 62

1    have prompted you to call in for that absence?

2 A Right.

3 Q But you can't remember specifically why you called in?

4 A No.

5 Q And you can't remember specifically if it was medical

6    issues?

7 A No, I can't.

8 Q Okay. Let's go to the next one on both documents,

9    which is February 19th, 2014, which indicates you

10    missed--on both documents it indicates you missed eight

11    full hours and were accrued one point.

12     Same questions. Can you tell me-- By the way,

13    it's listed on Exhibit 9 with that same ILL code?

14 A Okay.

15 Q Do you recall the specific circumstances that prompted

16    you to call in and miss work that day?

17 A That one I don't recall.

18 Q Okay. And I will represent to you again that I've

19    looked through and I don't see any documentation

20    indicating that you underwent any sort of medical

21    treatment or provided a doctor's note related to that

22    absence. Are you aware of any facts to suggest that

23    you were absent from medical reasons that you did seek

24    medical treatment or you did obtain a doctor's note for

25    that absence?

Page 63

1 A What I can recall, I would never call in twice in one

2    week.

3 Q Why do you say that?

4 A Because the 17th and the 19th are all within the same

5    week.

6 Q Right. Well, how can you say I never--

7 A I've never called in unless it was medical.

8 Q Okay. So you think you were sick?

9 A Yeah.

10 Q Okay. But as we sit here today, you can't provide me

11    any document?

12 A Documentation for the 19th, no.

13 Q And you also can't tell me with certainty when you're

14    testifying under oath what the circumstances were that

15    caused you to be absent that day?

16 A No.

17 Q And can you tell me under oath what information, if

18    any, you provided to Brunswick regarding the reasons

19    for that absence, even verbally?

20 A That one I can't answer.

21 Q Okay. And that's fair. I understand that, and I

22    understand it's a long time ago.

23 A Right.

24 Q But I just want to make sure I ask if there's something

25    that you-- If there's anything specifically documented or

Page 64

1   are aware of, and I understand your answer is no.
2 A   Okay.
3 Q   Now, I know you want to talk about this, so let's go to
4   the next one, which is March 8th of 2014. And
5   March 8th of 2014 is down as a no call no-show. It has
6   you absent for six hours--
7 A   Okay.
8 Q   --and you were assessed a full point. So at least
9   according to this document, this would indicate that
10   you did ultimately come to work. You just came to work
11   about three-quarters of the way through your shift,
12   correct?
13 A   No. I'm thinking this was a day, if it was Saturday or
14   Sunday, which it would have been overtime is the only
15   time I only worked six hours--
16 Q   Okay.
17 A   --I was bumped. And if this is the date, if I knew
18   exactly if it was Saturday or Sunday morning--
19       MR. FREED: We can look it up.
20 A   That one I can explain because they docked me for
21   something that had nothing to do with me. I was signed
22   up for overtime. I got bumped off of that the day, and
23   the guy that was supposed to take that shift because
24   first shift--
25       MR. FREED: It was a Saturday.

Page 65

1 A   Yeah, it was overtime. This is one that I argued with
2   them about that.
3 Q   Let me slow you down just so I make sure--
4 A   Okay.
5 Q   --we have a clear record and we understand. Sometimes
6   you--
7 A   I'm sorry.
8 Q   That's okay. Hey, this is a different way of talking.
9   We're creating a record, so you don't have to apologize
10   for anything. I just want to make sure-- There's
11   things you understand--
12 A   Yeah.
13 Q   --about the process of the plant that I don't
14   understand and that a judge or a jury--
15 A   Right.
16 Q   --hearing this later aren't going to understand, so I
17   want to see if we can explain it and make something
18   clear here.
19       I agree with Mr. Freed. I'm looking at my
20   calendar on my phone. March 8th of 2014 was a
21   Saturday.
22 A   Yes.
23 Q   And one of your preliminary statements regarding this
24   particular occurrence is that if you ever worked on a
25   Saturday, it would have been overtime.

Page 66

1 A   Right.
2 Q   Because you usually worked Monday through Friday.
3 A   Right.
4 Q   Okay. So explain what you believed this situation to
5   have involved.
6 A   I signed up for overtime. The night, which would have
7   been Friday, Friday morning Troy Schwartz came up to me
8   and said that you got knocked off of overtime for
9   Saturday and that-- I don't remember his name. Bumped
10   me because he works first shift. So he bumped me off
11   my work station. So he was basically-- I was
12   scratched off for overtime on Saturday. He got the
13   overtime on Saturday. He didn't show up. I got the
14   ding for it.
15 Q   Got you. Okay. Let me see if can make this clear. So
16   on a Friday if overtime--
17 A   Friday--
18 Q   --work was necessary on a Saturday-- Let me see if can
19   finish this.
20 A   I'm sorry.
21 Q   That's okay. The facility would tell people we have a
22   need for overtime. Do we have volunteers?
23 A   Right.
24 Q   If there were too many volunteers, the employees with
25   more seniority would get to work the overtime over

Page 67

1   employees with less seniority?
2 A   Right.
3 Q   So even if you volunteered, you could get told I'm
4   sorry, we won't be giving the overtime because--
5 A   Right.
6 Q   --somebody with more seniority got it. Okay. But what
7   you understand happened here is the company still had
8   you down to show up?
9 A   Right.
10 Q   So when you didn't show up, they gave you a ding. And
11   your position is you were told from another source that
12   you didn't have to come in at all?
13 A   Okay. Which is--
14 Q   I'm close?
15 A   Right.
16 Q   Go ahead.
17 A   But when you sign up from the week Monday, Tuesday,
18   Wednesday, they post the listing on the board by the
19   time clock who has overtime, who's not going to be
20   there.
21       So I was on Saturday for overtime, but Friday
22   morning, which is Thursday night, which would be our
23   Friday, Troy come up and says, "You're scratched off
24   for overtime for Saturday."

Case 2:16-cv-01063-PP   Filed 08/21/17   Page 20 of 48   Document 18-1

## Page 68

1   He says, "No." He says, "Somebody from first
2   shift asked for overtime on Saturday that doesn't work
3   my work station."
4     He got the overtime, so I was scratched off the
5   board. But because I was still on the board, they
6   never corrected that. He didn't show up for work. I
7   got the ding.
8   Q   Okay. Did you file a grievance about that?
9   A   Yes.
10   Q   What was the result of that grievance?
11   A   Just considered a ding. I mean--
12   Q   Okay. So was that a situation-- Let me rephrase it
13   this way: That was not a situation in which you didn't
14   come to work because of a medical issue?
15   A   Right.
16   Q   That was a situation where, according to your
17   recollection and understanding, somebody screwed up as
18   to whether you were supposed to come to work or not?
19   A   Right.
20   Q   Okay.
21   A   I was on the overtime list for Saturday. Friday
22   morning if they change anything, they usually tell you
23   before you go home. So I got off at seven o'clock that
24   morning. About 6:30 Troy come up and told me, "You're
25   not on the board for overtime tomorrow because you got

## Page 69

1   bumped off."
2   Q   So you agree that you didn't call in to say I'm not
3   coming because you had an understanding from your
4   supervisor--
5   A   Right.
6   Q   --there was no need to come, right?
7   A   Yep.
8   Q   So we could phrase it this way: You were a no call
9   no-show but you had no obligation to call or to show?
10   A   No.
11   Q   Got you. Okay.
12     Do you know who the specific person who was
13   responsible for making that mistake?
14   A   That one I don't know who does the overtime. It's
15   usually the plant manager, but the supervisors also
16   have to approve it. But when your supervisor comes up
17   and says you're scratched off for overtime on Saturday,
18   you just take his word and so be it.
19   Q   So you shouldn't get a ding for that?
20   A   No, I shouldn't have got a ding.
21   Q   But we don't know who screwed up?
22   A   No, I don't.
23   Q   Other than you know it wasn't you?
24   A   No. I was on the board.
25   Q   And do you know who would have been in charge of

## Page 70

1   of a better term, an unintentional mistake?
2   A   Yeah.
3   Q   We haven't touched on this. There's about 2,500
4   employees at the plant, right?
5   A   Yes.
6   Q   And it runs, as you've explained, three shifts?
7   A   Yeah.
8   Q   So it essentially runs 24 hours a day?
9   A   Seven days a week.
10   Q   Seven days a week?
11   A   Right.
12   Q   So sometimes the right hand might not know what the
13   left hand's doing?
14   A   Yeah.
15   Q   Okay. So you're not suggesting that particular day,
16   March 18, 2014, you had any sort of a medical issue--
17   A   No.
18   Q   --or had a medical treatment?
19   A   No.
20   Q   And you didn't provide any sort of doctor's note?
21   A   No.
22   Q   The next entry on there is March 27, 2014. Do you see
23   that? It's on both documents.
24   A   Yeah, I see that.
25   Q   And it indicates there-- Let's go ahead just because I

## Page 71

1   think it's helpful and keeps our record straight.
2   According to my calendar, March 27th is a Thursday.
3   A   Okay.
4     MR. FREED: That's correct.
5   Q   Of 2014. Thank you.
6     So that would be the shift that begins at
7   11:00 p.m. on March 26th and carries over till
8   7:00 a.m. March 27th?
9   A   Right.
10   Q   And according to Exhibit 9, it says you called, going
11   to be late, you missed four hours, and you were
12   assessed half a point. Do you see that?
13   A   Yeah.
14   Q   Okay. I know this gets a little monotonous, but I want
15   to give you an opportunity--
16   A   Okay.
17   Q   --for every absence you got any sort of attendance
18   point for. Are you able to testify under oath that
19   being late that day had anything to do with a medical--
20   A   No.
21   Q   --condition?
22   A   No.
23   Q   Okay. And can you testify as to whether you were
24   undergoing any sort of medical treatment during that
25   half-shift or whatever-- Let me rephrase it.

Case 2:16-cv-01013-PP   Filed 08/21/17   Page 21 of 48   Document 18-1

Page 72

1  A  No.
2  Q  And I will represent to you again I don't see a
3     doctor's note covering that late arrival.
4  A  No.
5  Q  You're not aware of one?
6  A  No.
7  Q  Okay.  Can you tell me under oath regarding any
8     information you might have provided to Brunswick other
9     than saying I'm going to be late?
10 A  Yep.  Yep.
11 Q  What information can you provide?
12 A  That I called Kevin, which was the sixth shift
13    supervisor that was taking over for Troy Schwartz.
14    This is the week that I had been putting in so many
15    hours.  And if you get it approved by your supervisor--
16    I said, "I've got a 16-hour shift going.  Can I come in
17    at three o'clock in the morning?"  And if it's--if they
18    have somebody to cover for them four hours, they will
19    do that.
20       And Shane's like, "Well, let me check up with the
21    other supervisor," Kevin that was working that night.
22    He said, "Yeah, we have somebody that can cover you, so
23    just come in at three o'clock."  But instead I still
24    got a half a ding for that.
25 Q  Okay.

Page 73

1  A  Or half a day or whatever you want to call it, .5.
2  Q  Okay.  Do I understand this correctly then to say that
3     there were some days when you knew you were going to
4     cover part of first shift?
5  A  Yep.  Yep.
6  Q  So you knew that when your regular third shift ended at
7     7:00 a.m. you were going to stay over and work at least
8     four hours on the first shift?
9  A  Right.
10 Q  So what you're saying is on those days when you knew
11    that was going to happen, there were times when you
12    called and said to the supervisor, since I'm going to
13    work four hours on third shift and four hours on first
14    shift, can I just skip the first four hours of third
15    shift?
16 A  Right.
17 Q  And you would do that contingent on an understanding
18    that someone was available to cover you?
19 A  Right.
20 Q  And so you did not believe you should receive a ding or
21    in this case half a ding for that situation?
22 A  No, because I did cover my shift, and I covered part of
23    first shift's.  Not second, but--  If I had to work 16
24    hours straight, I would do my shift and first shift.
25    But if the case is where I can do part of the third

Page 74

1     then I'd just do mine, my eight hours, or come in and
2     work four hours on first shift and then go home.
3  Q  Where did you develop the understanding that that would
4     not result in the assessment of points?
5  A  I don't know.  Because it was approved by the
6     supervisor.
7  Q  Which supervisor approved it?
8  A  Kevin.  I mean, not Kevin, but Shane Dvorjac.
9  Q  Shane Dvorjac?
10 A  Yeah, Dvorjac.  And in the conversation when this came
11    up when I got the half a ding, he remembers the
12    conversation, but he doesn't recall telling me that
13    just come in at three o'clock.  We had the shift
14    covered.
15 Q  Okay.  But that wasn't a situation where you told the
16    company--
17 A  No.
18 Q  --I'm coming in late--
19 A  No.
20 Q  Let me finish, okay?  We're getting familiar with each
21    other, but we're going to make--
22 A  Okay.
23 Q  --John--
24 A  Okay.  Confused?
25 Q  Yeah.  Let me finish.

Page 75

1  A  Okay.
2  Q  This wasn't a situation where you called and said I'm
3     going to be four hours late for medical reasons?
4  A  No.
5  Q  And are you aware of anything in the contract or any
6     other Brunswick policy that states employees can be
7     excused from attendance points under the circumstances
8     you just explained?
9  A  Yes, it's not in the book.  It's not in the handbook.
10    It's something between HR, plant manager, and
11    supervisors.
12 Q  Okay.  It's a verbal understanding?
13 A  Yeah, it's not something that's written in the contract
14    or the handbook.  It's something that is approved
15    through HR, something that's approved through plant
16    manager or supervisor.  So none of this is in there.
17 Q  Okay.
18 A  But the union does know that this does happen.
19 Q  All right.  But you agree with me you did call in?
20 A  Yes.
21 Q  And you agree with me that you said you're going to be
22    late?
23 A  Yes.
24 Q  And you agree with me that you missed the first four

Page 76

1  A  Yes.
2  Q  And that it wasn't for medical reasons?
3  A  No.
4  Q  Let's go to the next entry, which is May 3rd of 2014.
5    If you look on Exhibit 9 under the note, it says,
6    "Late. Dome light was left on in his car." And then
7    if you look at Exhibit 10, it says hours missed, 1.0,
8    absence points, .5.
9      Do you recall the specifics of that situation?
10  A  Yes.
11  Q  Okay. When it says the dome light was left on in your
12    car, was that a car that was in the Mercury parking
13    lot?
14  A  Yes.
15  Q  And how did you become aware that the dome light was--
16  A  Because I was at work. I wasn't late. I was at work.
17    One of the guys that came in later to cover somebody
18    else's shift that was called in for third shift said,
19    "Joe, isn't that your black car out there?"
20      I said, "Yeah. Why?"
21      "Your dome light's on."
22      So for me to be able to go out there and--it never
23    took no hour. So I was already at work when this
24    happened.
25  Q  Did you have to clock out to go turn--

Page 77

1  A  Yeah.
2  Q  --the light off?
3  A  Troy Schwartz, the supervisor, said, "Well, you know
4    you have the punch out."
5      I said-- he said, "Even though it's only going to
6    take you a couple minutes, but punch out. And then
7    when you come back, punch back in." In which I did
8    that, but it was no hour.
9  Q  Okay. You think it was less than an hour?
10  A  It was only ten minutes.
11  Q  You think it was ten minutes?
12  A  Yeah.
13  Q  Okay. But, again, that assessment of points, whether
14    fair or not fair, had nothing to do with any medical
15    issue that you had?
16  A  No.
17  Q  It's a dispute over how long you had to clock out—
18  A  Right.
19  Q  --for purposes of turning that dome light off in your
20    car?
21  A  Right. I can even give you the name of the guy that
22    told me.
23  Q  Okay. What's his name?
24  A  Jonathan Banks.
25  Q  Okay.

