UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSEPH E. BUCK, JR.,

        Plaintiff,

    v.                            Case No. 16-cv-1013-pp

MERCURY MARINE, A DIVISION OF
BRUNSWICK CORPORATION,

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 18)

Plaintiff Joseph E. Buck, Jr. worked as a machinist at defendant Mercury Marine's Fond du Lac-based boat manufacturing facility from September 2012 until August 2014. On August 25, 2014, the defendant terminated the plaintiff. The plaintiff filed a complaint, alleging that the defendant discriminated against him in violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), and that it interfered with his rights under the Family & Medical Leave Act ("FMLA"). The defendant moved for summary judgment on both claims, and during the briefing process, the plaintiff conceded the ADAAA claim. The court will grant the defendant's motion for summary judgment as to both that claim and the FMLA claim, and will dismiss the case.

## I.    Jurisdiction

The plaintiff's complaint alleged violations of two federal statutes, the Americans with Disabilities Act Amendments Act of 2008 and the Family

Medical Leave Act. Dkt. No. 1. Because the plaintiff sued under federal statutes, this court has federal question jurisdiction under 28 U.S.C. §1331.

## II.     Background

### A.     Procedural History

On August 2, 2016, the plaintiff filed a complaint alleging two causes of action. Dkt. No. 2. First, the plaintiff alleged that the defendant discriminated against him based on his disability in the terms and conditions of his employment, under the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101, *et seq.* Id. at 4. Second, the plaintiff alleged that the defendant had unlawfully interfered with his rights under the Family Medical Leave Act of 1993, 28 U.S.C. §825, *et seq.* Id. at 5. The defendant answered the complaint on September 30, 2016. Dkt. No. 5.

The court held a scheduling conference on December 5, 2016, setting discovery and dispositive motions deadlines. Dkt. No. 10. At that time, the court also scheduled the final pretrial conference for December 20, 2017 and the trial for January 8, 2018. Id.

The court had set a deadline of July 31, 2017 for filing summary judgment motions, but on June 26, 2017, the defendant requested an extension of that deadline. Dkt. No. 15. The court granted the motion, and gave the parties a deadline of August 21, 2017 by which to file dispositive motions. Dkt. No. 17. On August 21, 2017, the defendant timely filed a motion for summary judgment, dkt. no. 18, along with proposed findings of fact, dkt. no. 20. The plaintiff filed his opposition brief on September 20, 2017, dkt. no. 22,

but did not file responses to the defendant's proposed findings of fact. The defendant filed its reply brief, dkt. no. 25, and its response to the plaintiff's proposed findings of fact, dkt. no. 26, on October 4, 2017.

On that same day—October 4, 2017—the plaintiff filed an emergency motion for leave to file his responses to the defendant's proposed findings of fact. Dkt. No. 28. Without opposition from the defendant, the court granted that request. Dkt. No. 33. The court's order allowed the defendant to file a reply by the end of the day on December 11, 2017, but noted that, given the delay, the court might not be able to rule on summary judgment before the January 8, 2018 trial date. Id. The defendant filed its reply in support of its proposed factual findings on December 11, 2017. Dkt. No. 34.

On December 18, 2017, ahead of the December 20, 2017 final pretrial conference, the parties filed a joint Civil Local Rule 7(h) expedited, non-dispositive motion to convert the final pretrial conference to a status conference. Dkt. No. 35. The court granted that motion, dkt. no. 36, and at the status, orally informed the parties that it would be issuing this decision, dkt. no. 37.

B.    Factual History

Joe Buck began working for defendant Mercury Marine as a "Supplemental Tech" on September 24, 2012. Dkt. No. 26 ¶1. The defendant transferred the plaintiff to first shift on November 12, 2012. Id. at ¶2. A little over two months later, on January 21, 2013, the defendant transferred the plaintiff to third shift (he'd not worked that shift before), and made him a

"regular Machinist Tech." Id. at ¶3. Third shift lasted from 11:00 p.m. to 7:00 a.m. Id. The plaintiff remained on third shift as a Machinist Tech for nineteen months, until he was terminated on August 25, 2014. Id. at ¶4. The defendant admits that the plaintiff was a covered employee under the FMLA during his employment, and that during the period at issue, the defendant employed at least fifty employees within seventy-five miles of the plaintiff's work site. Id. at ¶¶6-7.

From ninety days after his employment began until his termination, the plaintiff was a member of the International Association of Machinists union. Id. at ¶5. This meant that a contract governed some of the terms and conditions of the plaintiff's employment; the contract included provisions governing employee attendance. Dkt. No. 27 at ¶¶8-9. The contract provided a list of absences that would be excused with proper documentation, including approved medical and FMLA leaves and absences for work-related injuries. Id. at ¶9. The contract also stated that employees accruing six points in a calendar year under the attendance provisions for unexcused absences would receive a final written warning, and employees accruing eight points during the year were subject to termination. Id. at ¶10.[1]

### 1.    May 28, 2014 Absence

On Monday, May 26, 2014, the plaintiff called his supervisor and asked for a vacation day for his May 27, 2014 shift, because he was very upset about having had to put his dog of thirteen and a half years to sleep that weekend.

_____

[1] The contract is docketed as an exhibit at Dkt. No. 18-2, pp. 1-3.

Dkt. No. 26 at ¶10. The plaintiff concedes that he did not tell his supervisor how upset he was about losing his dog, or that he had not been able to sleep since the dog had died. Id. The defendant granted the plaintiff the vacation day for the May 27, 2014 absence, and did not assess any attendance points against the plaintiff. Dkt. No. 27 at ¶36.