Page 78

1  A  He was the one that was late, and he's the one that
2    told me. He said, "Your car light is on in your dome."
3    Or, "Your dome light's on in your truck."
4      I said, "Really? It's supposed to automatically
5    shut off."
6      He said, "No, it's on."
7      So I had to ask permission to go out there and--
8    And he said, "Well, you know part of the rule is if you
9    walk outside of the gate, you got to punch out and then
10    punch back in when you come in."
11  Q  Okay. So you know you punched out, and you know you
12    punched in--
13  A  Right.
14  Q  --right? Okay.
15  A  And if I---
16  Q  Sure.
17  A  --may say something, this isn't the warning that I
18    have.
19      MR. FREED: Are you referencing
20  Exhibit 10?
21      THE WITNESS: Right.
22      MR. FREED: You're saying that's different
23  than the final warning you--
24      THE WITNESS: Right. It does not have my
25  signature on it.

Page 79

1  Q  Oh, on Exhibit 10 you would have signed something--
2  A  Yes.
3  Q  --acknowledging you got it?
4  A  Yes.
5  Q  Okay. But Exhibit 10 is what you got. It just doesn't
6    have your signature acknowledging receipt.
7  A  Everything is different than the one I have. I don't
8    know if I have brought it with me or not.
9  Q  What do you mean everything's different? The dates are
10    different?
11  A  Dates, the half point, .5, .5 three times.
12  Q  Have you provided the copy that you got to your
13    lawyers?
14  A  I don't know if he has that or not.
15      MR. FREED: I might have it.
16      MR. VOGEL: Okay. Let's take a look.
17  Because if the documents are different, I'd like to
18  know.
19      MR. FREED: Can we take a break?
20      MR. VOGEL: Sure.
21    (Recess from 10:42 a.m. to 10:49 a.m.)
22  Q  We just took a break because you had indicated,
23  Mr. Buck, that you not only think at some point there
24  was a copy of the final written warning dated May 30,
25  2014, with your signature acknowledging receipt--

Case 2:16-cv-01013-PP   Filed 08/21/17   Page 23 of 48   Document 38

Page 80

1  A   Right.
2  Q   --but you also indicated that you thought some of the
3      information in the content of that final written
4      warning was different than the document we're looking
5      at as Exhibit 10 today.
6  A   Yes.
7  Q   Your attorney during the break checked in the documents
8      that they've received and produced to Brunswick, and
9      the only copy they have of the May 30, 2014, final
10     written warning is identical to Exhibit 10, right?
11 A   Yes.
12 Q   Okay. And you have indicated that you're going to
13     check your documents and records; and if there's
14     another copy of the written warning with your
15     signature, you will provide it to your counsel.
16 A   Right.
17 Q   Thank you.
18         The next entry on both Exhibit 9 and Exhibit 10 is
19     May 19, 2014, right?
20 A   Yes.
21 Q   And that indicates that you called in, you ended up
22     missing a full day, and you were assessed one point,
23     correct?
24 A   Yes.
25 Q   Okay. That is a document for which I believe we have

Page 81

1      the call in. Let me ask first. If I say the telephone
2      number (920) 933-2857, do you recognize that number?
3  A   Yes.
4  Q   Was that your cell phone number?
5  A   No, home phone.
6  Q   That's your home phone landline number from when you
7      worked at Brunswick--
8  A   Right.
9  Q   --correct?
10        So if calls according to Brunswick records came
11     from that number, we can agree they came from your home
12     phone?
13 A   Yes.
14 Q   And I think as we play them, you will recognize your
15     voice.
16        This is a little out of the ordinary.
17     Technology's a little bit ahead of me, although this
18     isn't too complicated in terms of technology. What I
19     have here is something downloaded to an e-mail, and it
20     says it's a voice mail you and are I-- Can you see
21     that from there?
22 A   Barely.
23 Q   It says it's a voice mail from (920) 933-2857, correct?
24 A   6:25 p.m.?
25 Q   Right.

Page 82

1      your home number, correct?
2  A   Yeah, that's my home phone.
3  Q   And I provided these to your counsel. I'm not trying
4      to trick you.
5  A   I know, but Joe Black?
6  Q   Right. That's a software that tries to dictate it.
7      I'm actually going to play the call for you so you can
8      hear the actual words that were used.
9  A   Okay.
10 Q   The software that tries to record it in words--
11 A   Okay.
12 Q   --always gets it wrong. Some of them are even funnier
13     than that. But this would make sense, right, because
14     this is--we have an absence recorded on May 19th--
15 A   Okay.
16 Q   --and it would make sense that if you were to call in,
17     you would call in on May 18th at 6:25 p.m.
18 A   Right.
19 Q   That would coincide with what we've been talking about?
20 A   Right.
21 Q   Okay. I'm going to play that message, and I've turned
22     the volume up nice and loud.
23 A   Okay.
24        Audio recording: "Hey, Troy. Joe Buck
25     here. I'm going to take a ding tonight.

Page 83

1      I got some family issues with my kid, so
2      I'm not going to be in tonight. All
3      right? Talk to you later. Bye."
4  Q   Could you hear that okay?
5  A   Yes.
6  Q   Was that your voice?
7  A   Yes.
8  Q   And do we agree that in that call, which was presumably
9      to Troy Schwartz, correct?
10 A   Right.
11 Q   Would you actually call Mr. Schwartz's cell phone?
12 A   Yes.
13 Q   And then you would leave him a voice mail?
14 A   I'd leave him a voice mail, and I also would text him.
15 Q   Okay. And in that call can we agree that you said that
16     you were going to take a ding?
17 A   Yes.
18 Q   Which means you understood you were going to get an
19     attendance point?
20 A   Right.
21 Q   And I believe what you said, and I think John could get
22     down that message in its entirety, you had what you
23     described as family issues involving your kids?
24 A   Yeah--
25 Q   --and it would provide you--

Page 84

1 A No.
2 Q --or specifics?
3     So you didn't provide any information in that call
4 that would suggest it had to do with a medical issue
5 you were having?
6 A Right.
7 Q Such as your back or some sort of insomnia, right?
8 A No.
9 Q And can we agree that that was not-- Let me rephrase
10 that.
11     Can we agree that you did not miss work that day
12 to receive medical treatment for yourself?
13 A No.
14 Q You did not miss work because of a medical condition
15 that you had?
16 A No.
17 Q And there is no doctor's note excusing you from that
18 day?
19 A No.
20 Q So you are not challenging that day?
21 A No.
22 Q The next entry on both Exhibit 9 and Exhibit 10 is
23 May 22, 2014.
24 A Okay.
25 Q And it indicates on Exhibit 10 that you missed four

Page 85

1 hours and were assessed half a point, correct?
2 A Yes.
3 Q We also have that call. And I'm going to show you this
4 one, sir. The heading indicates--and your counsel can
5 read it--that the call came in on Wednesday, May 21st,
6 2014, at 10:52 p.m. Is that what that says?
7 A Yeah.
8 Q Okay. And we see on the documents that the date that
9 you were assessed points was May 22nd, correct?
10 A Right.
11 Q And, again, that's consistent with the pattern we've
12 talked about, right?
13 A Right.
14 Q And this would indicate that you called in nine
15 minutes--eight minutes or nine minutes-- I see there's
16 a 10:51 there too. But less than ten minutes before
17 your shift was scheduled to begin, correct?
18 A Right.
19 Q I'm going to go ahead and play that one as well, and
20 when it's done, I'll ask you a couple questions.
21     Audio recording: "Hey, Troy. Joe Buck
22 here. Say, I'm running late. I just
23 woke up late. I forgot to set my alarm.
24 So I'll be in at three o'clock. Just to
25 let you know--oh, it's 10:30 PM?

Page 86

1     I'll see you at 3:00. All right?
2 Goodbye."
3 Q Could you hear that okay?
4 A Yes.
5 Q Was that your voice?
6 A Yes.
7 Q And you were leaving that message for Mr. Schwartz,
8 correct?
9 A Yes.
10 Q And you were indicating in that message that you had
11 forgotten to set your alarm and therefore you had
12 overslept?
13 A Yes.
14 Q You didn't mention any sort of medical condition or
15 medical issue?
16 A No. I just got done pulling a 16-hour shift.
17 Q Sure. Did you ever provide any sort of doctor's note
18 that might excuse you--
19 A No.
20 Q --from missing that half day?
21 A No.
22 Q Were you aware-- You say in there "I'll see you at
23 3:00," which is exactly halfway into your shift, right?
24 A Yes.
25 Q Was that something where you knew that you'd only get

Page 87

1 half a point as long as you made it for half the shift?
2 A Yes.
3 Q If you missed any more than half the shift, you'd get a
4 full point?
5 A Right.
6 Q Is it fair to say that once you knew you were going to
7 be at least 30 minutes late, it didn't make a
8 difference for purposes of points whether you were
9 30 minutes late or four hours late for points?
10 A No.
11 Q As you hear that call, would anyone receiving that call
12 have any knowledge that you were late for medical
13 reasons?
14 A No.
15 Q The next entry on there--on both of them, and I think I
16 mistakenly said May 26th because the eight looks like a
17 six--
18 A Yeah, it does.
19 Q --on Exhibit 10. But if we look at Exhibit 9, it says
20 May 28th. And if we look at Exhibit 10, I think we can
21 agree that even though it's a little tight, that that
22 would also be May 28th, right?
23 A Yeah, that's May 28th.
24 Q And it indicates on May 28th on Exhibit 9, it says,

Page 88

1    Do you know what that stands for?

2 A   No, I have no idea.

3 Q   Okay. And then on Exhibit 10 it indicates you missed

4     eight hours and were assessed one point, correct?

5 A   Right.

6 Q   And I have that call as well. Actually, let me play

7     two calls for you if I can. So let me show you first--

8     I note there's nothing on here that indicates you were

9     assessed any attendance points for May 27th, 2014,

10    right?

11 A   No.

12 Q   Let me first show you this one, and this indicates that

13    the call came in again from your home phone number on

14    Monday, May 26, 2014, at 3:58 p.m., right?

15 A   Right.

16 Q   Let me play that one for you.

17       Audio recording: "Hey, Troy, this is

18       Joe Buck. I'm wondering if I can take a

19       vacation day for tonight. I had to put

20       my dog down to sleep on Saturday

21       morning. My intentions were coming to

22       work tonight, but it's been kind of

23       hard. If you can give me a call at

24       (920) 933-2857, I'd appreciate it. All

25       right? Talk to you later. Goodbye."

Page 89

1 Q   Just to go through it, we can agree that's your voice,

2     correct?

3 A   Yes.

4 Q   And that was a call you made to Mr. Schwartz?

5 A   Yes.

6 Q   And what happened there--and I feel for you on this

7     issue--you had to put your dog to sleep.

8 A   Right.

9 Q   And you asked if you could take a vacation day for what

10    would have been what we would call the May 27th shift?

11 A   Right.

12 Q   And as we see, there were no points assessed. You

13    didn't come to work May 27th, right?

14 A   That would have been overtime.

15 Q   Okay. But regardless whether it was overtime or not,

16    you were not assessed points for missing that?

17 A   No. See I just get done pulling a 62-hour shift all

18    week. I was scheduled to come in that night; but when

19    I got home that Saturday morning from working overtime

20    Friday night is when my dog-- This is kind of touchy

21    for me because--

22 Q   And I'm not trying to bring up an old wound, and I

23    remember--and this is apropos of nothing, but I

24    remember I had to go take a deposition the morning I

25    got a call that my family dog--and I have to say they're

Page 90

1     know it's--

2 A   Well, not to make up an excuse. I'm just saying that

3     that day was a bad day for me and the whole week would

4     have been long and I couldn't sleep and--

5 Q   And I understand that.

6 A   So he granted me the vacation day for that night but

7     didn't grant it the next day.

8 Q   Okay. I want to go over the next day in just a second.

9     But the reason you wanted to be excused from work

10    was--your stated reason--

11 A   Right.

12 Q   --was that you were upset about the loss of your dog?

13 A   Right.

14 Q   Not a medical condition that you had, correct?

15 A   Well, I was lacking sleep, but it was because of my

16    dog.

17 Q   Okay. Understanding your testimony now and not arguing

18    with you that you had been short on sleep because of a

19    long week, that's not what you said when you called in.

20 A   Right.

21 Q   You did not provide information to Brunswick indicating

22    that you wanted to be excused from May 27th because of

23    any sort of sleep-related issue--

24 A   No.

25 Q   --for you, right?

Page 91

1 A   No.

2 Q   Okay. I'm a little confused because I have May 27th,

3     2014, as a Tuesday.

4       MR. VOGEL: Do you agree with that,

5     Counselor?

6       MR. FREED: It's what my calendar says.

7 Q   So don't we agree May 27th, 2014, was your regular

8     shift, not overtime, if it was a Tuesday?

9 A   No, I still worked overtime. I was working first shift

10    and--

11 Q   Let me clarify.

12 A   --third and--

13 Q   When you-- You indicated if you ever ended up coming

14    in on a Saturday or a Sunday, that was pure overtime.