On May 27, 2014, the plaintiff called in before his May 28 shift began, and left the following voicemail:

> Hey Troy, Joe Buck here. Hey, if you get a chance, can you please give me a call before the end of the night? I just – I'm having a hard time with my dog, you know, putting her to sleep. (Indiscernible) with me for 13 and a half years, and it's just – I'm having a really hard time. If you can call me, I appreciate it. . . . All right, bye.

Dkt. No. 26 at ¶13. The plaintiff received a call back from the supervisor on May 27, 2014—again, before the shift began; according to the plaintiff's September 17, 2017 proposed findings of fact, the plaintiff "told [the supervisor during this call] that he had not slept for days and he could not work his May 28, 2014 shift." Dkt. No. 23 at ¶15. According to his September 20, 2017 declaration, the plaintiff "explained [to the supervisor] that [he] was still unable to sleep since the loss of [his] dog and [he] would not be able to work [his] May 28, 2014 shift." Dkt. No. 24 at ¶17.

At his July 18, 2017 deposition, the plaintiff indicated that he had not taped this call, dkt. no. 18-1 at p. 96 of the transcript, so there is no way to know who said what to whom. The defendant argues that the plaintiff provided no information about the identity of the supervisor to whom he spoke, and that

regardless, the plaintiff has not provided anything other than his own testimony as to the contents of this call. Dkt. No. 26 at ¶14.

The plaintiff did not report to work for his May 28 shift and the defendant assessed him an attendance point. Dkt. No. 27 at ¶39.

In his deposition, the plaintiff testified that he sought an appointment at a clinic on May 28, 2014, because "[he] hadn't slept in days." Dkt. No. 18-1 at p. 98 of the transcript. He explained:

> [the clinic] tried to get me in there that afternoon (May 28) before I was scheduled to work, but they didn't have any openings unless somebody canceled out. Otherwise, they said, you know, go to the ER.
>
> And I said, well, I'm not going to go [to] the ER for something that has to with – it's not an emergency thing. It's just something I haven't been able to sleep in days and couldn't understand why.

Id. at pp. 98-99 of the transcript.

The plaintiff worked his May 29 shift (which began at 11:00 p.m. on May 28 and ended at 7:00 a.m. on May 29) and, after working, visited a clinic that afternoon. Dkt. No. 27 at ¶42. At the clinic, the plaintiff saw Nurse Practitioner Theresa J. Baseley, who gave the plaintiff some laxatives and a sleeping pill. Dkt. No. 27, ¶43; Dkt. No. 24-9 at 1. The note from the nurse practitioner asked the defendant to excuse his absence on May 28. Dkt. No. 26, ¶19. The note read:

> This is to certify that Joseph was seen in the clinic on 5/29/2014. Please excuse Joseph from missed work May 28th.

REMARK: Please excuse missed work on May 28th. Joe was in the clinic for evaluation of situational insomnia. Treatment has been initiated.

Dkt. No. 24-9.

The plaintiff provided the defendant the note "that very same day, the 29th," when he came in to work that night. Dkt. No. 18-1 at p. 116 of the transcript. The plaintiff contends that his supervisor and an HR representative initially told him that the note was acceptable and that the absence would be excused, dkt. no. 23 at ¶21, but says that he learned the following week that the note had not been accepted, and that he was supposed to go back to the health care provider to have the note back-dated to May 28, 2017 (the date he was absent), dkt. no. 23 at ¶22.

Around June 3, 2014, the plaintiff had a meeting with his supervisor. Dkt. No. 26 at ¶39. At that meeting, he received a final written warning, dated May 30, 2014 (the day after his visit to the clinic). Id. The warning advised the plaintiff that between February 7, 2014 and May 28, 2014, he had been absent on eight occasions, and had accrued 6.5 absence points. Dkt. No. 24-4. The warning informed the plaintiff that if he reached 8 points, his employment would be terminated. Id. The 6.5 absence points included 1 point for the May 28, 2014 absence. Id.

2.    *August 20—25, 2014 absences*

The plaintiff injured his back at work on July 15, 2014. Dkt. No. 26 at ¶44. He indicates that he told his supervisor about this injury, but when the supervisor suggested that he go to occupational health, the plaintiff "declined,

7

stating that he only had an hour and a half left on his shift and he just needed to slow down." Id.

That same day, after his shift ended, the plaintiff began to suffer severe back spasms, and asked his girlfriend to take him to the doctor. Id. at ¶45. He saw a doctor about 1:30 p.m. on the 15th, and she put him on bed rest. Id. at ¶46. The plaintiff says that he immediately provided the doctor's note to the defendant; the note explained the injury, and asked the defendant to excuse the defendant from work July 15 through July 17. Id. The plaintiff alleges that the defendant did accept the note, "but registered his absences as DMAs, which used up his entire allotment for the year." Id. The plaintiff explains that "DMA" stands for "documented medical absence." Id. at ¶63. In the complaint, the plaintiff alleged that the defendant recorded this three-day absence as three events, rather than one. Dkt. No. 1 at ¶15. In his proposed findings, the plaintiff asserts that the defendant "should have counted those missed days as otherwise excused medical leave of absence under Sec. 5.12(2) of the [collective bargaining agreement] or as FMLA leave, and those absences should have been removed from Plaintiff's absence record before his termination because the worker's compensation claim had been activated, which encompassed those absences." Dkt. No. 23 at ¶63.

On August 20, 2014, the plaintiff re-injured his back at work. Dkt. No. 26 at ¶64. This time he went to the occupational health unit, but they were unable to treat him because his back was swollen. Id. at ¶65. The occupational health unit made an appointment for the plaintiff at Aurora Health Care at

approximately 1:30 p.m. on August 20, 2014. Id. at ¶66. There, he saw a physician's assistant, Stephen Kennebeck, who diagnosed him with "a work place injury of low back strain and ruled out a return to work for at least five days and recommended bed rest." Id. at ¶67.