15 A   Yeah.

16 Q   And I understand that there might have been other days

17    when you would have worked overtime, but based on that

18    call we just listened to, you were asking to be

19    excused--

20 A   Yeah, but that was on a Saturday that I called. If

21    you're saying the 27th is on a Wednesday--

22       MR. FREED: No, Tuesday.

23 Q   It's a Tuesday.

24 A   Tuesday. I don't know how they got that.

25 Q   Okay. And that would have been overtime -- the call came in on

Page 92

1    May 26th, right?
2         MR. FREED: That would have been Monday.
3    Q   That would have bene Monday. That's what we just
4    looked at--
5    A   Okay.
6    Q   --right? Okay.
7         And May 27th, your attorney and I both agree on
8    the calendars we have on our somewhat similar phones,
9    May 27th would have been a Tuesday.
10   A   I don't know how though.
11   Q   Because you think your dog died on a weekend?
12   A   No, it did.
13   Q   Okay.
14   A   I've got proof of that.
15   Q   Okay. But I also know--and we'll play the next call in
16   a second--its impact on you continued for a few days.
17   A   Yeah.
18   Q   So you could have been calling in on May 26th even if
19   you put your dog down a couple days previously saying
20   can I have the day off because I'm still shaken up
21   about this, right?
22   A   Well, Saturday. I know it was Saturday.
23   Q   Okay. But it's not inconsistent that--
24   A   But I would never called in on the 27th. If this
25   happened on a Saturday, why am I calling in on the

Page 93

1    27th? You say the 27th is on a Tuesday.
2         MR. FREED: You actually called on Monday.
3    Could you still have been shaken up is what counsel is
4    asking.
5         THE WITNESS: Oh, for the 28th then?
6         MR. FREED: No, for your dog having died
7    that weekend, could you have asked for subsequent days
8    off?
9         THE WITNESS: Yeah.
10   Q   And I don't think we're really disagreeing about it.
11   A   Okay.
12   Q   I'm not challenging the date that your dog passed away.
13   A   Okay.
14   Q   But you're agreeing with me that I've shown you--
15   A   Yeah.
16   Q   --a voice call that's dated--
17   A   My voice, okay.
18   Q   Let's make sure we talk one at a time. And I'm sorry,
19   I know I tend to go show, so let me finish. Okay.
20        Just to be sure we have a full understanding about
21   the May 26th call, do you agree with me that you called
22   in on the afternoon of May 26th and asked to be excused
23   from work on May 27th?
24   A   Yes.
25   Q   And do you recall--why not asked to be excused--You're

Page 94

1    attendance points for your May 27th absence?
2    A   No. Or, yeah.
3    Q   You agree?
4    A   Okay.
5    Q   You were not assessed points that day--
6    A   No.
7    Q   --correct?
8    A   No.
9    Q   Okay. All right. And in the information you provided
10   to Brunswick in the May 26th call, you were asking to
11   be excused because of the death of your dog?
12   A   Right.
13   Q   I'm going to show you another call that's Tuesday,
14   May 27th, 2014, recorded at 4:52 p.m., correct?
15   A   Yes.
16   Q   And this says May 27th was a Tuesday, correct?
17   A   Yes.
18   Q   Which would make May 28th a Wednesday, correct?
19   A   Yep.
20   Q   Okay. I'm going to play that.
21        Audio recording: "Hey, Troy, Joe Buck
22        here. Hey, if you get a chance, can you
23        please give me a call before the end of
24        the night? I just-- I'm having a hard
25        time with my dog, you know, putting her

Page 95

1    to sleep. (Indiscernible) with me for
2    13 and a half years, and it's just--I'm
3    just really having a hard time. If you
4    can call me, I appreciate it.
5    (920) 933-2857. All right, bye."
6    Q   And, again, we're going to move on from the situation
7    regarding your dog here in a moment, but that's your
8    voice on that call, correct?
9    A   Yes.
10   Q   And you are asking Mr. Schwartz to excuse you for
11   another day of work, and the reason you give is some
12   struggles you're having with the dog issue?
13   A   Right.
14   Q   And as I think you alluded to earlier--and just to
15   close it out--you didn't come to work on May 28th, and
16   you were assessed a point for that, correct?
17   A   Right.
18   Q   But you agree with me that your absence that day was
19   due to the issues with the dog, not personal medical
20   issues?
21   A   That was a personal medical issue.
22   Q   But the information that you provided to Brunswick was
23   that you were upset about the death of your dog?
24   A   Right, and I hadn't been able to sleep. But that's--
25   Q   And do you recall--why not asked to be excused--You're

Case 2:16-cv-01015-PP Filed 08/21/17 Page 27 of 48 Document 18-1

**Page 96**

1  hearing my voice, but you're not hearing his return
2  call back.
3  Q  Okay.  Do you have his return call back?
4  A  No, I don't tape.
5  Q  Okay.
6  A  Why do you think they're taping this stuff?  Because
7  they know it's going to come back and bite them.
8  Q  Well, they're taping it because it's a voice mail,
9  right?
10  A  But they don't have the ones in 2013 or any of that, do
11  they?  No.
12  Q  All right.  I want to hand you what's been marked as
13  Exhibit 11 to your deposition, which is a one-page
14  document numbered for production D2.  Is that a
15  document that you recognize?
16  A  Yes.
17  Q  And this is a document issued on Aurora Health Care
18  letterhead, correct?
19  A  Yes.
20  Q  And it is dated at the top May 29, 2014, correct?
21  A  Yes.
22  Q  And it regards you, right?
23  A  Yes.
24  Q  And it states:  "To Whom It May Concern:
25      "This is to certify that Joseph was seen in the

**Page 97**

1  clinic on 5/29/2014.  Please excuse Joseph from missed
2  work May 28th.
3      "Remarks:  Please excuse missed work on May 28th.
4  Joe was in the clinic for evaluation of situational
5  insomnia.  Treatment has been initiated."
6      And it is signed by someone named Theresa J.
7  Baseley, B-A-S-E-L-E-Y, who's identified as an NP,
8  which I think we can agree is an abbreviation for
9  nurse-practitioner.  Do you agree with me?
10  A  Yes.
11  Q  Just so we don't have a misunderstanding here,
12  May 29th, 2014, was a Thursday, according to the
13  calendar.
14      MR. VOGEL:  Are you with me on that,
15  Counsel?
16      MR. FREED:  29th?
17      MR. VOGEL:  Yes, sir.
18      MR. FREED:  Yes.
19  Q  So this says you went to the clinic sometime on
20  May 29th, correct?
21  A  Right.
22  Q  Do you know what time you went?
23  A  No.
24  Q  Was it during daytime hours?
25  A  It was during the

**Page 98**

1  Q  So you went sometime when you were not scheduled to
2  work, correct?
3  A  No, I was-- Well, yeah.
4  Q  You did not visit the clinic--
5  A  No.
6  Q  Let me finish, please.
7      You did not visit the clinic between 11:00 p.m.
8  and 7:00 a.m., did you?
9  A  No.
10  Q  To your knowledge, is the clinic that we're referring
11  to here even open from 11:00 p.m. to 7:00 a.m.?
12  A  No.
13  Q  And had you made an appointment to go to the clinic?
14  A  Yes.
15  Q  When had you made the appointment?
16  A  The 28th.
17  Q  And you would have made the appointment sometime during
18  daylight hours, correct?
19  A  Yeah, it was like 1:45 in the afternoon.
20  Q  Okay.  Why did you make an appointment at the clinic?
21  A  Because I hadn't slept in days.
22  Q  And they were able to get you in the next day?
23  A  Yeah.  They tried to get me in there that afternoon
24  before I was scheduled to work, but they didn't have
25  any openings unless somebody canceled out.  They were

**Page 99**

1  going to call me and let me know.  Otherwise, they
2  said, you know, go to the ER.
3      And I said, well, I'm not going to go the ER for
4  something that has to with--it's not an emergency
5  thing.  It's just something I haven't been able to
6  sleep in days and couldn't understand why.
7  Q  So you went ahead and went to work for your shift that
8  started at 11:00 p.m. on May 28th and concluded at
9  7:00 a.m. on May 29th?
10  A  No, I didn't work.
11  Q  You weren't assessed any points.
12  A  Yeah, I was.  It says right here.  May 28th, one ding.
13  Q  Listen to my question, okay?  We already talked about--
14  A  Okay.
15  Q  --you got a ding on the 28th.  I'm talking about the
16  next day, May 29th.
17      MR. FREED:  You said May 28th.
18      THE WITNESS:  Yeah, you did.
19  Q  I need to listen to my own questions.  I meant the
20  shift that started at 11:00 p.m. on May 28th--
21  A  Yeah, I--
22  Q  --and carried--
23  A  I didn't work the 28th, May 28th.
24  Q  You didn't work your May 28th shift?

Page 100

1 Q  Okay, let me just call it the May 29th shift. And
2    where I'm getting confused--and I'm sorry if I
3    misspoke, and I'm sorry if I followed up with a
4    question because I misspoke. But when we talk about
5    your May 29th shift, it starts at 11:00 p.m. on
6    May 28th?
7 A  Right.
8 Q  And it finishes at 7:00 a.m. on May 29th.
9 A  Right.
10 Q  We're calling that the May 29th shift.
11 A  Okay. You're asking me if I worked? Yeah, I worked.
12 Q  Okay.
13 A  I just got confused when you say--
14 Q  I probably screwed it up, which means we need to take a
15    break pretty soon. Okay.
16      So just to make sure we're on the same page, you
17    missed work May 28th and got assessed a point, correct?
18 A  Yes.
19 Q  You worked May 29th?
20 A  Yes.
21 Q  You got off at 7:00 a.m., and at some point later on
22    May 29th you went to the clinic?
23 A  No, that's not true. See--
24 Q  The letter--the letter, Exhibit 11, just help me
25    understand because I just want to make sure I

Page 101

1    understand. The letter says, "Joseph was seen in the
2    clinic on 5/29/2014."
3 A  Right. Okay.
4 Q  You worked your May 29th shift, you just told me.
5 A  Okay. Yes, that's true.
6 Q  So if you worked on May 29th and then you also went to
7    the clinic on May 29th, didn't you go to the clinic
8    after you finished your shift?
9 A  See, this is where it's confusing because it goes back
10    to the 28th. The 28th is the actual day that the
11    doctor's excuse is supposed to be made for, and because
12    I worked so-- The 28th is considered one day, one hour
13    in the day, so it goes to the 29th. We always have to
14    backdate it because our shift would be a Wednesday or a
15    Wednesday. We have to--we have to add that day as the
16    28th.
17      I don't know if you understand what I'm saying or
18    if I'm saying it right or not, but it's always been
19    that way. If you take-- Okay, if I'm working third
20    shift, Sunday is considered our Monday, but they want
21    it considered as a Sunday. Even though you're coming
22    in Sunday night one hour before midnight, so we're
23    working one hour of Monday in our Sunday. So
24    everything is supposed to be backdated to the day that
25    you come in. If you work on Sunday of Part of this

Page 102

1    o'clock Sunday night, that's considered our Monday, so
2    everything has to be backdated.
3      MR. FREED: So-- Never mind. I can't ask
4    questions.
5 Q  And we might get a clarification here. I want to make
6    sure I understand. So are you saying that you
7    understood this note from Aurora Health Care to be
8    saying Joseph was seen in the clinic on May 29th.
9    Please excuse missed worked on May 28th.
10 A  Right.
11 Q  They were excusing you from the shift that started at
12    11:00 p.m. on May--
13 A  28th.
14 Q  Okay. And continued till 7:00 a.m. on May 29th?
15 A  Right. That is considered our Monday, Tuesday,
16    Wednesday. Our Fridays are Thursday night.
17 Q  Okay. And so-- But do you agree with me that that
18    shows up on your record as the May 29th shift?
19 A  That's why it was supposed to be dated for the 28th.
20    The 29th should have nothing to do with it. That's
21    why-- I saw her on the 29th, Monday morning on the
22    29th. This is dated for the 28th is when I called in.
23 Q  One of the things that's going to make our record more
24    confusing-- I think we're all confused. Maybe we can
25    get back on track. May 29th, 2014, was a Thursday.

Page 103

1 A  Right.
2 Q  Okay? So Thursday, May 29th, 2014, is the calendar
3    day--
4 A  Right.
5 Q  --that you actually went to the clinic.
6 A  Yeah. That's this--probably the part that you're not
7    going to understand, and this is something that only
8    happens with third shift. I don't know if I'm
9    explaining it right or not, but--
10      MR. FREED: Can he clarify what shift he
11    actually missed?
12      MR. VOGEL: That's what I'm trying to
13    figure out.
14      THE WITNESS: The 28th.
15      MR. FREED: And when did that shift start?
16      THE WITNESS: Wednesday night at eleven
17    o'clock.
18 Q  Okay. But you also missed the shift that began
19    Wednesday--Tuesday night at eleven o'clock.
20 A  Yeah, but I took a vacation day.
21 Q  I'm sorry to do this, but we got to back up to get this
22    right because I told you we were going get off the dog
23    issue, which I know is sensitive.
24 A  The dog issue--

Page 104

1  A  --was something that at the time I--

2  Q  I understand. Look at my calendar for a minute. Okay?

3  A  Now, this is going back to 2014?

4  Q  But the dates are what the dates are. Your lawyer
5     doesn't think I'm messing with the calendar. My powers
6     are very limited and don't involve changing dates. I
7     assure you of that.

8  A  Okay. I know what you're saying, but it's like--

9  Q  I know it's confusing because the shift carries over
10     into two calendar days, right?

11  A  No, that's not how it works at Mercury.

12  Q  I know you don't know what to call it, Mr. Buck, but as
13     a literal fact, if you get there at 11:00 p.m. on one
14     calendar day, at midnight it becomes another calendar
15     day.

16  A  That's not how they state it, though, for third shift.

17           MR. FREED: That's not what he's asking.

18  Q  That's not what I'm asking.

19  A  No, I know it's the next day.

20  Q  In fact, I think what you told me since nine o'clock
21     this morning is that the shift that begins at
22     11:00 p.m. on May 26th and concludes at 7:00 a.m. on
23     May 27th is recorded in records as the May 27th shift.

24  A  Right.

25  Q  Okay. All right. So look at May 2014 on my calendar.

Page 105

1     Do you see that?

2  A  Yeah.

3  Q  So let's just go through this. May 26th is a Monday,
4     right?

5  A  Yes.

6  Q  May 27th is a Tuesday.

7  A  Okay.

8  Q  May 28th is a Wednesday; May 29th is a Thursday. We
9     don't have to go further than that.

10  A  No.

11  A  Okay.

12  A  Okay.

13  Q  All right. The first call-- I understand your dog
14     sadly, tragically passed away the weekend of May 24th
15     to 25th, 2014.