The plaintiff testified at his deposition that after making the diagnosis, the physician's assistant told the plaintiff that he would send the confirmation to the defendant, so that the plaintiff would not have to take it in to work. Dkt. No. 18-1 at pp. 142-143 of the transcript. The plaintiff alleged, however, that the defendant "called back" and said that the plaintiff had to drive to the defendant and hand-deliver the confirmation to the person on first shift at occupational health. Id. at p. 143 of the transcript. The plaintiff alleges that the defendant questioned the plaintiff about needing five days off from work, asking him how he would be able to go to the doctor or get medication; the plaintiff responded that his girlfriend could help him. Dkt. No. 23 at ¶71.

The plaintiff asserts that for each of the five days following August 20, 2014, the defendant's occupational health unit contacted the plaintiff's health care provider, asking if the plaintiff could return to work. Id. at ¶72. In turn, the plaintiff's health care provider asked the plaintiff if the plaintiff felt he could return to work; the plaintiff said no each day until the fifth day (August 25, 2014), when the plaintiff said yes, but only with light duty restrictions. Dkt. No. 26 at ¶73.

When the plaintiff got back to work on August 25, 2014, he had a text from his supervisor asking him to meet "in the place where [the supervisor]

usually held meetings]." Id. at ¶74. When the supervisor met with the plaintiff, the supervisor walked the plaintiff out of the building, telling the plaintiff that he had been terminated for reaching eight unexcused absences as of August 18, 2014. Id.

### 3. Other Assessed Absences

The plaintiff alleges that he was "wrongly assessed an absence point" on March 8, 2012. Dkt. No. 23 at ¶9. The defendant speculates that perhaps the 2012 date is a typographical error, and that the plaintiff meant March 8, 2014. Dkt. No. 26 at ¶9, n.1. Assuming that 2014 is the relevant year—the plaintiff asserts that the defendant should not have assessed him this point under the collective bargaining agreement because he was told not to show up by a supervisor, given that an employee with more seniority had taken the shift. When that employee failed to show, the plaintiff got an absence point. He filed a grievance with the union over that particular point; the union did not win the grievance. Dkt. No. 23 at ¶9.

The plaintiff indicates that, according to the defendant, the plaintiff called in saying that he'd be late to work his June 30, 2014 shift, and that the defendant assessed him half a point for showing up late. Id. at 40. The plaintiff asserts that the defendant produced no proof that the plaintiff called in late, id. at ¶¶41-42, but argues that even if he was late on that date, his "situational insomnia" may have played a role in his being late, id. at ¶43.

The plaintiff alleges that he was "wrongly charged with a four-hour late penalty" when his supervisor approved him to come to work at 3:00 a.m. on

August 18, 2014 and "work four hours into the next first shift to cover for an absent first shift employee, which would have still given him an 8 hour shift." Id. at ¶52.

In short, the plaintiff asserts that by August 18, 2014, the defendant had wrongly assessed him 2 absence points for the calendar year 2014.

### 4. Evidence Documenting Absences

The defendant says that it terminated the plaintiff "because he received eight attendance points, thereby authorizing termination under the applicable collective bargaining agreement." Dkt. No. 19 at 2. The plaintiff responds that "[o]nce the attendance points wrongly assessed against Plaintiff . . . are removed from his attendance record, he should not have been terminated under the terms of the collective bargaining agreement. Thus, Plaintiff has established that Defendant unlawfully interfered with his FMLA rights." Dkt. No. 22 at 13.

The plaintiff attached a chart to his declaration in opposition to the motion for summary judgment. Dkt. No. 24-3 at 5. There is no title or heading on the chart. It contains numerous hand-written notes, in different handwriting styles and different inks. It appears to show, among other things, the plaintiff's absences for 2014, with codes next to the absence dates (and, in some instances, explanations), for the period from February 17, 2014 through August 25, 2014. Id. The codes include "ILL," "UA," "LT(W)," "DMA," "(W), LE, (Z)," and "NAB." Id. There is no key to explain what the codes mean. The court cannot tell which of these absences the defendant "excused," for which it

assessed points under the collective bargaining agreement, or for which (if any) the defendant granted the plaintiff FMLA leave. The parties have not provided any documentation indicating how much FMLA leave the defendant granted the plaintiff in 2014 (or if they did, the court can't identify it).

On the chart, someone has hand-written, in red ink, numbers next to the explanations. If one assumes—a bit of a leap—that the numbers represent absence points assessed under the collective bargaining agreement, the numbers do not add up to 8. The number 5.5 appears next to February 17, 2014; the number 6.5 appears next to February 19, 2014. If one adds those numbers, it would appear that only two months into the 2014 calendar year, the plaintiff had accrued 12 absence points—that can't be right, because the collective bargaining agreement provides for termination at 8 points. If the court ignores those two notations, and starts on the next line—the March 8, 2014 absence, noted "No Call No Show—TDS," the court sees the number 1. The following line—an absence for March 28, 2014—is noted "Called going to be late. AZ." Next to that notation is the number 1.5. The court thinks— although it can't be sure—that this number represents the one point assessed for the March 8 absence, plus a half point assessed for the March 27 absence. If one tracks the remaining red numbers on the chart in that way—as a record of the accretion of half or full points for each succeeding absence—one reaches the total number of 8 on August 18, 2014. If the court is reading the chart correctly, it appears that between March 8, 2014 and August 18, 2014, the

plaintiff accrued the 8 points mandating termination under the collective bargaining agreement.

The parties appear to agree that, whether the defendant appropriately assessed all 8 points or not, the defendant recorded the plaintiff as having reached the 8-point mark on August 18, 2014. The termination letter is dated August 25, 2014. Dkt. No. 18-2 at 12.