16  A  Okay.

17  Q  Right?

18  A  Yeah.

19  Q  You were still upset when the regular week came around,
20     right?

21  A  Yep, because of Memorial weekend.

22  Q  Absolutely. So we looked at-- Sorry to go over this
23     again, but I just want to be clear. We looked at the
24     fact that you called in on Monday, May 26th, 2014, at
25     3:57 or 3:58 p.m., and you called in to excuse work. Then

Page 106

1     you could take a vacation day because you had to put
2     your dog to sleep, right?

3  A  Right.

4  Q  Okay. And we've looked at the records, Exhibit 9 and
5     Exhibit 10-- Let's back up just to make sure we have a
6     clear understanding.

7           When you called on the afternoon of Monday,
8     May 26th at 3:58 p.m., you were asking to be excused
9     for what we're calling the May 27th shift, correct?

10  A  No.

11  Q  Mr. Buck, you've told me all day that the shift that
12     starts at 11:00 p.m. on Monday May 26th and carries
13     over until 7:00 a.m. on Tuesday, May--

14  A  So if I called--

15  Q  Let me finish my question. Is referred to as the
16     May 27th shift. And I can tell you that dozens of
17     people from Brunswick are going to explain that that's
18     how it's recorded in the system.

19  A  Okay.

20  Q  And I think you've told me all day that you agree with
21     me. If you call in on Monday afternoon at four o'clock
22     and say can I have tonight off, you're talking about
23     the shift that's scheduled to begin at 11:00 p.m. on
24     Monday, May--

25  A  Monday.

Page 107

1  Q  --26th and conclude at 7:00 a.m. on Tuesday, May 27th,
2     correct?

3  A  Right.

4  Q  And that's going to show up in your attendance records
5     as the May 27th shift.

6  A  Okay.

7  Q  Are we agreeing on that?

8  A  Yeah. I'm just getting a little confused.

9  Q  I know it's confusing, but I thought we were pretty
10     good on that.

11  A  Yeah.

12  Q  So this call on Monday, May 26th was to be excused for
13     the May 27th shift, right?

14  A  Right.

15  Q  Okay. And we've looked at the records, and you have no
16     points that were assessed for May 27th?

17  A  No.

18  Q  You did not get a ding--

19  A  No.

20  Q  --half or whole for May 27th. Okay.

21  A  I got a vacation day.

22  Q  Okay. Agreed. And that's going to record as a
23     vacation day for May 27th.

24  A  Right.

25  Q  Okay. Now, let's go through this afternoon at work. Then

Page 108

1  you called on Tuesday, May 27th at close to 5:00 p.m.,
2  correct?
3  A   Uh-huh.
4  Q   Is that a yes?
5  A   Yes.
6  Q   And you indicated that you were still struggling about
7  the dog, right?
8  A   Yes.
9  Q   And asking if you could have that night off, correct?
10 A   Right.
11 Q   And we're talking about the shift that would have begun
12 on May 27th at 11:00 p.m. and concluded on May 28th at
13 7:00 a.m., correct?
14 A   Yes.
15 Q   And that would be referred to in the records as the
16 May 28th shift, correct?
17 A   Right.
18 Q   And you didn't come to work that day, but you did get a
19 point assessed, correct?
20 A   Yes.
21 Q   All right.  So I think we're back on track--
22 A   Okay.
23 Q   --with regard to that--
24 A   Go ahead.
25 Q   --so thank you.

Page 109

1       So if you're looking at Exhibit 11, which is the
2  note from the clinic, here's my question from what you
3  understand.  That's all you can tell me.
4  A   Okay.
5  Q   You went to the clinic on May 29, 2014?
6  A   Right.
7  Q   Sometime during the hours of 9:00 to 5:00, somewhere in
8  there--
9  A   Right.
10 Q   --9:00 a.m. to 5:00 p.m., right?
11 A   Yes.
12 Q   Which are not hours you're scheduled to work?
13 A   No.
14 Q   And I'm going to ask you a few more questions about the
15 treatment there.  But when they said-- Let me do it
16 this way:  After your appointment on May 29th, did you
17 go to work?
18 A   Yeah.
19 Q   So on May 29, 2014, at 11:00 p.m. you reported to work
20 and you worked until at least 7:00 a.m. on May 30th?
21 A   Right.
22 Q   On May 28th you had a shift that was scheduled to begin
23 at 11:00 p.m. and end at 7:00 a.m., right?
24 A   Right.
25 Q   And we talk about how you could call that the

Page 110

1  May 29th shift, right?
2  A   No.
3            MR. FREED:  Yes.
4            THE WITNESS:  Okay, yes.
5  Q   We've talked about that all day.  Okay.  So here's my
6  question:  Let's just call it the shift that was
7  supposed to start at 11:00 p.m. on the 28th--
8  A   Okay.
9  Q   --and end at 7:00 a.m. on the 29th.  Okay?  If that's
10 called the May 29th shift in Brunswick's records, we
11 don't have any points assessed against you on May 29th,
12 right?  Just answer that question.
13 A   Yes.  Or no.  Okay.
14 Q   Did you get a point for the shift that begins at
15 11:00 p.m. on May 28th at ends at 7:00 a.m. on
16 May 29th?
17 A   Yes.
18 Q   Where does that show up in the records?
19 A   May 28th, right here.
20 Q   Mr. Buck, we've talked--we keep going over the same
21 thing.  That May 28th point is for the shift that
22 begins at 11:00 p.m. on May 27th and ends at 7:00 a.m.
23 on May 28th.  That's what that point was for.  I'm
24 talking about the next shift.  Did you get points for
25 missing the next shift?

Page 111

1  A   No, I did not.
2  Q   Did you work it?
3  A   Yes, I worked it.
4  Q   Okay.
5  A   Where you're confusing me is from the 28th, and then
6  I'm going to the 29th.  It's like I'm still in the 28th
7  because the 28th is considered that night that I
8  called.
9            MR. FREED:  That you called?
10           THE WITNESS:  Right.
11           MR. FREED:  You called the night--or, the
12 afternoon of the 27th.  I'm just trying to clarify.
13           MR. VOGEL:  That's fine.  I don't think
14 you're being obstreperous or anything like that.  I got
15 you.
16 Q   So here's where I think our ultimate confusion is:
17 When you bring in this record, this document, that says
18 that you were seen in the clinic on May 28th and to be
19 excused from work on--
20           MR. FREED:  Can I clarify?
21 Q   I'm sorry, it says you were seen on May 29th.
22 A   Right.
23 Q   And it says, "Please excuse Joseph from missed work on
24 May 28th."

Page 112

1 Q Explain to me what shift you understood you were being
2    excused from.
3 A For the 28th.
4 Q The shift that started at 11:00 p.m. on May 28th?
5 A Right. I don't know. I need a break.
6 Q Okay. We'll take a break. Because of that date
7    carryover, is it fair to say that you're not sure what
8    date you were being excused from or what shift?
9 A Supposed to be--I'm supposed to be covered for the
10    28th.
11         MR. FREED: Which would have been what
12 shift? Beginning when?
13         THE WITNESS: Eleven o'clock at night.
14         MR. FREED: On what date?
15         THE WITNESS: The 28th.
16         MR. VOGEL: Okay.
17         THE WITNESS: No?
18         MR. FREED: According to everything you've
19 said--and this is just for clarity--you said that a
20 shift that begins on May 27th at 11:00 p.m. and ends at
21 7:00 a.m. on May 28th would be considered by Brunswick
22 to be the May 28th shift, not the May 27th shift.
23         THE WITNESS: The 27th is the day that--
24         MR. FREED: It starts, but it's only one
25 hour on May 27th, and there's seven hours on May 28th.

Page 113

1 And Brunswick considers that the May 28th shift. Isn't
2 that how they do it?
3         THE WITNESS: I don't even know anymore.
4         MR. FREED: Okay.
5         THE WITNESS: I don't.
6         MR. VOGEL: Okay, that's fair. You need a
7 break. Let's take a break.
8         MR. FREED: Let's do that.
9    (Recess from 11:34 a.m. to 12:45 p.m.)
10         MR. VOGEL: We are back on the record
11 after a lunch break.
12 Q You understand, Mr. Buck, that when we take breaks and
13    we come back you're still under oath, right?
14 A Yes.
15 Q Pretty much goes without saying, but I mention it once
16    sometimes. Okay.
17    I want to talk about Exhibit 11 a little bit more,
18    which is the note from Aurora Health Care dated May 29,
19    2014. Can you tell me how long your appointment with
20    Aurora Health Care lasted?
21 A About an hour.
22 Q Okay. Can you tell me what was done during that
23    appointment?
24 A She gave me some laxatives and a sleeping pill to try
25    to get caught up on sleep.

Page 114

1 Q And that was Ms. Baseley?
2 A Yes.
3 Q Did you go back to the clinic for any additional
4    treatment for any insomnia-related conditions after the
5    May 29th visit?
6 A Yes.
7 Q Okay. About how many times did you go back?
8 A Twice.
9 Q Did you go back before or after your employment with
10    Brunswick ended?
11 A I went before.
12 Q So two more times between May 29th and August 25th,
13    2014?
14 A Right.
15 Q Okay. Do you have anything that would pinpoint when
16    those two other appointments were?
17 A I do. It's in a log like that big so--
18 Q And-- My apologies. I lost my train of thought there.
19    Were the visits on the two other occasions
20    any--was different treatment provided than was provided
21    during the May meeting?
22 A No, they kept it on the same. She put me on like
23    Trazodone, but those were actually giving me headaches.
24    So it was like from the first time I saw her on the
25    29th, I went back two weeks later for a follow-up. The

Page 115

1 dates I don't have.
2 Q That's okay. The second visit was about two weeks
3    after the first?
4 A Right.
5 Q Okay. And during that follow-up, you indicated that
6    the medication she prescribed had given you headaches?
7 A Yes.
8 Q So they changed the medication--
9 A Yes.
10 Q --and tried something else?
11 A I have it somewhere in there.
12 Q That's okay. And then approximately how long was there
13    between the second and third visit?
14 A Thirty days.
15 Q Was that just a follow-up?
16 A Yeah, just to see how everything was going.
17 Q Was the second medication helping you?
18 A Yes.
19 Q Was your insomnia helped by the medication?
20 A Yes.
21 Q Let's see if we can do this without pulling each
22    other's hair out.
23 A Okay.
24 Q Did you have any discussion with anyone at Brunswick

Page 116

1   A   Yes.
2   Q   Okay. Who?
3   A   Troy Schwartz.
4   Q   Anyone else?
5   A   Jennifer Witt.
6   Q   Two separate conversations?
7   A   Yep.
8   Q   Was the conversation with Mr. Schwartz first?
9   A   Yes.
10   Q   Okay. And tell me about that conversation starting
11      about--starting with when did you have it?
12   A   That very same day, the 29th, when I come into work
13      that night.
14   Q   Okay. So you brought in this note, and what were you
15      asking Brunswick to do with regard to that note?
16   A   Accept the first note that I got for the 29th that was
17      dated for the 28th for my absence from the 28th.
18   Q   Okay. And what response did they give you?
19   A   They accepted the excuse. But then the following
20      week--the following week Troy Schwartz came up to me on
21      my shift--I don't know exactly what day it was, but he
22      came up and says, "HR said that you need to go back and
23      get it dated for the 28th."
24      I said, "Well, it is dated for the 28th."
25      "No, it's dated for the 29th, but it's for the

Page 117

1      28th."
2      I said, "Well, how can they not accept it? They
3      accepted it, and now they're going to decline it?"
4   Q   What do you mean they accepted it?
5   A   They accepted it. They accepted the doctor's excuse.
6      Yeah, it was for my absence for the 28th, but they
7      understood that I couldn't get into the doctor unless I
8      went to the ER on the 28th.
9   Q   Okay. Are you saying that they initially took the
10      point off?
11   A   They never even gave me a point for that whole week.
12   Q   Well, we know at some point they gave you a point.
13   A   Yeah, that was following.
14   Q   You're saying the point didn't show up until sometime
15      after these discussions about the note?
16   A   During our interview for the 6.5.
17   Q   Okay.
18   A   That was in June.
19   Q   Okay. So did Mr. Schwartz explain to you that the
20      plant had a practice that it didn't accept doctor's
21      notes for visits that occurred after the day in
22      question was missed?
23   A   No.
24   Q   Did Ms. Witt tell you that--
25   A   No.

Page 118

1   Q   --in a later conversation?
2      Tell me about your conversation with Ms. Witt.
3   A   The conversation I had with her is just, "Well, how can
4      you accept my--you accept it for the first week and
5      then you're declining it for the second?"
6      You know, my scheduled day on the 28th is for the
7      28th, you know, so basically Wednesday is considered
8      our Thursday. So if I go to see the doctor on the
9      29th, it's backdated because that is considered our
10      Wednesday, which is the 28th. I guess that's where I
11      was getting a little confused.
12   Q   Well, I won't say I'm not confused, but--
13   A   Well, because this is something that I've always known
14      since I was on third shift. If you call in or if you
15      got a doctor's excuse, make sure it's dated for the day
16      that you actually called in. So the 28th is when I
17      called in. The 29th is the day that I couldn't--is the
18      only day that I could get in because I did go to work
19      that Thursday on the 29th.
20   Q   And--
21   A   And Thursday is considered our Friday because our week
22      starts Sunday night, Monday, Tuesday--Monday would be
23      our Tuesday, Wednesday would be our Thursday, Thursday
24      would be our Friday.
25   Q   I got you. I understand what you're saying there, and

Page 119

1      I don't question that you saw--went to the clinic on
2      May 29th.
3   A   Okay. I tried to get in on the 28th, but they're so
4      booked up because after Memorial weekend, they had a
5      lot of sick people.
6   Q   Okay.
7   A   And their only excuse to me was that if you can't--if
8      we can't get you in today, other options are either go
9      to the ER-- I said, "Well, that's going to cost me a
10      hundred dollars. My insurance won't cover that."
11   Q   Okay.
12   A   So I had it dated for the actual date that I called in,
13      which would be May 28th.
14   Q   Okay. But you saw the doctor on May 29th.
15   A   On the 29th, right.
16   Q   And the only thing-- And maybe it doesn't even matter.
17      Maybe I've confused myself about it. But one thing I'm
18      not clear on is the shift that began at eleven o'clock
19      on May 28th and ended at 7:00 a.m. on May 29th, did you
20      work that day?
21   A   The 29th?
22   Q   Yes, sir.
23   A   Yeah, I did.
24   Q   Okay. Tell me about your conversation with Ms. Witt.
25      How long after the conversation with Mr. Schwartz did

Case 2:16-cv-01013-PP    Filed 08/21/17    Page 33 of 48    Document 28-5

Page 120

1　　that occur?
2　A　It was like within 15 minutes because he told me--Troy
3　　said, "First thing tomorrow morning before first shift
4　　comes go down to HR and talk to her about it."
5　Q　Okay. So you did that?
6　A　Yep.
7　Q　Tell me about your conversation with her.
8　A　She just said, "Well, you know our rules here."
9　　　And I says, "Yeah."
10　　And our rules have always been on third shift, if
11　you work third shift, the day that you start at eleven
12　o'clock, that's the day you write the doctor's excuses.
13　Whether you see them that day or the next day, you're
14　covering the day that you actually called in. So
15　eleven o'clock is considered the 28th, and that's the
16　actual date that I had the doctor's excuse because I'm
17　covering the 28th. It doesn't run into the 29th. I
18　went to work on the 29th.
19　Q　Did you ever have any discussions during your
20　　employment about a practice at the facility where you
21　　worked about not accepting doctors' notes for visits
22　　that occurred after the shift that was missed?
23　A　No.
24　Q　Did you hear about that later after you left?
25　A　This-- No, I never heard it.