### III.    Analysis

The plaintiff originally alleged two causes of action—discrimination under the ADAAA, and interference with his rights under the FMLA. On the last page of his brief in opposition to the motion for summary judgment—over a year after the date on which he filed the complaint—the plaintiff stated the following: "Plaintiff concedes his disability discrimination claim." Dkt. No. 22 at 13.

While this statement is less clear and specific than the court might wish, the court construes it to mean that the plaintiff does not oppose the court granting summary judgment in the defendant's favor on the plaintiff's first claim for relief, labeled "ADAAA Discrimination." Dkt. No. 3 at 4. The court will grant summary judgment in the defendant's favor on that first claim, and analyzes only the plaintiff's FMLA claims.

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). Material facts are those "facts that might affect the outcome of the suit[,]" and a dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, a court "construe[s] all factual disputes and draw[s] all reasonable inferences in favor of the non-moving party." Golla v. Office of the Chief Judge of Cook Cty., Ill., 875 F.3d 404, 407 (7th Cir. 2017) (citing Cole v. Bd. of Trs. Of N. Ill. Univ., 838 F.3d 888, 895 (7th Cir. 2016). The court's "'favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.'" Monroe v. Ind. Dep't of Transp., 871 F.3d 495, 503 (7th Cir. 2017) (quoting Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008)). "Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough to stave off summary judgment." King v. Ford Motor Company, 872 F.3d 833, 840 (7th Cir. 2017) (internal quotations and citations omitted).

At this stage, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. While it is inappropriate for the court to evaluate witness credibility, Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008), a court appropriately grants summary judgment "if [plaintiff] cannot present sufficient evidence to create a dispute of material fact regarding any essential element of [his] legal claims on which [he] bears the burden of proof."

Burton v. Bd. of Regents of Univ. of Wis. Sys., 851 F.3d 690, 694 (7th Cir. 2017) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

    B.    Standard for FMLA Claims

The FMLA "entitles eligible employees to take up to 12 work weeks of unpaid leave per year[,]" including for "'(D) the employee's own serious health condition when the condition interferes with the employee's ability to perform at work.'" Coleman v. Court of Appeals of Md., 566 U.S. 30, 34 (2012) (quoting 29 U.S.C. §2612(a)(1)). In bringing a claim under the FMLA, "[p]laintiffs bear the burden of proving their eligibility for the FMLA's protections[.]" King v. Ford Motor Company, 872 F.3d 833, 840 (7th Cir. 2017) (citing Simpson v. Office of Chief Judge of Circuit Court of Will Cty., 559 F.3d 706, 712 (7th Cir. 2009)).

The FMLA prohibits an employer from interfering with, restraining or denying an employee's exercise or attempt to exercise any right provided under the FMLA. 29 U.S.C. §2615(a)(1); Arrigo v. Link, 836 F.3d 787, 794 (7th Cir. 2016).

To prevail on a claim of FMLA interference, the plaintiff must show that

> (1) he was eligible for the FMLA protections; (2) his employer was covered by FMLA; (3) he was entitled to take leave under FMLA; (4) he provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which he was entitled.

Curtis v. Costco Wholesale Corp., 807 F.3d 215, 223 (7th Cir. 2015) (quoting James v. Hyatt Regency Chicago, 707 F.3d 775 (7th Cir. 2013)).

The defendant concedes that the plaintiff can demonstrate the first two factors—that the plaintiff was an eligible employee and that the defendant was

covered by the FMLA. Dkt. No. 19 at 7-8. The defendant disputes (a) that the plaintiff was entitled to take FMLA leave; (b) that the plaintiff provided sufficient notice of his intent to take FMLA leave; and (c) that the defendant denied the plaintiff FMLA benefits to which he was entitled.

## C.    Application of the Law to the Facts

Despite the plaintiff's discussions of other absences which resulted in the defendant assessing absence points against him under the collective bargaining agreement, his brief opposing summary judgment discusses only two incidents—the "May 28, 2014 Absence," dkt. no. 22 at 2, and the "August 20, 2014 Back Injury," dkt. no. 22 at 4. Below, the court analyzes whether the plaintiff has provided sufficient evidence to raise disputes of material fact regarding whether either of these two incidents constituted interference with his rights under the FMLA.

### 1.    The May 28, 2014 Absence

The court begins by discussing what this part of the plaintiff's claim is *not* about. The plaintiff spends a lot of time discussing the absence points system under the collective bargaining agreement between the union and the defendant. As far as the court can tell, the plaintiff believes that the defendant miscalculated (or deliberately wrongly assessed) absence points under the collective bargaining agreement. He states that if the defendant had not wrongly assessed/miscalculated certain points, he would not have accrued 8 points as of August 18, 2014—the 8 absence points that led the defendant to terminate him under that agreement.

If the plaintiff believed that the defendant terminated him in violation of the collective bargaining agreement, or that the defendant violated that agreement in calculating his absence points, the plaintiff had the ability to ask the union to pursue a grievance against the defendant. He knew how to do that—he did it for the March 8, 2014 absence point he argues was wrongfully assessed. He indicates that he "attempted" to do it for the May 28, 2014 absence, "but his union told him it was not worth filing the grievance." Dkt. No. 23 at ¶25. Whether following the grievance procedure was "worth it" or not, the fact that the plaintiff was not successful in pursuing his grievances through the union does not convert those grievances into an FMLA claim.

The plaintiff has chosen to sue the defendant under the FMLA. That is the only claim before the court—whether the defendant interfered with the plaintiff's rights under the FMLA. Discussion of the points system under the collective bargaining agreement is a red herring; to mix metaphors, it muddies the waters of the May 28, 2014 absence claim. The court will not focus on the assessment or calculation of points, but will focus solely on the elements of the FMLA as they relate to the May 28, 2014 absence.