Page 121

1　Q　All right. So we know now, right, wrong, or
2　　indifferent, that the May 28th point stayed on your
3　　record, right?
4　A　Yeah. And I had the conversation with the union
5　　because the third shift union, which was Ricky, knew
6　　about that. He says, "HR will do whatever they want."
7　Q　Okay. Did you ask the union to grieve that for you?
8　A　Yeah.
9　Q　And did they?
10　A　No.
11　Q　Did they tell you why?
12　A　No. I did have a conversation with Randy from the
13　　union. He said that it doesn't matter if they accept
14　　it and decline it a week later. That's their
15　　discretion.
16　Q　All right.
17　A　And that's not worth filing a grievance.
18　Q　All right. You still have Exhibit 9?
19　A　Yeah.
20　Q　Now, the next entry on there for any assessment is
21　　June 16th, and it indicates on this note that you were
22　　late that day and you called in, right?
23　A　Yes.
24　Q　And kind of going back to what we were talking about
25　　before that point, if you would, read the point under the policy

Page 122

1　　pardon. I have that one. Let's do this exercise again
2　　if you bear with me. The e-mail indicates that was a
3　　voice male on Sunday, June 15th sometime shortly after
4　　ten o'clock p.m., correct?
5　A　Uh-huh.
6　Q　Is that a yes?
7　A　Yes.
8　Q　And from your home telephone number, correct?
9　A　Yes.
10　Q　Let's listen to it, and then I'll ask you a couple of
11　　questions.
12　　　Audio recording: "Hey, Troy, Joe Buck
13　　　here. Say, I'm running a little late,
14　　　but I think I'm just going to take half
15　　　a ding and come in at 3:00 in the
16　　　morning. So I'll see you at 3:00.
17　　　Okay? Talk to you later. Bye."
18　Q　And that's your voice on the tape, right?
19　A　Yes.
20　Q　And you're calling Mr. Schwartz, correct?
21　A　Yes.
22　Q　And in that message you say that you're running a
23　　little late, correct?
24　A　Yes.
25　Q　And you say that you will take half a ding, right?

Page 123

1　A　Yes.
2　Q　Which would be a half point, right?
3　A　Yes.
4　Q　You don't say anything about any sort of medical issue,
5　　correct?
6　A　No.
7　Q　And can you provide me with my information that would
8　　indicate that you were receiving medical treatment that
9　　caused you to miss half that day?
10　A　No.
11　Q　Were you suffering from some sort of medical condition
12　　that caused you to miss half that day?
13　A　No.
14　Q　And are you aware of any doctor's note that would
15　　excuse you from being late for half that day?
16　A　No.
17　Q　And then there's--the next entry is June 30th, 2014,
18　　and it says that you called in late, correct?
19　A　That's what it says.
20　Q　And do you have any specific recollection of that date?
21　A　No.
22　Q　And someone has written sort of off to the left of
23　　called in late, someone has written in .5.
24　A　Okay.
25　Q　And we've established half a point under the policy

Page 124

1  on June 30th?

2  A  I don't recall that day.

3  Q  Okay. So you just don't recall one way or the other?

4  A  No.

5  Q  So you don't recall the reason that you might have been

6  late?

7  A  If it was, it was because I was working overtime again.

8  Q  Okay. But you can't tell me under oath that you

9  conveyed any information about a medical condition or a

10  health impairment or an alleged disability to

11  Brunswick--

12  A  No.

13  Q  --that day?

14    And you can't tell me that you received any sort

15  of medical treatment with regard to any late arrival

16  that day?

17  A  No.

18  Q  And you can't show me any medical records that would

19  show that you received treatment or otherwise excuse

20  you for being late that day?

21  A  No.

22  Q  Let me hand you what's been marked as Exhibit 12, which

23  is a one-page document marked for production D1, and

24  it's another note from Aurora Health Care, and this

25  one's dated July 15th, 2014, and it's regarding you,

Page 125

1  correct?

2  A  Right.

3  Q  And it's signed by someone named Jessica Sabel,

4  S-A-B-E-L, who's also a nurse-practitioner, right?

5  A  Right.

6  Q  And this is what we were talking about at the beginning

7  of your day when you first hurt your back, right?

8  A  Right.

9  Q  And this states, "This is to certify that Joseph Buck

10  has been under my care from 7/15/2014 and is excused

11  from work on July 15th"--

12    Sorry, that's turned up. I'll re-read it.

13    "This is to certify that Joseph Buck has been

14  under my care from July 15, 2014, and is excused from

15  work on July 15th to July 17th."

16    I read that correctly, didn't I?

17  A  Yeah.

18  Q  And it says on restrictions: "Off work due to back

19  pain. Prescribed medications may cause drowsiness.

20  "Remarks: Okay to return to work on July 20th."

21    Now, prior to missing work July 15th to July 17th,

22  you had 7.5 points under the attendance policy,

23  correct?

24  A  Right.

25  Q  So any of those late arrivals would have gotten you up

Page 126

1  you to eight points, correct?

2  A  Yeah.

3  Q  So if you had been assessed a half a point or a point

4  for any absences on July 15th, 16th, or 17th, that

5  would have taken you to or over eight points, right?

6  A  Yeah.

7  Q  Because what I'm asking you--and I've looked at the

8  records--do you agree with me Brunswick did not assess

9  any points against you for the July 15th, 16th, and

10  17th absences?

11  A  I can argue that one.

12  Q  Here's my question. It's a very simple factual

13  question.

14  A  I know.

15  Q  Did you get any points under the policy set out in the

16  collective bargaining agreement for an absences on

17  July 15th, 16th, or 17th?

18  A  They tried to.

19  Q  My question is not that. My question is, did they

20  assess points or not?

21  A  No, not that they're showing up in here.

22  Q  Okay. So those absences were excused?

23  A  Yes.

24  Q  And this was the first time you had provided

25  information to Brunswick that you had some sort of

Page 127

1  medical condition that affected your back?

2  A  Right.

3  Q  Sir, I might have to get you another copy here that I

4  don't have, and I'm sorry. But on Exhibit 9, the next

5  entry--the next time you got assessed a point--or, it

6  was actually half a point, was August 18th, 2014,

7  according to Brunswick records. It is that first

8  shaded box there, but I realize it's hard to read. It

9  says 8/18/2014. And, in fact, sir, if you look back at

10  Exhibit 8, that one is readable, and I realize your

11  name doesn't-- Do you have Exhibit 8 in front of you?

12  A  Yeah.

13  Q  And I understand your name doesn't appear on this, and

14  your counsel's pointed that out. But assuming that

15  this is a record regarding your attendance, do you see

16  down there there is an entry on August 18, 2014?

17  A  Yes.

18  Q  And there's an LT there under the absence code?

19  A  Yes.

20  Q  And then it indicates hours, four, which would be--if

21  that's you and if you were late on August 18th and

22  missed four hours under the agreement, that would

23  result in a half point, correct?

24  A  Right.

25  Q  And that would have taken you to eight points, correct?

Case 2:16-cv-01013-PP Filed 08/21/17 Page 35 of 48 Document 18-1

Page 128

1   A   Right.
2   Q   And as we're sitting here today, does that refresh your
3      recollection that according to the records that's the
4      late arrival that took you to eight points under the
5      attendance agreement in the collective bargaining
6      agreement?
7   A   I don't recall it.
8   Q   Okay. That's fine. So understanding and appreciating
9      your testimony that you don't recall, you can't tell
10     me, assuming you were late, what the circumstances were
11     that caused you to be late?
12   A   No.
13   Q   And you can't tell me what information you might have
14     provided to Brunswick regarding the reason you were
15     late that day?
16   A   No.
17   Q   And you can't tell me whether you received any medical
18     treatment related to being late that day?
19   A   No.
20   Q   And you can't tell me that there's any sort of doctor's
21     note that would indicate you were treated or otherwise
22     excused you from being late that day?
23   A   No.
24   Q   And just again-- And I know I'm asking you to make an
25     assumption that these records apply to you, but there

Page 129

1      is nothing on this document which lists a series of
2      absence codes--oh, I'm sorry, under the 7/15, 7/16, and
3      7/17 it's recorded as DMA, which I think we've already
4      agreed is an excused absence, right?
5   A   Right.
6   Q   Now, would it refresh your recollection at all if I
7      told you that on August 18th you came in four hours
8      late, but then you worked four hours on first shift?
9   A   No.
10   Q   Okay. And you're not on this e-mail string which I'm
11     handing you. It's been marked as Exhibit 13, but I'm
12     going to ask you to look at it. It's marked for
13     production D67 and 68. And if you look at the second
14     page of that exhibit, because e-mail strings go from
15     the bottom, that's what I want to ask you about.
16   A   Okay.
17   Q   At the bottom there's a message from someone named
18     Shane Dvorjac to Dixie Kraege. Do you see that?
19   A   Yes.
20   Q   And Mr. Dvorjac was your supervisor at this time,
21     right?
22   A   Yes.
23   Q   And do you know who Ms. Kraege is?
24   A   No, I have no idea.
25   Q   Okay. And you're not on this e-mail string. She's listed to

Page 130

1      block as an HR business partner. Do you have any
2      reason to dispute that?
3   A   No.
4   Q   Okay.
5   A   I don't know her.
6   Q   Okay. Well, she writes: "Shane, I'm sorry to beat a
7      dead horse, but we were looking closer at Joe's
8      absences."
9      And up in the subject line it says Joe Buck, so
10     that's the Joe they're referring to, right?
11   A   Must be.
12   Q   She says: "He worked the OT that HR signed up for,"
13     and I think that's a typo. I think she meant to say
14     that "he signed up for on Sunday 8/17, 12:00 a.m. to
15     6:00 a.m. He was scheduled to work 11:00 p.m. to
16     6:00 a.m. on Monday, 8/18, but didn't come in until
17     3:00 a.m., so four hours late. However, he stayed
18     until 11:00 a.m. that morning, so he still got eight
19     hours in. Do you recall why he stayed that morning?"
20     And you've explained to me earlier--and I
21     understand you don't remember this particular day, but
22     that is something that happened a couple of times,
23     right?
24   A   Yeah.
25   Q   So you would come in and miss half of your assigned

Page 131

1      shift, but then you would stay over and cover half of
2      the next shift, correct?
3   A   Because they asked me.
4   Q   Okay. And Mr. Dvorjac writes back to Ms. Kraege and
5      writes, "I believe he was covering for a first shift
6      absence," which would make sense.
7   A   Right.
8   Q   And then if you go to the second page, Ms. Kraege
9      writes to Mr. Schwartz, who had been your supervisor
10     for a longer period of time, correct?
11   A   Right.
12   Q   And was Mr. Dvorjac just covering for Mr. Schwartz for
13     a period of time?
14   A   Yeah. Troy had surgery on his knee, so he was out.
15   Q   So Ms. Kraege writes to Mr. Schwartz and says: "Troy,
16     is there any way of tracking down who Joe Buck covered
17     for the morning of August 18th? I'm trying to
18     understand why he came late but stayed late. He claims
19     we allowed him to flex his hours because he worked OT
20     over the weekend, and I'm afraid that seems like a
21     valid case. Any thoughts?"
22     And Mr. Schwartz writes back: "Dixie, this is
23     something we've never allowed. We never are flexing
24     these hours."
25     And Mr. Dvorjac was your supervisor and listed to

Page 132

1  cover for Donnie Samuel on first shift. This was after
2  Donnie called in that morning, 8/18. This wasn't a
3  planned or preauthorized. This is not a valid case.
4  We never have allowed this elsewhere. I do not agree
5  with the last chance with Joe."
6      Then he goes on to write: "A few other things
7  that do not sit well with me. Joe stating that he was
8  okayed to come in late. None of us supervisors work
9  this way. If late, it is late and counts against their
10 ding. It does not matter if he is working into first
11 shift's hours."
12     Then there's some information about the back
13 injury and the dates you missed until July.
14     So here's my question. That says what it says,
15 and those people can talk about what they meant or what
16 their history is, but I want to ask you this question:
17 Are you aware of any other employees at the plant who
18 skipped for hours of their assigned shift and worked
19 overtime into the next shift--
20 A  Yes.
21 Q  --who were not assessed half a point for the late
22 arrival--
23 A  Yes.
24 Q  --that you know as a fact?
25 A  Yes.