The plaintiff argues that the defendant should have treated the May 28, 2014 absence as a medical absence (rather than assessing an absence point), because it was the result of "situational insomnia," brought about by a combination of working third shift, working a lot of overtime and suffering from emotional distress over the passing of his dog. He asserts that the defendant

17

never gave him notice of, or educated him about, his rights under the FMLA. Dkt. No. 22 at 10-11.

> a. The plaintiff has not produced sufficient evidence to show that he was entitled to FMLA leave for the May 28, 2014 absence as a matter of law.

The FMLA allows an employee to take leave for a "serious health condition" that renders the employee "unable to perform the functions" of his job. 29 U.S.C. §2612(a)(1)(D). While the FMLA itself "provides little guidance on the meaning of the phrase 'serious health condition,' the Department of Labor issued regulations addressing the meaning of this phrase pursuant to an express congressional delegation of authority to the Secretary of Labor to promulgate regulations 'necessary to carry out' the FMLA." Haefling v. United Parcel Service, Inc., 169 F.3d 494, 498 (7th Cir. 1999) (quoting 29 U.S.C. §2654). Under those regulations, a "serious health condition . . . means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in §825.114 or continuing treatment by a health care provider as defined in §825.115." 29 C.F.R. §825.113(a).

For the plaintiff to establish that he was entitled to leave under the FMLA for the May 28, 2014 absence, the plaintiff needed to show that he suffered from a "serious health condition" that involved "inpatient care" or "continuing treatment by a health care provider as defined in §825.115." 29 C.F.R. §825.113(a). Section 825.115 defines "serious health condition." There are several ways in which a condition may qualify as "serious" for FMLA purposes.

The condition may necessitate a period of incapacity and subsequent treatment:

> §825.115(a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (1) Treatment two or more times, within 30 days of the first day of incapacity . . . by a health care provider . . . .

29 C.F.R. §825.115(a)(1). The term "incapacity" is also defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 U.S.C. §825.113(b).

The health condition may be "chronic":

> §825.115(c) Chronic condition. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
>
> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
>
> (2) Continues over an extended period of time (including recurring episodes of a single underlying conditions); and
>
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. §825.115(c).

The health condition may be "permanent," or "long-term," if it is a condition "for which treatment may not be effective." 29 C.F.R. §825.115(d). For such a condition, the employee "must be under the continuing supervision of,

but need not be receiving active treatment by, a health care provider;" the regulation provides examples like Alzheimer's and a severe stroke. Finally, the condition may be one that requires "multiple treatments;" the regulation refers to restoration after a surgery or injury, or conditions creating long-term incapacity and multiple treatments, such as cancer or kidney disease. 29 C.F.R. §825.115(e).

If the plaintiff suffered from insomnia that caused him to be incapacitated more than three full, consecutive calendar days, and caused him to have two or more treatment sessions within the thirty days thereafter, his condition arguably would have been a "serious health condition" under §825.115(a). If he suffered from insomnia that required him to go to a doctor or nurse at least twice a year, and that continued over an extended period of time, his condition arguably would have been a "serious health condition" under §825.115(c). But the question of "[w]hether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." Haefling, 169 F.3d at 499. And therein lies the plaintiff's problem.

The plaintiff contends that he

> has shown that he suffered from a chronic serious health condition, situational insomnia, that was related to his working third shift together with the 218 hours of overtime he had worked through the mid-July 2014. [PFOF ¶11] Plaintiff was treated for situational insomnia after being incapacitated for both his May 27, 2014 (took vacation time) and May 28, 2014 (called in sick) shifts as well as the two prior weekend days when he was not

20

> scheduled to work, and that treatment continued for at
> least 45 days. [PFOF ¶¶15-17]

Dkt. No. 22 at 9.

The only proof in the record that the defendant had a "chronic" condition "related to his working third shift together with the 218 hours of overtime he had worked through" mid-July 2014, or that he obtained treatment that "continued for at least 45 days," is the plaintiff's own word, in his deposition testimony and in his declaration. See Dkt. No. 23 at ¶11 (citing dkt. no. 18-1 at 9; dkt. no. 24 at ¶22.); at ¶15 (citing dkt. no. 18-1 at 28; dkt. no. 24 at ¶17); at ¶16 (citing dkt. no. 18-1 at 32; dkt. no. 24 at ¶19-21). The plaintiff's declaration is what is known as a "self-serving affidavit." Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004). A self-serving affidavit *can* defeat a motion for summary judgment, if it is "supported by facts in the record." Id. (citing Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003). This plaintiff's self-serving affidavit is not supported by any other facts in the record.

The record contains a letter dated May 29, 2014 from Theresa J. Baseley, a nurse at the Aurora Health Center North in Fond du Lac. Dkt. No. 18-2 at 8. Nurse Baseley reported that the plaintiff was "seen" in the clinic on that date, "for evaluation of situational insomnia." Id. She asked that he be excused from work *for that day*, and indicated that "[t]reatment has been initiated." Id. (emphasis added). On April 10, 2017, the plaintiff filed his expert witness disclosures—not in connection with the summary judgment pleadings, but as required by the court's December 5, 2016 scheduling order (dkt. no. 10). Dkt. No. 14. The plaintiff listed Nurse Baseley as an expert witness, stating that she

"w[ould] testify as to a note she wrote asking that Plaintiff be excused from work he missed on May 28, 2013. She will also testify as to Plaintiff's progress and prognosis." Dkt. No. 14 at 3. The plaintiff has not provided any expert witness report from Nurse Baseley, nor has he provided progress reports, prognoses or any evidence that he ever saw Nurse Baseley again.