Page 133

1  Q  Okay. Who are they?
2  A  Jonathan Banks.
3  Q  When-- First of all, how do you know that Mr. Banks
4  did that and did not receive the assessment of some
5  sort of strike under the attendance system?
6  A  Because he worked right across from the work station
7  that I worked on. He worked 5/28 with the-- I can't
8  remember the name of the line. But you got the Mazak
9  machines that come by. He always worked on the other
10 side. Then there's also--
11 Q  Listen to my question because I'm--maybe I'm just not
12 understanding your answer. How do you know that he
13 called in, said I'm skipping the first half of my
14 shift, worked over the second part, and didn't get
15 assessed any sort of point? How do you know that?
16 Have you seen his attendance records?
17 A  I seen his attendance in January for 2013.
18 Q  Okay. You saw his January 2013 attendance records?
19 A  Yep.
20 Q  How did you see those?
21 A  He showed it to me because Troy Schwartz gave it to
22 him. He had nine and a half dings. They never walked
23 him out. He never even got a warning. And I've seen
24 him come in many a time three o'clock in the morning.
25

Page 134

1      THE WITNESS: January. Actually, it was
2  January 2014. It was his attendance for--for 2013
3  attendance.
4      MR. FREED: Okay.
5      THE WITNESS: He had nine and a half dings
6  and never got written up. That I personally saw.
7  Q  Anyone other than him?
8  A  There's a couple other guys. I don't know them. One
9  worked in assembly. He had like 12 dings.
10 Q  What's his name?
11 A  I don't know.
12 Q  It's going to be really hard--
13 A  I know that. I know that. Jonathan is the only one
14 that I can verify that I saw like he had.
15 Q  The only one that you're factually asserting--
16 A  Is Jonathan Banks.
17 Q  --is Jonathan Banks?
18 A  Yes.
19 Q  Okay. That day, August 18th, assuming this is all
20 accurate that you did come in late that day, worked
21 over into the first shift but still got half a point
22 because they said you missed the first half of your
23 shift, you were physically able to work that day
24 because you worked eight hours?
25 A  Right.

Page 135

1  Q  You had just made a decision based on your
2  understanding that you were going to work your eight
3  hours between third shift and first shift?
4  A  That's not true.
5  Q  Okay. Well, tell me what's true.
6  A  Because it was okayed by Shane.
7  Q  Okay. You said Shane said it was okay?
8  A  I text him. He remembers the conversation. When this
9  actually came down when they walked me out, I said,
10 "Shane, do you remember, I text you?"
11     "I remember the conversation. I'm just not sure
12 if I told you it was okay if you come in at 3:00,"
13 because they do it.
14     They're only telling you their side of the story,
15 but it's up to the discretions of the supervisor to
16 decide if the shift can be covered. And if you're on a
17 12-, 16-hour shift, if you get it okayed by your
18 supervisors, it's okay if they can cover your four
19 hours if you come in late. But it's not considered
20 late. I'm still covering my eight-hour shift.
21 Q  Okay. I understand what you're saying. When you had
22 the discussion about Mr. Dvorjac after the fact, did he
23 say anything to you to the effect of, well, when you
24 said you were going to be late, I said okay, but that
25

Page 136

1   A   That wasn't the conversation I had. The conversation
2   is when I text him at nine o'clock the first time I did
3   it, I said, "Shane, I need to know if it would be all
4   right if you can cover my shift if I come--can come in
5   at three o'clock because I'm working 16 hours the next
6   day." Well, I would be if I weren't in at eleven
7   o'clock, so actually I'm on a 12-hour shift.
8   Q   I spent some time looking at documents in this case
9   that have been produced by your counsel, and I haven't
10   seen any text messages at all. Do you still have these
11   text messages?
12   A   No, I don't.
13   Q   Okay.
14   A   I did have them. Shane remembers the conversation.
15   Q   Why don't you have them anymore?
16   A   Because my son needed my phone. I got a new iPhone, so
17   I got rid of my old AT&T phone, flip phone.
18   Q   Okay. Approximately when was that?
19   A   That was like in September, October.
20   Q   Of '16 or '15?
21   A   '14. He didn't have a phone. His broke. I had a
22   spare because I updated my phone.
23   Q   If it was a flip phone, it was about time to update it.
24   A   It needed it, and I says, "Whatever you do, don't lose
25   this," because I had pictures of there and text

Page 137

1   messages. And I did have some of the conversations,
2   messages, call back from Troy on my home phone, but my
3   son was staying with me for a few months, him as his
4   girlfriend, and they deleted it.
5   I tried getting it from AT&T, wondering if there's
6   any way I can go back and get these messages because
7   they're very important. And AT&T said they couldn't.
8   They only go 30 days. And same thing with my home
9   phone with Charter. They don't save messages.
10   Q   Just to draw some context, this e-mail exchange that we
11   were just looking at as Exhibit 13, that's in November
12   of 2014, right?
13   A   I don't know why it would have anything to do with me.
14   Q   Well, that's three months after you got terminated,
15   right?
16   A   Right.
17   Q   But you filed a grievance regarding your termination?
18   A   Supposedly, but I never signed nothing with the union.
19   Q   Okay. I want to get your response specifically with
20   regard to Mr. Schwartz. Mr. Schwartz writes, "This is
21   something we never allowed." I know you're saying
22   Mr. Dvorjac told you it was okay. Are you aware of
23   anytime that Mr. Schwartz said it was okay?
24   A   He was gone.
25   Q   Okay.

Page 138

1   A   He wasn't there.
2   Q   All right.
3   A   Shane's the one that took over, and he was a third
4   shift supervisor for maintenance, not for the machine
5   shop.
6   Q   I understand. Other than the two doctors' notes that
7   we've looked at today from the Aurora clinic-- You
8   know what I'm talking about?
9   A   Yeah.
10   Q   So one was the May 2014 request that a day be excused
11   because you were being treated for insomnia.
12   A   Right.
13   Q   And one was in July of 2014 asking that you have three
14   days excused for back pain, right?
15   A   Right.
16   Q   And we agreed that the three days for the back pain
17   were excused, right?
18   A   Right.
19   Q   Other than those two situations, can you specifically
20   recall any situation which you asked that a half point
21   or a point be removed from your record for medical
22   reasons?
23   A   No.
24   Q   I want to talk-- I know it's the subject of a separate
25   workers' compensation claim, but in terms of your back

Page 139

1   problems that began in July of 2014, they extended for
2   a period of time, correct?
3   A   Right.
4   Q   And do they still continue today?
5   A   Not since I had the surgery.
6   Q   When did you have the surgery?
7   A   August 2015.
8   Q   Almost two years ago?
9   A   Yeah.
10   Q   So between August 2014 and August 2015, did you have
11   some restrictions that related to your back?
12   A   Yeah.
13   Q   And can you tell me what those restrictions were?
14   A   Lifting, standing, bending, twisting.
15   Q   Okay. Would those restrictions have prevented you from
16   performing your machinist job?
17   A   Yes.
18   Q   What about as of today? Do you have any restrictions?
19   A   Slight. I'm able to work 40 hours a week.
20   Q   Is that since August of '15 or I guess--
21   A   Yes. Actually, August of 2016.
22   Q   August of 2016. Got you.
23   A   Would have been a year after my surgery.
24   Q   I got you. So you had some pretty extensive
25   restrictions in terms of work that you had

Case 2:16-cv-01013-PP    Filed 08/21/17    Page 38 of 48    Document 18-1

Page 140

1  surgery in August 2015, you kind of have had one year
2  after the surgery where the restrictions continued,
3  right?
4  A  Right.
5  Q  And as of August 2016, you are kind of back a hundred
6     percent?  Sorry, no pun intended.  You were a hundred
7     percent again?
8  A  I'm like 95.
9  Q  Ninety-five percent, okay.  Can you tell me if you have
10    any restrictions on working that continue today?
11 A  Just the bending, twisting, lifting.  I'm able to work
12    40 hours.
13 Q  Okay.
14 A  But this will all be lifted come August of this year.
15    I go back August 9th.
16 Q  So--
17 A  I can lift occasionally up to 50 pounds.
18 Q  Under the restrictions that you've had even since your
19    surgery and the one year after your surgery, could you
20    have gone back and performed your machinist job at
21    Brunswick?
22 A  As of August of last year, yeah.
23 Q  As of August of '16?
24 A  Yeah.
25 Q  Let's talk about what you have done since you left

Page 141

1  Brunswick.  Okay?  Let's just work through it.  So you
2  were terminated--  Actually, let's go ahead just to
3  make sure we have a record here.
4      I'm going to hand you what's been marked as
5  Exhibit 14, which is a one-page document marked for
6  production D70.  That's just a one-page letter that's
7  signed by Mr. Dvorjac dated August 25th, 2014,
8  indicating you're being terminated effective
9  immediately due to your attendance, correct?
10 A  Right.
11 Q  And essentially what it says there is you got the final
12    written warning on June 3rd when you got 6.5
13    occurrences, and since then you had additional
14    occurrences that have brought you up to eight points,
15    correct?
16 A  Yep.
17 Q  Do you remember when you got this letter?  Was it
18    delivered to you by hand?
19 A  I don't remember getting this letter.
20 Q  Do you remember how you found out you were terminated?
21 A  The day that I come back to work on the 25th.
22 Q  You'd been out in between the last day you worked,
23    which was August 18th, and August 25th.  You'd been out
24    due to your back issues, right?
25 A  Yeah.

Page 142

1  Q  And when you came back, tell me what happened.
2  A  Can I go back to the 20th?
3  Q  Sure.
4  A  The day I got hurt at work, I went to occupational
5     health.  They couldn't do anything because they knew my
6     back was swollen.  They made up--  Occupational health
7     made a doctor's appointment to see--to go to Aurora and
8     see Dr. Kennebeck.  So this is like 1:30 in the
9     afternoon on the 20th I went and seen the doctor.
10    Mercury was calling the clinic wanting to put this
11    on my private insurance.  And Lisa yelled out, the
12    receptionist at the desk, "Joe are we putting this on
13    your personal insurance, or is this going as workmen's
14    comp.?"
15        I says, "No, it's going on my personal."
16        That's what Mercury tried to do.  They tried to
17    get me to put it on my private insurance.
18        So she goes, "That's what I thought, but Mercury
19    is trying to say no, it's going on your private
20    insurance."
21        So anyway, I saw the doctor.  They put me on five
22    days of bedrest.  So he said, "We're going to send this
23    down to occupational health at Mercury at HR so you
24    won't have to bring it there."
25        They called back and said no, I had to personally

Page 143

1  hand it--drive it down there to Mercury, bring it into
2  HR, and hand it to the person in charge on first shift
3  in occupational health.
4      He looked at the excuse, and he says, "You mean to
5  tell me you can't work?"
6      I said, "Well, that's what they're saying because
7  they're putting me on heavy medication."
8      He's like, "Well, what are you going to do if have
9  you to go to the doctor or you have to get medicine or
10 something like that?"
11     I said, "Well, I have my girlfriend."
12     So that was the end of that day.  They took the
13 doctor's excuse.  I went home.
14     The very next day I get a call from my own doctor,
15 Kennebeck, saying, "Joe, Mercury's calling up here.
16 They want to know when you can come back to work.  They
17 want you to come back to work."  He says, "I told them
18 I got him on five-day bedrest."
19     "Well, we can put him somewhere in here."
20     And he was like, "Do you feel like you can go back
21 to work."
22     And I says, "No, I'm on this medication that makes
23 me really drowsy and dizzy.  What am I going to do
24 there?  I can't do my job."
25     He was like, "That's what I told them, but they're

Page 144

1   hounding me."
2        So I said, "I'll just call them back."
3        He said, "No, check with me tomorrow."
4        So Mercury called the third day, called again,
5   called the clinic. And you never get a call from your
6   doctor. And Dr. Kennebeck said, "I've never seen this
7   happen with Mercury before. They never do this.
8   Somebody gets hurt on the job, they're not hounding the
9   doctor to find out when I can go back to work." He
10  says, "You need to talk to an attorney." So he gives
11  me the handbook for workmen's comp. He says, "Mercury
12  never does this."
13       So they called again on Friday, says, "Is he able
14  to come back to work?"
15       Says, "I don't know. I haven't talked to him
16  since yesterday."
17       So he called me and asked me, and I says, "Well,
18  I'm not really--my back is still bothering me a little
19  bit." I says, "Maybe Sunday I can come in for my
20  Monday."
21       He says, "Okay, I'll call them up and ask them."
22       So he called--I can't remember her
23  name--occupational health, talked to her.
24       Said, "Well, we'll just wait for his follow-up on
25  the 25th. So tell him don't come into work Sunday

Page 145

1   night."
2        So I went in Monday morning. They told me--put me
3   on restrictions. Go ahead and go back to work. Light
4   duty, doing something like that.
5        So I got a text that Sunday--or, that Monday night
6   when I went into work. I pulled into the parking lot,
7   and I got a text from Shane saying, "Joe, I need to
8   meet you in the"-- I forgot what office it was. Where
9   we have our meetings. "Meet me in there."
10       So I knew exactly what was going to happen. So I
11  was telling some of the people there, "Yeah, if I don't
12  see you tomorrow, that's because they walked me out.
13  And I walked in there, and that's the first thing they
14  did.
15  Q    Who was it in there when you walked in there?
16  A    Shane.
17  Q    Was anybody else there?
18  A    Yeah, there was somebody from the union. I don't
19  recall his name. I never seen him because he worked
20  sixth shift. But he was representing Ricky that night.
21  Ricky was off that night, so he covered for Ricky.
22  Q    Ricky was the regular third shift rep?
23  A    Rep.
24  Q    Do you know his last name?
25  A    No, I don't. He was working the--

Page 146

1   Q    So if I understand your prior testimony, you attempted
2   to file a grievance through your union challenging your
3   termination, but you don't really know what they did
4   with that or what happened with that?
5   A    No.
6   Q    Okay.
7   A    They just told me that guy that was there that Sunday--
8   I think his name was Jeff. I don't know what his last
9   name was. I'm just guessing at the name, but Jeff just
10  seems to pop in my head. Was a union rep that night on
11  the Monday, the 25th. He says, "Don't worry. I'll
12  talk to Al. We'll take care of it."
13       I says, "Well, I want to file a grievance."
14       He says, "Okay."
15       So the next day, that Monday morning, because Al
16  doesn't get in there, he works first shift, I called at
17  7:15. And I have dates and times on all the
18  conversations I've had and times I've tried to reach
19  somebody. I called Al, which is a union rep on first,
20  and says, "Al, I want to file a grievance."
21       He says, "Okay."
22       I says, "Do I have to come in and sign anything?"
23       "No, we'll take care of everything. You don't
24  have to do nothing."
25       I says, "Well, ain't I supposed to sign something?"