At his deposition, the plaintiff acknowledged that he did not go to the emergency room for treatment of the insomnia that kept him from work on May 28, 2014, nor did he think such care was necessary. Dkt. No. 18-1 at 28 ("I'm not going to go [to] the ER for something that has to with – it's not an emergency thing."). The record contains no evidence that the plaintiff sought, or obtained, medical attention for the insomnia, other than his one visit to Nurse Baseley—no prescriptions, no treatment reports, nothing to support the statements in his declaration.

Even viewing the evidence in the light most favorable to the plaintiff, the court cannot conclude that the plaintiff has presented evidence sufficient to raise a dispute as to an issue of material fact. The note from Nurse Baseley indicates only that plaintiff should be excused from work on May 28, 2014—it does not state that he was unable to perform the functions of his job. It references only one day—May 28, 2014. Even if the court were to credit the plaintiff's assertion that he took off the preceding day, May 27, 2014, because of the insomnia (despite asking for a vacation day that day, and not mentioning his dog's passing or the insomnia), the plaintiff missed, at most, two consecutive days due to his insomnia. The nurse's letter does not categorize the

insomnia as chronic, or say whether she expected it to continue. There is no evidence to support the plaintiff's statement that he had been suffering from intermittent, shift-related insomnia for months.

The plaintiff has demonstrated only that he missed one—possibly two—days of work because of "situational" insomnia; even accepting that he missed two days, the evidence is not sufficient as a matter of law to raise a question of fact about whether the plaintiff's May 28, 2014 absence was the result of a serious health condition that rendered him unable to perform daily functions.

      b.  The plaintiff has not produced sufficient evidence to show that he provided the defendant with sufficient notice of the May 28, 2014 absence as a matter of law.

Because the court finds that the plaintiff has not presented sufficient evidence with regard to the third element of an FMLA interference claim, it need go no further in its analysis of the May 28, 2014 absence. The court notes, however, that the plaintiff could not demonstrate the fourth element of an FMLA interference claim—that he gave sufficient notice to his employer of his intent to take FMLA leave.

The regulations promulgated in support of the FMLA explain what an employer must do to let employees know about their rights under the FMLA. 29 C.F.R. §825.300(a)(1) requires employers to post on the premises—where employees can see it—a notice explaining the provisions of the FMLA. Section 825.300(a)(3) also requires the employer to put the information in employee handbooks or other written guidance, or by giving the employee a written notice upon hiring (on paper, or electronically). When an employee asks for

leave under the FMLA, or "when the employer acquires knowledge that an employee's leave may be for an FMLA—qualifying reason," the employer has to notify the employee of his eligibility for FMLA leave within five business days. 29 C.F.R. §825.300(b)(1). The regulations specify that the notice must contain certain information, and if the employee isn't eligible for FMLA leave, the notice has to explain why. 29 C.F.R. §825.300(b)(2).

The plaintiff alleged in the complaint that the defendant never "notified Plaintiff that he could take FMLA leave for his own serious health condition absences or offered him FMLA leave." Dkt. No. 1 at ¶25. In his proposed findings of fact, the plaintiff stated that "in May 2014," he "heard from a coworker . . . who had applied for FMLA leave for absences for eye surgery and was going to get his absences excused and get paid for them." Dkt. No. 23 at ¶29. He stated that he "then heard from this coworker that because he had only missed two days due to his surgery, he was not going to get FMLA leave." Id. at ¶30. (In his deposition, the plaintiff indicated that the co-worker had told the plaintiff that the co-worker was going to take three days off for the surgery, but that because the co-worker "came back and worked the third day," the defendant had denied the co-worker the FMLA leave. Dkt. No. 18-1 at p. 26 of the transcript.) The plaintiff asserts that this conversation was the first he'd heard of the FMLA, dkt. no. 23 at ¶32; that the defendant did not ever give him any information about the FMLA, id. at ¶33; that he was not "provided" with a copy of the defendant's FMLA policy, id. at ¶34; and that he "never read any of the posters on bulletin boards in Defendant's factory," id. at ¶35.

The defendant admits for the purposes of summary judgment that it didn't provide the plaintiff directly with information about his FMLA rights, or provide him with a copy of its FMLA policy (assuming it had a written policy). Dkt. No. 26 at ¶¶33, 34. That admission does not mean that the defendant committed a technical violation of the FMLA—it appears that the defendant did have posters up on its premises, as required by §825.300(a)(1) (although the plaintiff did not read them). And the regulations require the defendant to provide the plaintiff with the required notices only "when the employer acquires knowledge that an employee's leave may be for an FMLA—qualifying reason." There is a factual question as to whether the defendant committed a technical violation of the FMLA regulations.

But that factual question must be material in order to survive summary judgment. Even if a plaintiff can demonstrate a technical violation of the FMLA, the plaintiff still must prove that the violation prejudiced him in order to prove an interference claim. Ridings v. Riverside Medical Center, 537 F.3d 755, 764 (7th Cir. 2008) (citation omitted). Again, it is not entirely clear, but it appears that the plaintiff raises the defendant's alleged technical failures to show why he did not ask for FMLA leave. The regulations do not require a plaintiff to request FMLA leave; the employer must provide the notifications "when the employer acquires knowledge that an employee's leave may be for an FMLA—qualifying reason." 29 C.F.R. §825.300(b)(1).

The plaintiff asserts that in May of 2014, he was suffering from insomnia induced by having to work third shift (to which he was not accustomed) and

working a large number of overtime hours, and that this was exacerbated by the emotional distress of losing his dog. Dkt. No. 23 at ¶¶11-12. The plaintiff asserted that he called his supervisor on Monday night, May 26, 2014, and asked for a vacation day. Id. at ¶10. He says that the reason he asked for the vacation day was that he was upset about the loss of the dog, but he concedes that he did not tell the supervisor how upset he was, or that he had not been able to sleep since the dog had passed. Id. So as of May 26, 2014, all the defendant knew was that the plaintiff had asked for a vacation day.