Page 147

1   Ain't I supposed to be involved in all these
2   procedures?"
3        And he said, "No." So he said, "It will take
4   about a month."
5        So I waited, called him like once a week for the
6   whole month of September, and he would never get back
7   to me. So I went down to the union hall, and I talked
8   to Randy. "What's going on with this grievance with
9   Mercury?"
10       He says, "I don't know. They're still working on
11  it."
12       So within a week Al called me back and said,
13  "Well, they're not going to settle. They're not going
14  to let you come back. So we can do the next step."
15       I said, "What's that?"
16       "File a second grievance."
17       I says, "Okay."
18       So it was filed supposedly, but I was never
19  involved in any of this. Never signed nothing,
20  nothing.
21  Q    Okay.
22  A    And it went on for months. And I tried to call James
23  Gardner from HR, the head of HR, from the day I got
24  discharged, the following morning. I called him for

**Page 148**

1 to me. And the only reason he got back to me is
2 because I went above his head and I called Brunswick
3 down in Illinois. I said, "I need to speak with
4 somebody besides anyone at the HR Mercury here in
5 Fond du Lac."
6     So they never--I never got to talk to anybody at
7 Brunswick. They called him and said, "You need to call
8 and talk to Joe."
9     So I talked to him, which was November 18th, for
10 45 minutes on the phone. I says, "Al," I says--I mean
11 James. I says, "I need to know, how do you accept a
12 doctor's excuse?" Because this basically goes back to
13 May 28th. "You accept the excuse, and then a week
14 later you decline it."
15 Q   And I'm just asking, do you have a document or anything
16    that says we accept this excuse?
17 A   No. Basically, it's--that was my very first doctor's
18    excuse. You're allowed three of them. So that was my
19    very first one for one day, and they accepted it, and
20    then they declined it. But anytime you bring them one,
21    it's basically if they didn't accept it, people would
22    hear about it.
23 Q   Okay.
24 A   So it took me a week to hear something from them.
25 Q   I got you. Okay.

**Page 149**

1 A   So anyway, the conversation that I had with James
2    Gardener for 45 minutes, I said, "I've never been
3    written up. I've never been late for work. I've
4    always been on time. I put in 218 hours of overtime
5    from February 15th up until the day I got hurt. I did
6    a lot, and it's a physical job. You're picking up 40-,
7    70-pound blocks, and you're down stacking them on
8    pallets and everything else. I've always worked the
9    overtime. It didn't matter. I never had a complaint
10    with anybody and never been written up or nothing. I
11    liked my job. I liked doing what I did." And I said,
12    "And you're going to fire me because of that May 28th
13    excuse that puts me at eight dings, but yet Jonathan
14    Banks gets a notice in January from Troy Schwartz for
15    his 2013 attendance. He's got nine and a half dings
16    and never been written up."
17 Q   Do you know since he apparently showed you his records
18    that he talked to you about the reasons, if any, that
19    he was absent?
20 A   No.
21 Q   You don't know if he had--
22 A   No.
23 Q   --any health-related issues or anything like that?
24 A   No. And the conversation that James had, he says,
25    "That's up to management." Something. I don't know. I told--

**Page 150**

1 let them go."
2     And I said, "There's other guys--I don't know
3 their names--first shift that work assembly. They got
4 12, 13, 14 dings and you leave them on.
5     "That's because they're supplementals."
6     I said, "A rule is a rule. You know, if I'm going
7 to get walked out for eight dings and these guys can
8 get nine and a half, 10, 11, 12, 13 dings, you know, a
9 rule is a rule."
10     "Well, that's up to their discretion if they
11 accept them or decline them."
12 Q   Did Mr. Schwartz ever discuss with you the fact that
13    you were asking to be excused for a day when you had
14    called in and said you weren't coming to work because
15    you were upset about your dog?
16 A   No, we never had that conversation. He never asked.
17 Q   You realize the day that you--one of the days that you
18    were asking to be excused for was a day that you had
19    called before the shift started and said you didn't
20    want to come to work because of your dog?
21 A   Right.
22 Q   Let's talk about what you've done since you left
23    Brunswick. And I understand there was a period of time
24    from August 2014 to August 2016 where you had, as
25    you've explained to me, some significant restrictions,

**Page 151**

1 right?
2 A   Right.
3 Q   And with what you kind of talked to me about about your
4    employment background, what you've been trained to do,
5    and that sort of thing, I'm presuming that, at least
6    from your seat, that limited significantly the kinds of
7    jobs you could go out and get?
8 A   Right.
9 Q   Is there a period of time after your separation from
10    employment in August of 2014 where you would testify
11    you were unable to work at all?
12 A   Yes.
13 Q   When was that?
14 A   Oh, with anybody else? With Mercury or--
15 Q   With anyone--
16 A   No.
17 Q   --to get any job.
18 A   No. Oh, with DVR at unemployment.
19 Q   What do you mean by that?
20 A   DVR is basically for department of veterans
21    rehabilitation.
22     MR. FREED: Division of Vocational
23 Rehabilitation.
24     MR. VOGEL: Okay.

Page 152

1  A   They were trying to find something that I was capable
2      of working; but because of my restrictions, it limited
3      to me what I could actually do until I actually got my
4      restrictions lifted.
5  Q   Okay.  When was the first time you got any kind of job
6      after leaving Brunswick?
7  A   November of 2016.
8  Q   And just so I understand, between August 2014 and
9      November of 2016, would it be your testimony that there
10     was nothing available that you had the skill set to
11     perform in line with your restrictions?
12 A   No.
13 Q   Okay.  So what did you start doing in November of 2016?
14 A   Started driving a day-care bus.
15 Q   And I know I've seen it in some document--or, some
16     discover responses, rather, but was that a full-time
17     position?
18 A   No.
19 Q   Part-time position, correct?
20 A   Right.
21 Q   And how much money did you make in that part-time
22     position?
23 A   Paid by the hour, 17 an hour.
24 Q   How much--  What was your hourly rate at Brunswick?
25 A   At that time it was 16.

Page 153

1  Q   So your hourly rate was actually a little bit higher as
2      a driver, but you didn't work as many hours?
3  A   No.
4  Q   Are you still driving that bus?
5  A   Not right now.  As of June I'm not.
6  Q   Between November 2016 and June of 2017 did you do any
7      else--anything else in addition to the bus driving?
8  A   No.
9  Q   Have you worked since June of 2017?
10 A   No, June 7th, I think, was my last day.
11 Q   Why was it the last day?
12 A   School is out.
13 Q   Have you applied for other positions?
14 A   Yeah.
15 Q   Have you kept a record of what you've applied for?
16 A   No.  I filed for unemployment, but I haven't heard
17     anything back from unemployment because they're waiting
18     for the wages back from Playhouse for the Precious.
19 Q   But you do have job applications in?
20 A   Yeah.
21     MR. VOGEL:  Let's take a break.
22     (Recess from 1:51 p.m. to 1:58 p.m.)
23 Q   We're back on the record after a break, Mr. Buck.
24     I think before the break you were testifying as to
25     a situation where you dealt with some of the lifting from

Page 154

1      getting calls from Brunswick trying to get him to
2      release you to return to work.
3  A   Yes.
4  Q   Who was making those calls?
5  A   I have no idea.
6  Q   And the only reason you know those calls were made is
7      because your doctor told you that he was getting those
8      calls?
9  A   Yes.
10 Q   And he never indicated who was making the calls?
11 A   He might have.  I probably forgot it.
12 Q   I'm going to hand you what's been marked as Exhibit 15,
13     and this is a document--  And I don't know if you've
14     seen it for not, and that's fine, but this is a form of
15     a document that attorneys exchange on behalf of their
16     clients in cases regarding some witnesses and documents
17     that they might utilize in a case.  And basically
18     there's a list here of people who are potential
19     witnesses, and I think we've talked about all of them
20     today.  It starts with you.  Obviously, we've talked
21     about you quite a bit.
22         And it talks about Mr. Schwartz, who was your
23     supervisor.  Is it fair to say Mr. Schwartz was your
24     supervisor for most of your Brunswick employment?
25 A   Yeah.

Page 155

1  Q   How would you describe your relationship with
2      Mr. Schwartz generally, your professional relationship?
3  A   It was pretty good.
4  Q   He generally acted in a professional manner with you?
5  A   Right.
6  Q   Did he ever say anything to you that indicated that he
7      had a negative opinion or negative feelings about you
8      because you had some sort of a medical condition?
9  A   No.
10 Q   The next person there is Shane Dvorjac, who is also
11     a supervisor; and if I understood you correctly,
12     there's a period of time when Mr. Schwartz had to be
13     out of work because he had some knee surgery, correct?
14 A   Yes.
15 Q   And Mr. Dvorjac replaced him?
16 A   Yes.
17 Q   And your understanding was that was for a limited
18     period of time?
19 A   (No response.)
20 Q   Was that a yes?
21 A   Yes.
22 Q   Yeah, you just nodded.
23 A   I know.
24 Q   That's okay.  And Mr. Dvorjac happened to be your

Page 156

1  employment--
2  A  Yes.
3  Q  --right?
4     Did Mr. Dvorjac--  Other than the fact that he was
5  the person who informed you you were bing terminated,
6  which I'm sure was not a positive experience, how was
7  your working relationship with Mr. Dvorjac generally?
8  A  I never really had to talk to him because he was the
9  head of maintenance.  So he just kind of took over as a
10  fill-in if somebody from the machine department needed
11  somebody, opinion about something, like if we were out
12  of parts, ran out of parts, or if there was a machine
13  down.  Otherwise, I never really had a conversation
14  with him.
15  Q  Okay.  Did Mr. Dvorjac ever say anything that you heard
16  that indicated he had a negative opinion or negative
17  feelings about you because of some physical impairment
18  that you had?
19  A  No.
20  Q  The next person on the list is Jennifer Witt, who you
21  previously identified as a member of the facility's
22  human resources team, correct?
23  A  Right.
24  Q  We've talked about some exchanges you had with her
25  primarily about the issue of whether the absence on

Page 157

1  May 28th was going to be excused or not.
2  A  Yes.
3  Q  And she was also someone who you believe provided some
4  information during your new employee orientation?
5  A  Yes.
6  Q  Other than that, are you aware of any information that
7  you believe she has specifically regarding your claims
8  against the company?
9  A  No.
10  Q  And did Ms. Witt ever make any comments that you heard
11  that indicated she had a negative opinion or negative
12  feelings about you because of some physical
13  impairment--
14  A  No.
15  Q  --that you might have had?
16     The next person on there is James Gardner, and I
17  believe you explained that Mr. Gardner is also a member
18  of the human resources team at the facility, correct?
19  A  Right.
20  Q  And he's kind of the big boss of HR?
21  A  Yes.
22  Q  As far as you know, he is the top of the line on HR at
23  that facility?
24  A  Yes.
25  Q  Other than giving you information during your

Page 158

1  separation from employment, did you have any
2  interactions with him during your employment?
3  A  No, none.
4  Q  Have you ever heard him make a comment that indicated
5  he had a negative opinion or negative feelings about
6  you because you had some sort of physical impairment?
7  A  The only time I heard was on May 28th.  That was the
8  deal that him and Jennifer and myself had.  He couldn't
9  understand why they didn't accept it because it was my
10  workday.  The 28th is my scheduled workday, the day
11  that I called in and I saw the doctor, and that's what
12  I was told to do, which we already went through that.
13  Q  Right.  To be clear, when you called in that day, your
14  call-in, you didn't say in the call that you were going
15  to the doctor.
16  A  No, I didn't.
17  Q  You brought the note in after you'd gone to the doctor.
18  A  Right.
19  Q  And you went to the doctor after the shift that you
20  missed.
21  A  I had told Troy that night of my shift, because he was
22  the supervisor then, I said, "I tried to get into the
23  doctor, but they couldn't get me in because they were
24  booked up after Memorial weekend.  They were booked up
25  and they had no openings unless somebody canceled.

Page 159

1  Otherwise, I can go in the following day."
2     So he just advised me, "Make sure you date it for
3  the 28th."
4  Q  Any other comments or interactions with Mr. Gardner
5  that you think have any bearing on your case?
6  A  No.
7  Q  We talked about Jonathan Banks and why he's mentioned
8  as a potential person with knowledge.  Any other
9  knowledge that Mr. Banks might have regarding your
10  complaints or any other relevance that you know of that
11  he might have to your case that we haven't talked
12  about?
13  A  He actually quit before I was released, so I haven't
14  talked to him since.  So I don't know.  I had tried
15  getting ahold of him, but he's not listed in the phone
16  book or anything else, so I have no idea where he's at.
17  Q  Okay.  I'm going to hand you what's been marked as
18  Exhibit 16, which is a four-page document that was
19  provided to us by your attorneys, and it's headed
20  Plaintiff's Expert Disclosures, and I want to walk
21  through this with you.  Because these are--I believe
22  these are healthcare providers that provided some sort
23  of treatment to you.
24  A  Right.
25  Q  Okay.  And so we're going to spend some time talking about

Page 160

1 these folks. The first one's Dr. Richard Sturm, and in
2 the summary it indicates that Dr. Sturm treated you for
3 your back condition in September of 2014, correct?
4 A  Right.
5 Q  And September of 2014 was after your employment with
6 Brunswick had ended, correct?
7 A  Yes.
8 Q  Did you ever see Dr. Sturm before your employment--
9 A  No.
10 Q  Let me-- I didn't even get to finish my question.
11 A  Oh, sorry.
12 Q  I might have changed it on you.
13 A  Okay.
14 Q  Let me finish it. Did you ever see Dr. Sturm before
15 your employment with Brunswick ended?
16 A  No.
17 Q  The next name on the list is Dr. Ahmet Dervish, and it
18 also indicates that Dr. Dervish saw you regarding your
19 back condition in September 2014, correct?
20 A  Yes.
21 Q  And you did not see Dr. Dervish during your employment
22 with Brunswick, correct?
23 A  No.
24 Q  The next name on there is Dr. Chandur Piryani.
25 A  Something like that.

Page 161

1 Q  And it indicates that Dr. Piryani saw you regarding
2 your back condition from January 2015 through
3 July 2015?
4 A  Yes.
5 Q  And we agree that that is after your employment with
6 Brunswick ended?
7 A  Right.
8 Q  Did you ever see Dr. Piryani during your employment
9 with Brunswick?
10 A  No.
11 Q  The next name on here is Dr. Shekhar Dagam. I'm sure
12 I'm mispronouncing that.
13 A  Something like that.
14 Q  This indicates that Dr. Dagam is the doctor who
15 performed your back surgery in August of 2015, correct?
16 A  Yes.
17 Q  So this was one you saw, in fact, close to a year after
18 your employment ended, correct?
19 A  Yes.
20 Q  Did you ever see Dr. Dagam during your employment?
21 A  No.
22 Q  The next page is Theresa Baseley, who's the
23 nurse-practitioner who you saw for the situational
24 insomnia in May of 2014, correct?
25 A  Yes.