The plaintiff called his supervisor the next night—May 27, 2014. This call was taped; in it, the plaintiff asked his supervisor to give him a call before the end of the night if the supervisor got a chance, stating that he was having a hard time with having had to put the dog to sleep. Id. at ¶13. The plaintiff mentions more than once in the brief voice mail message that he was having a hard time. He does not mention insomnia. Id. As discussed above, the plaintiff avers—without any supporting evidence in the record—that when the supervisor called him back, "Plaintiff told him that he had not slept for days and that he could not work his May 28, 2014 shift." Id. at ¶15.

Finally, on May 29, 2014, the plaintiff provided the defendant with the note from Nurse Baseley, asking that his May 28, 2014 absence be excused because he was being "evaluated for situational insomnia," and saying that treatment had been initiated. Id. at ¶¶18, 19.

The question, then, is whether the undisputed evidence shows that the defendant had acquired knowledge that the plaintiff's May 28, 2014 leave

might have been for an FMLA-qualifying reason—in other words, for a serious health condition. The defendant had the following knowledge:

* That the plaintiff had asked, on May 26, 2014, to take May 27, 2014 as a vacation day;

* That on the night of May 27, 2014, the plaintiff left a voice mail that he was having a hard time with the fact that he had to put his dog down;

* That on May 29, 2014, the defendant received a medical note indicating that the plaintiff had seen a nurse the day before to be evaluated for "situational insomnia," and that treatment had begun.

In addition, the plaintiff alleges that when his supervisor called him back on May 27, 2014, he told the supervisor that he hadn't slept for days.[2]

At most, the facts support a conclusion that the defendant knew that the plaintiff was distraught over his dog, and that the plaintiff had indicated that he had not "slept for days." While it is possible that the plaintiff did have intermittent situational insomnia that constituted a serious medical condition, the information he provided the defendant did not indicate that. The plaintiff did not notify his supervisor that he suffered from insomnia. He did not

---

[2] The plaintiff stated in his opposition brief that he had put the defendant on notice that "he had not been able to sleep in days, was incapacitated for two work days (May 27 and May 28) and two weekend days, and sought treatment on at least one occasion that resulted in continuing treatment over a period of 45 days." Dkt. No. 22 at 9. The record does not support this assertion. There is no evidence that the defendant knew the plaintiff had been "incapacitated" on May 27, 2014; he asked for vacation leave that day, with no mention of the dog or sleeplessness. There is no evidence, other than the plaintiff's unsupported declaration, that the defendant knew the plaintiff had been incapacitated for two weekend days, or that the defendant knew that the plaintiff had had forty-five days of treatment.

indicate that he had been diagnosed with insomnia. All he said was that he hadn't slept for days (without specifying how many), after which he provided a note indicating that he'd been evaluated for "situational insomnia" and started treatment.

The Seventh Circuit has held that when an employee gives an employer notice that he is seeking FMLA leave, the notice "must succeed in alerting the employer to the seriousness of the health condition." de la Rama v. Ill. Dept. of Human Serv's, 541 F.3d 681, 687 (7th Cir. 2008) (citation omitted). Even a doctor's note is insufficient "if the note does not convey the seriousness of [the plaintiff's] medical condition." Id. (citation omitted). The plaintiff asked for one day of leave, because of his grief over his dog and the fact that he "hadn't slept for days," and later provided a note saying that he'd been evaluated for a situational event that had been treated. This evidence, even viewed in the light most favorable to the plaintiff, was not sufficient to put the defendant on notice that the plaintiff's May 28, 2014 absence was occasioned by a "serious health condition."

For these reasons, the court will grant summary judgment in favor of the defendant as to the May 28, 2014 absence.

### 2. The August 20-25, 2014 Absences

The plaintiff missed five days of work from August 20 through 25, 2014, after re-injuring his back. He spends less than one page in his brief in opposition for summary judgment arguing that the defendant should have

granted him FMLA leave for that five-day absence. Dkt. No. 22 at 11-12. He states that:

> [f]or most of the same reasons that that [sic] Plaintiff has satisfied the five elements of his FMLA interference claim against Defendant on the May 28, 2014 absence, he also satisfies those elements with respect to his August 20, 2014 absences. Plaintiff's August 20, 2014 back injury certainly qualified as a serious health condition under the Act as he was incapacitated for more than three consecutive days, had more than one appointment with his health care provider and was on a continuation of case. [PFOF ¶¶64-73]

Dkt. No. 22 at 11.

The defendant responded that it was "perplexed" by this position, because "regardless whether the absences due to his back could have been approved under the FMLA, plaintiff has agreed that he was never assessed points under the plant's attendance rules due to any missed time related to such a condition, and that all such absences were excused." Dkt. No. 34 at 5. The defendant asserts that the plaintiff has acknowledged that "he reached eight unexcused absence points prior to his August 20 back injury," id., referring to the plaintiff's proposed findings of fact. (The plaintiff did not exactly acknowledge that he reached eight absences prior to August 20; he stated that when he appeared for work on August 25, 2014, his supervisor "told him he was terminated for reaching eight unexcused absences on August 18, 2014." Dkt. No. 23 at ¶74.)

The parties' focus on the collective bargaining agreement's absence points system was not relevant to the analysis of whether the defendant interfered with the plaintiff's FMLA rights as to the May 28, 2014 absence. It is

relevant, however, to the question of whether the defendant interfered with the plaintiff's FMLA rights regarding the August 20-25, 2014 absences—particularly to the question of whether any alleged interference with the plaintiff's FMLA rights prejudiced him.