Page 162

1 Q  And we've talked about her already, right?
2 A  Yes.
3 Q  And then the next one Jessica Sabel, who you saw in
4 July of 2014 for back pain?
5 A  Yes.
6 Q  And we've talked about her already, correct?
7 A  Yes.
8 Q  And then Dr. Kennebeck is who you saw after your last
9 day of active employment but before you were formally
10 terminated; is that right?
11 A  Yes.
12 Q  Any other doctors you have seen for your back
13 condition?
14 A  No.
15 Q  Any other doctors or healthcare providers you have seen
16 for your situational insomnia?
17 A  Nope, just Dr. Baseley. There was one other doctor
18 that-- Actually, it was a chiropractor.
19 Q  A chiropractor, okay. And who was that?
20 A  Dr. Moxon.
21 Q  Do you know Dr. Moxon's first name?
22 A  I don't.
23      MR. FREED: Do you know how to spell his
24 last name?
25      THE WITNESS: I believe it's M-A-X-O-N.

Page 163

1      MR. FREED: It's M-O-X-O-N.
2      THE WITNESS: Pretty close.
3      MR. VOGEL: Got a first name on there?
4      THE WITNESS: That's what I'm looking for.
5      MR. FREED: I don't see a first name.
6      THE WITNESS: I always call him Dr. Moxon.
7 Q  And Dr. Moxon is someone you began seeing after your
8 employment ended with Brunswick?
9 A  Right.
10 Q  Have you ever applied for any sort of
11 disability-related benefits?
12 A  No.
13 Q  And why not?
14 A  I was told not to.
15 Q  By who?
16 A  My other attorney.
17 Q  Oh, okay. I don't want to go into any attorney-client
18 communications. Sorry.
19      Have you ever reapplied to Brunswick?
20 A  No.
21 Q  I'm going to hand you what's been marked as Exhibit 17
22 to your deposition, and your signature actually appears
23 on the last page of these. These are what are called
24 interrogatory responses. They'll be in the record, and
25 Page 44 of 48 answer the interrogatory number

Page 164

1    one, this indicates that your-- First, let me ask you

2    this: Is it your understanding that your workers'

3    compensation against Brunswick is still going on?

4  A   Yes.

5  Q   And your lawyers for that case work for a firm called

6    Hickey & Turim in Brookfield; is that correct?

7  A   Yes.

8  Q   Turn to the second page to interrogatory number four.

9    And I really don't want to ask you very many questions

10    about Ms. Tew. Do you have a wedding date?

11  A   No.

12  Q   Okay. I wish you the best on that.

13  A   Thank you.

14  Q   Does she have any independent knowledge about your

15    claims? It indicates in this interrogatory response

16    that you've discussed your claims with her, but is

17    there anything that she has specifically witnessed or

18    has independent knowledge of, or is everything just

19    kind of what you told her?

20  A   She has a lot of knowledge up until the day I got

21    fired.

22  Q   Okay.

23  A   That's--

24  Q   And those would be things that you would have come home

25    and told her; is that right?

Page 165

1  A   No, she was living with me at the time.

2  Q   Okay. What kind of things would she have knowledge

3    about?

4  A   The conversations I had with Shane and Troy Schwartz

5    the times I had called in and asked about is it all

6    right if I come at three o'clock in the morning, texts

7    back to me.

8  Q   You would show those to her, you're saying?

9  A   Yeah, because she would always say, "Well, don't call

10    in and take a ding. Just find out if it's going to be

11    all right." Because she didn't want to see me--

12    Because she knew I was getting up to the amount,

13    especially after May 28. She had no knowledge of that

14    one at all because we weren't together at that time.

15  Q   Okay. When did you get together?

16  A   In June.

17  Q   June of?

18  A   2014.

19  Q   2014, okay. So would she be present, are you saying,

20    in June 2014 when you would be on the phone?

21  A   The text messages.

22  Q   Okay. You would just share with her text messages?

23  A   Right. All conversations, that was basically kind of

24    private between me and whoever I was trying to get

25    ahold of--

Page 166

1  Q   Fair enough. If there were a text message exchange

2    regarding her attendance, you would share those texts

3    with her?

4  A   Yes.

5  Q   But we don't have any of those texts anymore?

6  A   No.

7  Q   You wouldn't have forwarded those to her phone--

8  A   No.

9  Q   --or anything like that?

10  A   No.

11  Q   And then also listed on there is Ms. Tew's mother, who

12    lives in Iowa?

13  A   Yeah.

14  Q   What knowledge does she have?

15  A   She does my taxes, and that's--she's a tax preparer.

16           MR. FREED: Preparer.

17           THE WITNESS: Or preparer.

18           MR. VOGEL: Got you. Thank you for

19    clarifying that.

20  Q   Have you ever posted anything on social media about

21    Brunswick? Have you put anything on your Facebook

22    account or anything like that?

23  A   No. I don't like the drama.

24  Q   Are you alleging that you suffered any kind of

25    emotional distress resulting from your termination?

Page 167

1  A   I probably still do to be honest.

2  Q   First, let me ask you just to cover it, have you ever

3    sought any treatment from any kind of healthcare

4    provider, either a healthcare provider that generally

5    provides physical treatment or a mental health care

6    provider, for any of what you would describe as

7    emotional distress or mental upset resulting from your

8    termination?

9  A   No.

10  Q   So you have not seen a psychiatrist or a psychologist

11    or a counselor or anything like that?

12  A   No.

13  Q   Can you describe for me how your termination-- First

14    of all, has it had any physical impact on you? And I'm

15    talking about separate and apart from your workers'

16    compensation claim for your back. Have you had any

17    physical symptoms that you attribute to your

18    termination?

19  A   Not physically.

20  Q   How about emotionally? Tell me about emotionally how

21    it's impacted you.

22  A   Trying to understand the whole situation. Since I left

23    Superior to get this job in 2012, I could never

24    understand how I've seen so many people come and go

25    and the supervisors weren't doing it right behind

Case 2:16-cv-01013-PP   Filed 08/21/17   Page 45 of 48   Document 18-1

Page 168

1   it, but I'm not going to get involved in that right
2   now.
3   Q   What do you mean?  That's what here to talk about.  If
4       it's going to come up at a potential trial, I want to
5       hear about it.
6   A   Well, when I first started there on the 24th-- My dad
7       passed away in November, so I needed some time off
8       because I was the oldest boy of the family, so I was
9       kind of the head of everything.  It was going to be in
10      Superior and because we didn't actually have a date
11      set, I didn't know how long it would take.
12          From experience of people that have worked for
13      Mercury, there is one guy that I could use for a
14      witness that worked 12 years for them; and when his
15      father died, he had to go to Arizona and couldn't make
16      it back in time to go back to work, they fired him.
17  Q   But you didn't get fired for taking time off for your
18      dad's death, did you?
19  A   No.
20  Q   In fact, I've seen it in some documents, you went to
21      human resources and you said I need some time off and
22      you filled out a form, and they gave you that time off,
23      didn't they?
24  A   They would give me three days off, but they wanted me
25      to take two dings.  I said, "I don't want to take a

Page 169

1   ding.  I just started here.  I've only been here for
2   two months.  Is there any other way of doing it?"
3       Because he died on a Friday.  I went to work on
4   second shift.  I still went to work that day.  There's
5   nothing I can do.  He's 365 miles away.  I mean, I
6   called and said, "I need to get some time off.  I don't
7   know how long it's going to take.  We don't have a
8   funeral date or anything.  He just passed away."
9       They had asked me if I wanted to take time off to
10  go up there, and I said, "No, I'll finish my day off.
11  Come in there, work my second shift, which is Friday,
12  last day of the week."
13      I went to work, I talked to HR, I talked to my
14  supervisor and plant manager just trying to figure out
15  how can I take off a week without getting any dings
16  against me or any points against me.  And so I
17  basically took off one week voluntary leave.
18  Q   Okay.  And if I can understand this correctly, one
19      thing that they told you was they give employees three
20      days off--
21  A   Right.
22  Q   --because of the death of an immediate family member,
23      right?  And that's across the board, right?
24  A   Right.
25  Q   And they gave you that same time off, but they told you

Page 170

1   they told you it would be unexcused?
2   A   Right.
3   Q   So you would get dings for that?
4   A   Right.
5   Q   But you worked it out with them so you didn't get
6       paid--
7   A   No.
8   Q   --but you didn't get any dings?
9   A   No.
10  Q   Tell me what happened.  Did you get dings?
11  A   No.  The only way I could get it approved is I had to
12      get it approved by a supervisor, which was Jason
13      Rodriguez at that time on second shift, Carrie Rhode,
14      which was plant manager, and from Jennifer Witt from
15      HR.
16  Q   And they did approve it?
17  A   Yeah.
18  Q   All right.  I understand those are incredibly sensitive
19      issues.  I've lost parents as well, so I understand
20      that.  And I understand how that could frustrate you.
21  A   My biggest thing worrying about was coming back and
22      having a job because I had too many other people that
23      had dealt with Mercury.
24  Q   But in that instance in 2012--
25  A   Right.

Page 171

1   Q   --even though you had only been there a couple months
2       and had to take a significant amount of time off, you
3       kept your job--
4   A   So--
5   Q   --right?
6   A   Right, I kept it.  That's when I got shifted to first
7       shift.
8   Q   And then-- Okay.
9   A   So that was another deal that kind of worried me.
10  Q   I actually-- I think I asked.  I just want to make
11      sure I cover it.  When we look at your points that were
12      assessed pursuant to the attendance rules in 2014, do
13      you agree that you were not assessed any points for
14      missed work that related to a back issue?
15  A   No.
16  Q   I said, "Do you agree," and you said, "No."
17  A   Oh.
18  Q   That was a--
19  A   Can you rephrase that?
20  Q   Yes, sir, I can.  Were any of the points that you were
21      assessed in calendar year 2014 related to absences
22      connected to back problems?
23  A   No.
24  Q   Okay.  And the only point that was assessed to you for

Page 172

1    is the May 28 point, correct?

2  A   Yes.

3  Q   Did you ever talk to any of the nurses who worked at

4    the facility?

5  A   At Mercury?

6  Q   Yes, sir.

7  A   Yeah, just the one that worked third shift.

8  Q   If I said Sherry Wallers, would that ring a bell?

9  A   Could have. I'm not sure.

10  Q   But you don't remember any specific discussions?

11  A   No.

12  Q   There was a nurse at the facility on third shift?

13  A   Yes.

14  Q   Were there any other medical personnel there on third

15    shift?

16  A   No. If that's her name, it's the only--she's only

17    there until three o'clock in the morning.

18  Q   Okay. Do you remember a member of management during

19    the time you were at Mercury named Jason Schweifel?

20  A   No, don't recall.

21         MR. VOGEL: Let's take one more

22    five-minute break, and I might be done.

23      (Recess from 2:32 p.m. to 2:36 p.m.)

24         MR. VOGEL: Let's go back on the record.

25  Q  Mr. Buck, I'm ready to wrap up my examination of you

Page 173

1    today pending any potential additional questions that I

2    have based on questions your counsel might ask. I want

3    to tell you I appreciate your time today and your

4    patience with me. And I do want to ask, did I treat

5    you professionally and respectfully today?

6  A   Yes.

7  Q   Okay.

8         MR. VOGEL: Pass the witness.

9    EXAMINATION BY MR. FREED:

10  Q   Okay. Mr. Buck, we spent a lot of time today trying to

11    clarify exact dates around the May 28th absence that

12    you had. Irrespective of all that conversation about

13    exactly when--what dates the company records as dates

14    of work or what have you, is it fair to say and

15    accurate to say that the doctor's note that you got,

16    which is Exhibit 11, that is dated May 29th asking that

17    you be excused from work on May 28th, is it fair and

18    accurate to say that that note was meant to have you

19    excused for the date that you missed your shift?

20  A   Yes.

21  Q   Okay. So whatever date that was, whether it be in your

22    head May 27th or in the company's date May 28th or vice

23    versa or what have you, I just want to be clear that

24    this note was meant to be a medical excuse for the date

25    that you missed--May--01013--PP of your shift?

Page 174

1    27th.

2         MR. VOGEL: I'm just going to pose an

3    objection to form. It's been asked and answered and

4    calls for speculation. But go ahead.

5  Q   But you can still answer that.

6  A   Yes, it was meant for the 28th.

7  Q   Okay. Is it fair and accurate to say that the medical

8    visit that you made to Aurora Health Care on May 29th

9    was related to insomnia that you were suffering both as

10    a result of the overtime hours that you had worked that

11    year in 2014, as well as the emotional strain of losing

12    your pet?

13  A   Yes.

14  Q   Also, have you currently contacted your Division of

15    Vocational Rehabilitation Counselor to re-open your

16    Division of Vocational Rehabilitation Case?

17  A   Yes.

18  Q   And do you have a meeting scheduled with your

19    counselor?

20  A   Yeah, Monday at nine o'clock.

21  Q   Okay. And is it accurate to say that DVR, Division of

22    Vocational Rehabilitation, helps people with

23    disabilities find new skills in order to find new work?

24  A   Right.

25  Q   They can train you in new areas of skill?

Page 175

1  A   Yes.

2  Q   Okay.

3         MR. FREED: That's all I have.

4    EXAMINATION BY MR. VOGEL:

5  Q   How many times a day do people mistake you for Fox

6    sportscaster Joe Buck?

7  A   All the time.

8  Q   I sometimes like to end with a little levity.

9  A   If I forget my badge at Mercury, that's the first time

10    I ever heard it. One of the guys at the security gate

11    says, "You're not related to Joe Buck, are you?"

12      "No, he's the imposter. He stole my paycheck and

13    my identity. I hate that guy."

14  Q   I'm teasing you. I appreciate the lighthearted answer,

15    and I thank you for your time. I don't have anything

16    further for you, sir.

17      (Deposition concludes at 2:42 p.m.)

18

19

20

21

22

23

24

25

Page 176

1    STATE OF WISCONSIN)
                      )SS
2    COUNTY OF BROWN   )

3

4        I, John W. Gales, Registered Merit Reporter and

5    Notary Public in and for the state of Wisconsin, do

6    hereby certify that I have carefully compared the

7    foregoing 175 pages with my stenographic notes, and

8    that the same is a true and correct transcript.

9        I further certify that I am not a relative or

10   employee or attorney or counsel of any of the parties,

11   or a relative or employee of such attorney or counsel,

12   or financially interested in said action.

13       Dated at Green Bay, Wisconsin, on this 25th day

14   of July 2017.

15

16

17               John W. Gales
                 Registered Merit Reporter
18               Notary Public

19

20

21

22   My commission expires October 25, 2019.

23

24

25