As noted above, the parties agree that on August 18, 2014—two days before the plaintiff re-injured his back—the defendant assessed him his eighth absence point. This means that as of August 18, 2014, the defendant had arguable grounds under the collective bargaining agreement to terminate the plaintiff, and the defendant *did* exercise its authority and terminate him one week later. Thus, the plaintiff was a "lame duck" from August 18 through August 25, 2014. He no longer had a job, although the defendant had not yet informed him of that fact.

Even if the plaintiff was entitled to take leave under FMLA for the five days in August he was off due to his back injury, and even if his communications with the defendant about the injury provided the defendant with sufficient notice of his intent to take FMLA leave, and even if the defendant denied him FMLA leave for those days, he cannot demonstrate that he was prejudiced. See Ridings v. Riverside Medical Center, 537 F.3d 755, 764 (7th Cir. 2008).

The court perceives that *this* is why the plaintiff spends so much time disputing point assessments under the collective bargaining agreement. The plaintiff implies that if the defendant had not wrongly assessed him two absence points for the March 8, June 30 and August 18 incidents, he would

have accrued only 6 absence points as of August 20 (the day he reinjured his back). If that had been the case, it would have mattered to him whether the defendant treated his five days off as FMLA leave, so that any other sources of leave for future injuries or absences would not be depleted. The plaintiff seeks to convince the court that it should assume, for the sake of his FMLA claim, that he was not eligible for termination on August 18, 2014, and thus that he was prejudiced by the defendant denying him FMLA leave (if it did—that is not clear).

Even if the parties dispute whether the defendant correctly assessed the absence points,[3] the plaintiff did not plead that dispute, and the court has no statutory or legal framework in which to resolve it. The parties do not dispute that the defendant had assessed 8points as of August 18, 2014. They do not dispute that the collective bargaining agreement provided for termination once

---

[3] The court can't tell whether the parties have an actual dispute over whether the defendant accurately calculated the plaintiff's absence points. The plaintiff says the defendant wrongly assessed him a point for his March 8, 2014 absence, dkt. no. 23 at ¶9; the defendant gives a non-response response, stating that the plaintiff has not "challenged the fact that his absence on March 8, 2014 was not for a serious health condition, and it therefore has no bearing on his sole remaining claim for FMLA interference," dkt. no. 26 at ¶9. The plaintiff asserts that he has no recollection of calling in saying he was going to be late for his June 30, 2014 shift (for which the defendant assessed him half a point), dkt. no. 23 at ¶40; the defendant responds that failure to recall doesn't mean the event didn't happen, dkt. no. 26 at ¶40. The plaintiff says that even if he was late that day, it could have been related to the insomnia, dkt. no. 23 at ¶43; the defendant reiterates that the plaintiff has produced no evidence that he was being treated for insomnia, and didn't tell the defendant that that was the reason he'd be late, dkt. no. 26 at ¶43. Finally, the plaintiff says that he was wrongly assessed a half point on August 18, 2014, dkt. no. 23 at ¶52; the defendant responds that the plaintiff has produced no evidence to show that he had been approved to come in late on August 18, dkt. no. 26 at ¶52.

an employee had accrued 8 points. They do not dispute that the defendant terminated the plaintiff for accruing too many absence points. *Those* are the facts the court must accept as true, and given those facts, the plaintiff cannot prove prejudice as a matter of law.

Even more perplexing, the plaintiff spent time discussing a back injury that he suffered on July 15, 2014, which caused him to be off work from July 15-17, 2014. It is undisputed that the defendant did not assess any absence points under the collective bargaining agreement for these three days. The plaintiff asserts, however, that if the defendant had not assessed him a "DMA"—a documented medical absence—for each of those days, it would have freed up three "DMAs" for him to use on other occasions. See Dkt. No. 23 at ¶¶46, 62. He says that those three days "should also have potentially qualified for FMLA leave, which would have left Plaintiff with three DMA's to use for other absences. Dkt. No. 23 at ¶62. He asserts, for various reasons having to do with the collective bargaining agreement, that the defendant "should have counted those missed days as otherwise excused medical leave of absence under Sec. 5.12(2) of the CBA or as FMLA leave, and those absences should have been removed from Plaintiff's absence record before his termination because the worker's compensation claim had been activated, which encompassed those absences." Id. at ¶63.

The plaintiff presented no evidence to show that he was entitled to take FMLA leave for these three days. He presented no evidence regarding what kind of notice he gave the defendant that he intended to take that leave. He asserts

only that these three days were "potentially" entitled to FMLA leave. Even if the defendant violated the FMLA by not granting the plaintiff FMLA for those three days, he cannot demonstrate that he was prejudiced by that denial, given the fact that he was fired a month later for excessive absence points (which did not include points for these three days).

## IV.    Conclusion

The plaintiff does not allege that he was fired for taking medical leave—he does not dispute that he was terminated for accruing 8 absence points under the collective bargaining agreement. He alleges that the defendant should have granted him FMLA leave for an absence that resulted in one of those points, but has not produced sufficient evidence to raise a genuine dispute as to an issue of material fact regarding whether he suffered from a serious medical condition on that date, or to show that the defendant had reason to know that he suffered from a serious medical condition on that date. He alleges that the defendant "potentially" could have treated three days in July—which did not result in absence points under the collective bargaining agreement—as FMLA leave, which would have freed up more company sick leave time for him, but he presented no evidence regarding the elements of the FMLA regarding this assertions. Finally, he argues that the defendant should have granted him FMLA leave for five additional days in August, but cannot show prejudice from that denial because by that time, he was subject to termination.

The plaintiff has not presented sufficient evidence to raise a genuine issue of material fact with regard to this FMLA claim. The defendant is entitled to judgment as a matter of law.

## IV.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment, as to both counts of the complaint. Dkt. No. 18. The court **ORDERS** that this case is **DISMISSED**. The court will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 22nd day of December, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**